# EXHIBIT H

Vinson&Elkins

Alden L. Atkins aatkins@velaw.com
**Tel +**1.202.639.6613 **Fax +**1.202.879.8813

March 16, 2021

**Via Email**

Sarah R. LaFreniere
Hausfeld LLP
888 16th Street N.W.
Suite 300
Washington, DC 20006

Re: Defendants' methodologies for technology assisted review ("TAR")
*In re Diisocyanates Antitrust Litigation,* MDL No. 2862

Dear Counsel:

I write to follow up regarding our meet and confer on March 12, 2021 regarding Domestic Defendants' disclosed TAR methodologies and to respond to your letter dated March 4, 2021.

As I mentioned during our meet and confer, until our discussion Defendants had understood that Plaintiffs' concern was principally regarding Defendants' proposed estimation sample methodology—as you asserted in your letter that "Defendants' statistical measure for deriving the richness sample will yield a large margin of error." As you noted, some Defendants had proposed initiating a review using an estimation/richness sample of a size derived based on a 95% confidence level and a 5% margin of error. To address Plaintiffs' concerns in this respect, Defendants agreed to employ a 2% margin of error. We and our discovery vendors expected that this would address nearly all of the concerns in your letter. As explained below, employing a 2% margin of error would provide a more precise, statistically reliable estimate of the number of responsive documents in the population of documents that form the TAR review set, which would guide the Defendants as they conducted the review.

We were surprised to learn during the meet and confer that Plaintiffs' objection to Defendants' disclosed TAR methodologies goes far beyond the proposed margin of error. In fact, we learned that Plaintiffs want to impose on Defendants a procedure that would be performed without the slightest idea at the start of the process how many responsive documents are in the review population. Rather than perform a statistically reliable estimate at the outset of the number of responsive documents in the review population, Plaintiffs dismiss the significance of this step and insist that Defendants' review stop only upon reaching arbitrary level of responsive documents found in the queue without the slightest regard for whether a generally accepted recall rate had been achieved. Then, Plaintiffs want Defendants to use a

**Vinson & Elkins LLP Attorneys at Law**
Austin Dallas Dubai Houston London New York
Richmond Riyadh San Francisco Tokyo Washington

2200 Pennsylvania Avenue NW, Suite 500 West
Washington, DC 20037-1701
**Tel** +1.202.639.6500 **Fax** +1.202.639.6604 velaw.com

fictitious construct that you incorrectly label "recall," but which bears no resemblance to generally accepted definitions of recall and does not provide a statistically meaningful measurement of anything.[1] Plaintiffs' proposed procedures are arbitrary and ignore commonly accepted principles of statistics.

Defendants have proposed a straight-forward process that is widely accepted in the industry. It uses robust statistical methods to inform each Defendant at the outset how many responsive documents it expects to find, and then uses additional robust statistical techniques and objective criteria to determine when they have reviewed and produced a reasonable number of those documents. At a high level, Defendants propose to:

1. Define the "TAR review set" by applying agreed search terms to the data corpus and removing documents not suitable for TAR.

2. Review a statistically significant, randomly-generated sample set of documents from the TAR review set ("Richness/Estimation Sample"). This sample would be designed to achieve at least a 95% confidence level with a 2% margin of error.

3. Train the TAR predictive model, which would then score documents within the TAR review set to indicate a likelihood of responsiveness.

4. Review documents until each Defendant reasonably believes it has achieved a targeted recall rate of approximately 70%, which Plaintiffs agreed was a reasonable, well accepted recall target.

5. Validate, using a randomly drawn sample with 95% confidence and 2% margin of error from the unreviewed documents in the TAR review set to determine with a high degree of statistical confidence that the targeted recall rate was actually achieved against the entire corpus of documents in the TAR review set. (Or continue reviewing until the targeted Recall rate has been achieved.)

As set forth below, each Domestic Defendant's methods for implementing these steps are based objective, statistically reliable criteria.

---

[1] *Compare* Appendix A of Plaintiffs' February 19, 2021 letter (describing a multi-step "Recall Estimation Process") *with* Maura R. Grossman and Gordon V. Cormack, *The Grossman-Cormack Glossary of Technology-Assisted Review, with Foreword by John M. Facciola, U.S. Magistrate Judge*, 2013 Fed. Cts. L. Rev. 7 (January 2013), at 27 ("Recall: The fraction of Relevant Documents that are identified as Relevant by a search or review effort.")

***Richness/Estimation Sample***

We do not believe we are at issue on the methodology to determine a richness/estimation sample. To reiterate, Domestic Defendants agree to sample to a statistical confidence level of 95%, with a margin of error of +/- 2%.[2] We agree that the sample size would be approximately 2,400 documents, which is enough to achieve that high degree of statistical confidence and low margin of error.

During the call, however, you claimed—for the first time—that this procedure still would be neither robust nor valid because the Richness/Estimation Sample would be based on the TAR review set rather than the entire raw collection of documents before the application of search terms. However, it is widely accepted that the Richness/Estimation Sample can and should be based on the population of documents being reviewed, after search terms have culled non-responsive documents. Further, it would be statistically meaningless to perform the sample on the raw collection of documents when the review is being performed on a different set of documents. Statistical techniques measuring the characteristics of one set of documents cannot be used to estimate the number of responsive documents located in a different set of documents.

We asked whether Plaintiffs could identify any other reasons to question the reliability of a Richness/Estimation Sample with a 95% confidence level and a margin of error of +/- 2%, and you did not identify any. Please confirm whether the parties remain at issue with respect to Defendants' proposed Richness/Estimation Sample procedure.

***Stopping Criteria/Validation***

Plaintiffs also objected to Defendants' proposed stopping criteria and validation. Plaintiffs accurately state in their March 4 letter that some Defendants "propose to stop the review once 'the responsiveness rate of the documents being reviewed meets or falls below the expected prevalence for the entire review population.'" While this is true with respect to The Dow Chemical Company, for others, such as Wanhua Chemical (America) Co., Ltd., and BASF Corporation, the review will stop (and the

---

[2] Plaintiffs' March 4 letter presented a hypothetical in which a +/-5% margin of error would mean that the actual number of responsive documents in a population with a richness of 10% would be between 50,000 and 150,000. In reality, the margin of error depends on the richness point estimate; that is, mathematically, the margin of error reaches its highest level only when, point estimate of richness is 50%. As we explained, with a sample designed to achieve a +/- 2% margin of error would actually be 1.12% at a 10% richness. This means that one would be 95% confident that the actual number of responsive documents in the review set is between 88,000 and 112,000, a reasonable and narrow margin.

validation procedures will begin) once the number of responsive documents identified meets or exceeds the target recall. These are both valid stopping criteria.

As the 2019 EDRM Technology Assisted Review (TAR) Guidelines ("TAR Guidelines") note,

> TAR typically ends with validation to determine its effectiveness. Ultimately, the validation of TAR is based on reasonableness and on proportionality considerations: How much could the result be improved by further review and at what cost? To that end, what is the value of the relevant information that may be found by further review versus the additional review effort required to find that information?[3]

Plaintiffs reject these proportionality principles in favor of remote hypotheticals – i.e., what if the richness sample estimates 10% prevalence, Defendants reach the statistically-dictated review goals, but then "the next 10,000 documents in the review queue have a high richness, e.g. 90%, then Defendants stopping criteria would ignore those responsive documents. . . ." Plaintiffs ask for our "justification for potentially cutting off review" given the hypothetical possibility of such an event. The justification is simple: All of the Defendants plan to use TAR 2.0, where the system is trained to push documents most likely to be responsive to the front of the queue. By the time the party has reached an acceptable level of recall of 70%—*i.e.*, 70% of the estimated responsive documents have been found—relatively few of the next tranche of documents are likely to be responsive. While it is theoretically possible to have achieved a recall rate of 70% and the next tranche of documents be 90% responsive, the probability of that occurring is infinitesimal. The point of performing the statistical tests Defendants propose is to have a mathematically reliable method to be confident that your hypothetical would not occur.[4] Put another way, the possibility that 90% of the next 10,000 documents could be responsive is so remote that the burden of continuing the review outweighs the likely, statistically reliable benefits of doing so.

As the TAR Guidelines note, there are "two primary approaches to estimating the extent to which TAR has found relevant documents":

> One common approach involves taking a random sample of the TAR set, reviewing it for relevancy, identifying the relevant documents, and then determining the percentage of documents that are relevant from this sample.

---

[3] EDRM/Duke Law, Technology Assisted Review (TAR) Guidelines, January 2019, ***available at*** https://edrm.net/wp-content/uploads/2019/02/TAR-Guidelines-Final.pdf, at 6.

[4] Further, the procedure Plaintiffs propose is subject to the same criticism. It is also theoretically possible that a party could reach the stopping criteria you have proposed—a prevalence rate of 5% to 10%--and the next tranche could be 90% responsive.

> By examining how this sample of relevant documents is categorized by TAR, the recall of the review can be estimated.
>
> The second method of determining recall involves drawing a random sample from the documents in the predicted nonrelevant set. The sample is used to estimate the richness of the predicted nonrelevant set, sometimes called the "elusion rate" of responsive documents in the predicted nonrelevant set. The elusion rate can be used to estimate the number of relevant documents in the nonrelevant set. This measurement can be used to calculate recall when used with other measurements, such as the number of estimated or actual responsive documents in the responsive TAR set (depending on workflow).[5]

The Defendants proposed TAR methodologies that incorporate one or both of these well-accepted methodologies. Plaintiffs do not.

Rather, Plaintiffs propose a different set of criteria: "review should stop when the last few batches of documents identified by TAR for human review contains no more than five to ten percent responsive documents, and none of the responsive documents is novel and/or more than marginally relevant." The "no more than five to ten percent responsive" metric is arbitrary. It is tied to no objective criteria or recognized statistical measures. Most importantly, it is not connected in any way to whether Defendants have located a reasonably acceptable number of the responsive documents estimated to be in the set. Further, Plaintiffs introduce additional arbitrary and vague concepts such as "novel" and "marginally relevant." During our meet and confer, you stated that Plaintiffs believe the Parties could reach agreement on what these terms mean at the appropriate time. But it is inappropriate for Plaintiffs to dictate how Defendants might identify "novel" or "marginally relevant" documents. Indeed, the entire review process is aimed at identifying documents that are *responsive*, not those that are "novel" or "marginally relevant," and as the Sedona Principles recognize, a responding party is in the best position to determine how to locate and produce responsive documents from its files. In any event, Defendants do not share Plaintiffs' optimism that objective criteria could be agreed for inherently subjective determinations given the protracted negotiations to date. Defendants anticipate numerous, time-consuming disputes about whether a particular document is so "novel" that Defendants would have to continue the review, even though their targets have been achieved by all reasonable criteria. Defendants prefer—and industry standards and

[5] TAR Guidelines, *supra* note 3, at 25.

caselaw dictate—that the Parties set clearly defined, objective, and empirically-based goals, and transparently disclose when those goals have been met.

Further, Plaintiffs insist on the "Validation Protocol," specified in their February 19, 2021 letter, that envisions combining four "subcollections" of assorted arbitrary composition—including documents from the "Delta Set" of "documents that were not included in the TAR Review Set"—preparation of a table listing each of the 5,000 documents in the "Validation Sample," and an assessment of whether "the recall estimate and the samples indicate that Subcollections (2), (3), and/or (4) still contain a substantial number of novel, non-marginal, or non-duplicative responsive documents as compared to Subcollection (1)." To be frank, Defendants' e-discovery vendors, statisticians, and TAR experts were confounded by this proposal. Not only is the comparison of sampling across these four populations of different characteristics and composition statistically meaningless, it offers *nothing* beyond the stopping and validation measures Defendants have outlined. Plaintiffs' appendix has a formula that combines these four different measures into a single figure, which Plaintiffs call "recall," but that number bears no resemblance to the widely used definition of recall for TAR. Further, the procedure invites disputes about the responsiveness determinations made during the Validation Protocol, again improperly injecting Plaintiffs into Defendants' review process and adding delays and burdens to the completion of the document production. As explained above, Defendants intend to perform, consistent with well-established industry standards, a **robust statistical analysis to confirm that, in relation to the entire TAR corpus, the minimum recall is equal to or higher than the defined stopping criteria.**

***Additional Matters***

At the conclusion of Plaintiffs' March 4 letter, Plaintiffs ask for responses to the following questions. Please find our responses below.

1. **Will Defendants create an independent, manual review process for documents not suited to TAR such as photographs, audio files, certain spreadsheets, and the like?**

   **Relatedly, will Defendants apply TAR to text messages, or review them independently?**

<u>Response:</u> Defendants will determine how to assess the responsiveness of documents not suited for TAR, consistent with our obligations under the Federal Rules. Each Defendant will independently determine whether to use TAR in conjunction with the review of text messages, based on the software and review tools they are using.

**2. Will Defendants disclose the types of "junk" files removed from the review population?**

Response: Yes; Defendants will disclose this information.

**3. Will Defendants allow Plaintiffs to provide documents that will be used as training samples?**

Response: Defendants are still considering this request. During our call, we asked what documents Plaintiffs proposed to use. We asked whether Plaintiffs intended to create fictitious documents as examples of what they wish they would find in the documents. Defendants made clear that they will not agree to the use of fictitious documents. Defendants also asked if Plaintiffs intended to limit the documents to ones that were actually once in a Defendant's possession. We discussed, for example, whether Plaintiffs might use a document found in one Defendant's files as a training document for another Defendant, even if there is no reason to believe the document was ever in the second Defendant's files. You indicated that Plaintiffs needed to further evaluate the types of documents they were considering for the proposed training samples. Consistent with the Parties' discussion, please tell us the types of documents Plaintiffs have in mind, and whether they intend to ask a Defendant to use a document that was never in its possession.

**4. Will Defendants commit to collecting certain categories of documents responsive to Plaintiffs' RFPS and not conductive to search terms or TAR? Likewise, will Defendants produce known responsive documents (i.e. those documents known to Defendants or their Counsel to be responsive, regardless of the method of identification)?**

Response: We understand that this refers to so-called "go get" documents, which Plaintiffs are discussing with each Defendant individually. Each Defendant has agreed to produce materials responsive to Plaintiffs' requests as modified during meet and confers, subject to the proportionality standards of Rule 26. The details of how each Defendant intends to locate responsive documents is up to each Defendant and may vary among Defendants. Again, as the Sedona Principles recognize, a responding party is in the best position to determine how to locate and produce responsive documents from its files. Plaintiffs have no right to dictate how Defendants will locate and produce responsive documents. Speaking for Wanhua Chemical (America) Co., Ltd., we anticipate that most of the documents responsive to the type of requests you have identified will be in the custodial files we are collecting. Once we have analyzed that data, we will consider the best way to locate and produce the responsive documents.



        Sincerely,

        /s/ Alden L. Atkins

        Alden L. Atkins

Cc:    Megan E. Jones
        Jason S. Hartley
        William Pietragallo, II