# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: DIISOCYANATES ANTITRUST LITIGATION<br><br>This Document Relates to All Actions | Master Docket Misc. No. 18-1001<br><br>MDL No. 2862 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL DEFENDANTS PRE-TAR APPLICATION OF DISPUTED SEARCH TERMS**

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................... 1

II.  SEARCH TERMS ......................................................................................................... 3

     A.   Impact of Search Terms on TAR ...................................................................... 3

III. STATEMENT OF RELIEF SOUGHT........................................................................... 3

IV.  BACKGROUND AND PROCEDURAL HISTORY ...................................................... 4

V.   LEGAL STANDARD ................................................................................................... 4

VI.  ARGUMENT................................................................................................................. 6

     A.   Search Terms That Retrieve Large Numbers of Documents May Indicate Relevance or
         Reasonable Search Terms............................................................................... 6

     B.   Many Courts Have Ordered Use of Plaintiffs' Search Terms ......................... 7

     C.   Defendants Have Eliminated Search Terms Designed to Find Relevant Documents in
         An Antitrust Case. .......................................................................................... 9

         1.   Dow flatly refuses to apply key terms related to co-Defendant Wanhua.................. 9

         2.   Defendants flatly refuse to apply key conspiracy terms. ........................................ 10

     D.   Defendants have provided no mechanism to adequately identify evidence of meetings
         with competitors (Group 4 terms)................................................................... 16

     E.   Proximity limiters will exclude key evidence................................................. 19

VII. CONCLUSION ............................................................................................................. 20

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Actavis Holdco U.S., Inc. v. Connecticut,* No. 19-3549, 2019 WL 8437021 at *1
(3d. Cir. Dec. 6, 2019) ............................................................................................... 5

*Axcan Scandipharm Inc. v. Ethex Corp.*, No. 07–2556 (RHK/JSM), 2008 WL 11349882,
at *22 (D. Minn. Dec. 31, 2008) ............................................................................... 19

*County of Cook v. Bank of America Corp.*, No. 14 C 2280, 2019 WL 5393997, at *6
(N.D. Ill. Oct. 22, 2019) ............................................................................................ 19

*Custom Hardware Eng'g & Consulting v. Dowell,* No. 4:10CV000653 ERW,
2012 U.S. Dist. LEXIS 146, 7-8 (E.D. Mo. Jan. 3, 2012).......................................... 5

*EPDM*, 681 F. Supp. 2d at 174 .......................................................................................... 11

*In re Capacitors Antitrust Litig.*, Case No. 17-md-02801-JD (N.D. Cal. Jan. 21, 2021) ............. 18

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2017 WL 5957654, *2
(N.D. Cal. Feb. 27, 2017) .......................................................................................... 13

*In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 225-26 (E.D. Pa. 2016) ............. 14

*In re Facebook PPC Advertising Litig.*, No. 09--03043, 2011 WL 1324516, at *1 n.1
(N.D. Cal. Apr. 6, 2011).............................................................................................. 1

*In re Fannie Mae Sec. Litig.*, 552 F.3d 814, 821 (D.C. Cir. 2009)...................................... 6

*In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 364-65 (3d Cir. 2007) ......................... 18

*In re Generics Pharmaceuticals Pricing Antitrust Litig.*, 394 F.Supp.3d 509, 518
(E.D. Pa. 2019) ......................................................................................................... 15

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002) ................. 12

*In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 53-54 (E.D. Pa. 2007) ............................. 14

*In re Polyurethane Foam Antitrust Litig.*, 152 F.Supp.3d 968, 983-84
(N.D. Ohio Feb. 9, 2015) ................................................................................ 10, 11, 12

*In re Seroquel Products Liability Litig.*, 244 F.R.D. 650, 662 (M.D. Fla. 2007))........................ 5

*In re Static Random Access Memory (SRAM) Antitrust Litig.*, Case No. M:07-cv-01819-CW
(N.D. Cal. Sep. 17, 2007) .......................................................................................... 18

*In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 815 (D. Md. 2013)...................... 14

*In re Vitamins Antitrust Litig.*, No. MISC 99–197(TFH), 2000 WL 1475705, *9
(D.D.C. May 9, 2000) ................................................................................................ 15

*Lawson v. Love's Travel Stops & Country Stores, Inc., C.A.* No. 1:17-CV-1266, 2019 WL
7102450, at *5 (M.D. Pa. Dec. 23, 2019) ............................................................... 2, 8

*Lawson v. Spirit Aerosystems* No. 18-1100-EFM-ADM, 2020 WL 6343292, at *8
  (D. Kan. Oct. 29, 2020) ........................................................................................... 8

*Livingston v. City of Chicago* No. 16 CV 10156, 2020 WL 5253848, at *1
  (N.D. Ill. Sept. 3, 2020) ........................................................................................... 8

*Mercedes-Benz Emissions Litig.*, No. 2:16-CV-881, 2424 WL 103975, at *2
  (D.N.J. Jan. 9, 2020) ................................................................................................ 5

*Pyle v. Selective Ins. Co. of Am.*, No. 2:16-CV-335, 2016 WL 5661749, at *2
  (W.D. Pa. Sept. 30, 2016) ........................................................................................ 1

*Romero v. Allstate Ins. Co.,* 271 F.R.D. 96, 109–10 (E.D. Pa. 2010) ....................... 1, 2

*United States v. N/M State Univ.*, No. 1:16-cv-00911-JAP-LF, 2017 WL 4386358, at *2
  (D.N.M. Sept. 29, 2017) ........................................................................................... 5

*Urethanes,* 913 F. Supp. 2d at 1162 ............................................................... 11, 15, 20

## Statutes

Fed. R. Civ. P. 26 ............................................................................................... *passim*

Fed. R. Civ. P. 37 .......................................................................................................... 5

## Other Authorities

Craig Ball, *Selected Short Articles about Search in Electronic Discovery* 20 (2012) ................... 6

## I.    INTRODUCTION

The days of courts rewarding purely adversarial, scorched-earth discovery tactics are gone; courts realized that the cost to itself, justice, and ultimately the parties were too high. Rather, the parties have a duty to cooperate in discovery which requires "forgoing the short term tactical advantages afforded one party to information asymmetry . . . rather than evad[e] their production obligations[.]" *In re Facebook PPC Advertising Litig.*, No. 09--03043, 2011 WL 1324516, at *1 n.1 (N.D. Cal. Apr. 6, 2011) (cooperation under Rule 26). *See also Romero v. Allstate Ins. Co.*, 271 F.R.D. 96, 110 (E.D. Pa. 2010) (same).  The Federal Rules expressly require counsel to meet and confer on "any issues about disclosure, discovery, or preservation of electronically stored information, including the form or forms in which it should be produced[.]" Fed. R. Civ. P. 26(f)(3)(C).  The parties echoed this same commitment in their previously entered ESI Protocol, stating "the parties are aware of the importance the Court places on cooperation and **commit to cooperate in good faith** throughout this Litigation consistent with the Court's Guidelines for the Discovery of Electronically Stored Information Guidelines set forth in Appendix LCvR 26.2.C GUIDELINES to the Local Rules."  *See* ECF No. 313-1 at 2 (emphasis added).

Judges in this Circuit have extended that cooperation to search terms.  "Among the items about which the court expects counsel to 'reach practical agreement' without the court having to micro-manage e-discovery are '**search terms**, date ranges, key players and the like.'" *Romero*, 271 F.R.D. at 109 (emphasis added). Indeed, Judge McVerry held that "this principle is incorporated into this Court's Local Rules, which direct counsel to 'meet and confer, and attempt to agree, on the discovery of ESI, including... application of **search terms** or date ranges.'" *Pyle v. Selective Ins. Co. of Am.*, No. 2:16-CV-335, 2016 WL 5661749, at *2 (W.D. Pa. Sept. 30, 2016) (citing LCvR 26.2(C)) (emphasis added).  When parties could not

1

voluntarily agree, Judge McVerry ordered a plaintiff to generate search terms for defendants' use, holding that "it is in the best interest of all parties, to amicably resolve the outstanding issue of the methodology for ESI searching as expeditiously as possible…." *Id.* Similarly, Judge Buckwalter deemed "it reasonable to compel the parties to confer and come to some agreement on the search terms that Defendants intend to use …." *Romero v. Allstate Ins. Co.,* 271 F.R.D. 96, 109–10 (E.D. Pa. 2010). In this Circuit, parties cooperate on the selection of search terms. "[T]he failure to engage in a collaborative search and sampling strategy can often yield discovery dysfunction." *Lawson v. Love's Travel Stops & Country Stores, Inc., C.A.* No. 1:17-CV-1266, 2019 WL 7102450, at *5 (M.D. Pa. Dec. 23, 2019).

Defendants[1] have identified no cases in this district or others that would authorize them to, as they suggest, unilaterally choose search terms to run, unilaterally reject any search terms they do not want to run, and then require the Court, Judge Francis and/or Plaintiffs to deal with the aftermath of Defendants' results. Defendants baldly refuse to let the TAR tool analyze documents that include the word "crime," or "price" within ten words of "agree," or their own co-Defendants' email domains. Defendant Dow excluded most of the search strings that contain the term "Wanhua"—its competitor, alleged co-conspirator, and defendant, even though the other Defendants have agreed to run those search strings. This Court has an adequate record to order the use of the disputed search terms and should do so to avoid the further expense and delay of resolving the parties' disputes. Defendants have had a year to articulate any adverse impact of using these search terms, and have found only insufficient generalities to rely on.

---

[1] For purposes of this motion, "Defendants" here refers only to BASF Corporation, Covestro LLC, The Dow Chemical Company, Huntsman International LLC, and Wanhua Chemical (America) Co., Ltd.

## II.    SEARCH TERMS

### A.    Impact of Search Terms on TAR

Defendants have chosen to utilize search terms to limit the base set of documents for mere consideration by TAR. Based on previous estimations and the older, less narrowed set of search terms, Plaintiffs estimate that TAR will be run on only 50% of the collected documents, **leaving the rest of the collection – approximately 5 million pages – utterly ignored**, without explanation, systematic testing, or cost estimates.

To safeguard against this potentially huge loss of evidence, Plaintiffs move to compel Defendants to add four categories of searches totaling 80 search strings (collectively referred to herein as "terms"), in addition to those they have chosen to run, to identify the base set of documents to which TAR will then be applied, and thereby ensure that relevant evidence will have the chance to be identified and produced.[2]  To preclude the application of the disputed terms is to preclude Plaintiffs from receiving highly relevant evidence which goes to the very heart of their claims. Notably, the TAR process will exclude the vast majority of irrelevant documents on its own.

## III.    STATEMENT OF RELIEF SOUGHT

Plaintiffs seek an order:

directing Defendants to use Plaintiffs' search terms because the time to submit an adequate record justifying the denial of using those search terms has past; **_OR_**

(1) Directing Defendants to meet and confer in an effort to reach agreement on search words or phrases;

(2) Granting authority to Judge Francis to resolve any search term disputes that are not

---

[2] *See* Exhibit A to the Declaration of Sarah R. LaFreniere in Support of Plaintiffs' Motion to Compel Pre-Tar Application of Search Terms, and in Opposition to Defendants' Motion for a Protective Order, submitted herewith ("Decl.").

resolved by the parties; and

(3) Requiring Defendants to promptly provide any metrics requested or approved by Judge

Francis as necessary for any resolution of these disputes.

## IV.    BACKGROUND AND PROCEDURAL HISTORY

The Parties have been discussing, negotiating, and litigating search terms at length since October 2020. Decl. ¶ 3. On August 23, 2021, the Special Master entered a Report and Recommendation. ECF No. 529. In that report, Judge Francis found Defendants "failed to show that their suggested search terms are reasonable," R&R at 22, and that they had not "shown that their own search terms will capture a reasonable proportion of the responsive documents." *Id.* at 23. The Court adopted the R&R in full, ECF No. 549, and permitted Defendants to implement a Mediation Proposal regarding TAR methodologies. The Mediation Proposal did not address the present situation: Defendants' purposeful omission of relevant terms that leaves almost 50% of Defendants' collected documents unreviewed, and appears designed to prevent key conspiracy evidence from even being considered for review by the TAR tool.

What remains in dispute are four categories of search terms that Plaintiffs have both suggested and conclusively demonstrated are highly relevant. During a meet and confer on December 6, 2021, Defendants indicated that they would not discuss the search terms at all. Decl. ¶ 20. Plaintiffs asked Defendants at that time to provide hit counts for the disputed terms, and to describe any testing they had done to ensure the search terms did not exclude an unreasonable number of responsive documents. Defendants have not provided this information.

## V.    LEGAL STANDARD

The Federal Rules of Civil Procedure allow for broad discovery into "any non-privileged matter that is relevant to any party's claim or defense," or, where cause exists, into any matter that is "relevant to the subject matter of the action." Fed. R. Civ. P. 26(b)(1). Information is

relevant to a case if it "appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Under Rule 37(a)(1) and (a)(3)(B)(iv), a party may "move for an order compelling disclosure or discovery."

The Third Circuit has held that a district court has "wide latitude in controlling discovery." *Actavis Holdco U.S., Inc. v. Connecticut,* No. 19-3549, 2019 WL 8437021 at *1 (3d. Cir. Dec. 6, 2019). Courts have long held that a producing party may be compelled to collect documents using certain search terms. *United States v. N/M State Univ.*, No. 1:16-cv-00911-JAP-LF, 2017 WL 4386358, at *2 (D.N.M. Sept. 29, 2017); *Custom Hardware Eng'g & Consulting v. Dowell,* No. 4:10CV000653 ERW, 2012 U.S. Dist. LEXIS 146, 7-8 (E.D. Mo. Jan. 3, 2012) (same).

A party cannot simply use any search terms they want without testing them.  As the Special Master affirmed, "Rule 26(g) requires that a party responding to a discovery request must conduct 'a reasonable inquiry,'" including validation of search terms and TAR. R&R at 10. Rule 26(g)'s principles require "that appropriate validation be utilized to test search results," and "sampling and other quality assurance techniques" be employed. *Id.* at 11 (quoting *Mercedes-Benz Emissions Litig.*, No. 2:16-CV-881, 2424 WL 2020, at *2 (D.N.J. Jan. 9, 2020); *In re Seroquel Prods. Liab. Litig.*, 244 F.R.D. 650, 662 (M.D. Fla. 2007)).

## VI.    ARGUMENT[3]

### A.    Search Terms That Retrieve Large Numbers of Documents May Indicate Relevance or Reasonable Search Terms

Defendants suggest that simply because Plaintiffs' search terms bring back large numbers of documents, they are automatically deficient because they will "add hundreds of thousands of additional documents to Defendants' TAR review …." Decl. of Alden Atkins (Sept. 13, 2021) ECF No. 584 at ¶ 25. But this is a red herring. A high hit rate simply may mean the returned documents are highly relevant. R&R at 21. And the numbers of documents for mere consideration by the TAR tool (much less review or production) pale in comparison with other large antitrust cases, like *In re Urethanes*.  In any event, courts have approved search terms that have returned high hit rates.  *See, e.g.*, *In re Fannie Mae Sec. Litig.*, 552 F.3d 814, 821 (D.C. Cir. 2009) (commenting on search terms that retrieve 80 percent of the office's emails, "far from showing bad faith, that figure may simply indicate that most of the emails actually bear some relevance, or at least include language captured by reasonable search terms."); *see also* Craig Ball, *Selected Short Articles about Search in Electronic Discovery* 20 (2012) ("A lawyer who dismisses a search because it yields 'too many hits' is as astute as the Emperor Joseph dismissing

---

[3] Plaintiffs are asking the Court to order Defendants to apply the "disputed terms," Decl. Ex. A, which are organized into four groups. For efficiency of argument in this memorandum, Plaintiffs discuss the disputed terms by subject-matter category rather than by specific "Group" number. For reference, **Group 1** is made up of principally conspiracy-related terms that all Defendants refuse to run (Nos. 37.a, 50, 57.a-c, 58.a, 59.c1, 62.a-b, 65.a, 66, 68, 72); **Group 2** is terms that Defendants implicitly acknowledge are relevant but seek to modify their parameters (Nos. 87.r-y, 88.a-h, 122, 128.a1); **Group 3** is terms on which only certain Defendants refuse to run (or are running a modified version) (Dow: 42.i, 42.j, 44.f, 51.f, 64.h, 82.e, 82.i17, 82i.18, 84.e1, 84.e2, 86.f, 86.o, 86.af, 87.e1, 87.e2, 84.ad, 88.e, 108.i, 110.f, 120.i, 121.I, 128.b11; Huntsman: 1.b, 23, 49, 54; Huntsman, Covestro, Wanhua and BASF: 106.c; Wanhua and Huntsman: 139); and **Group 4** is terms relating to trade associations and meetings between Defendants, which Defendants refuse to run and for which Plaintiffs have offered to accept full calendars instead (59.a1, 59.b1, 59.c, 59.d, 59.d1 59.e, 59.f, 59.h). The search term numbers herein refer to "No." in column A of the exhibit, which reflects the initial search terms Plaintiffs proposed, as modified based on vendor limitations and negotiations to narrow the scope of the search strings.

Mozart's *Il Seraglio* as an opera with 'too many notes.'") (available at
http://www.craigball.com/search2012.pdf). A search yielding many documents is not necessarily
disproportionate, especially when Defendants are not conducting a linear review. The important
question is whether high hits on search terms translates into an unreasonable additional burden
for review. With TAR, it doesn't because the TAR tool is designed to ferret out the irrelevant
documents. And if the TAR tool returns more documents to review as a result of the high hits,
then it is because those are responsive documents that *should* be reviewed for production.

       The Special Master explicitly recognized this. The high hit rate for Plaintiffs' proposed
search terms is colored by the fact that the terms are not being used to determine what will be
produced or linearly reviewed, but what will ultimately be entered into TAR before review. *See*
R&R at 21 ("In this regard, it should be kept in mind that the function of search terms in this
case is not to identify documents for production or even to select those that will be provided
directly to human reviewers; it is to narrow the universe of documents to which TAR will be
applied."). Because the TAR tool ranks documents by responsiveness, any minimally responsive
document will likely never be seen by a human reviewer.[4] *See* R&R at 22 (observing that
documents "relating to lunch prices or meeting minutes that do not have some other indicator of
relevance would […] likely never be assessed by a human reviewer."). Thus, Plaintiffs' terms do
not unduly increase any burden on Defendants using TAR.

       **B.    Many Courts Have Ordered Use of Plaintiffs' Search Terms**

       Defendants have had over a year to make a record of why their chosen search terms are
reasonable. They have not. This Court has seen no unique hit counts on the disputed search

---

[4] Defendants misconstrue the relationship between the search terms and TAR. The proposed
search terms are not meant to create a population of documents that will be produced or even a
set to be manually reviewed, but to create a set of documents to be reviewed by TAR. As such,
"there is no need to review 'every document.'" R&R at 22.

terms, no declarations about the cost of adding the disputed terms to their TAR tool, and most importantly, no declarations about how the disputed terms require review of *non-responsive* documents. Defendants never submitted any metrics on the disputed search terms.  <u>*None*</u>.  Given that Defendants never addressed the proportionality factors, and failed to articulate any burden, the proportionality factors strongly weigh in Plaintiffs' favor.[5]  Based upon this record, this Court should order Defendants to include the disputed search terms to select documents for TAR review.

This Court would not be an outlier if it ordered Defendants the use the disputed search terms.  In facts similar to this case, Magistrate Judge Kim in *Livingston v. City of Chicago* ordered an outside vendor to export emails and apply keyword searching using Plaintiffs' search terms before the City used TAR.  No. 16 CV 10156, 2020 WL 5253848, at *1 (N.D. Ill. Sept. 3, 2020).  In *Lawson v. Spirit Aerosystems*, the defendant agreed to use TAR on a corpus of documents **created by using the plaintiff's search terms** and custodians.   Defendants there produced 85% of the TAR set to Plaintiffs.  No. 18-1100-EFM-ADM, 2020 WL 6343292, at *8 (D. Kan. Oct. 29, 2020), *aff'd*, No. 18-1100-EFM, 2021 WL 4844058 (D. Kan. Oct. 18, 2021). In *Lawson v. Love's Travel Stops & Country Stores*, Magistrate Judge Carlson ordered that Defendants run **25 terms chosen by Plaintiffs** and a statistically valid random sample for mutual inspection.  No. 1:17-CV-1266, 2019 WL 7102450, at *6 (M.D. Pa. Dec. 23, 2019).  He also held that where "counsel are using keyword searches for retrieval of ESI, they at a minimum must carefully craft the appropriate keywords, with input from the ESI's custodians as to the words and abbreviations they use, and the proposed methodology must be quality control tested

---

[5] Plaintiffs' concurrently filed Opposition to Defendants' Motion for a Protective Order, and the Declaration of Maura Grossman in support, further refute Defendants' contentions that (a) large hit counts are inherently burdensome, and (b) adding documents to the TAR review after it has been initiated is difficult.

to assure accuracy in retrieval and elimination of 'false positives.' It is time that the Bar—even those lawyers who did not come of age in the computer era—understand this." *Id.* at *5. There is no record that Defendants carefully crafted search terms; Judge Francis found the exact opposite. R&R at 20. This Court has an adequate record to order the use of Plaintiffs' search terms.

### C. Defendants Have Eliminated Search Terms Designed to Find Relevant Documents in An Antitrust Case.

Defendants omit the search terms most likely to uncover a conspiracy. Some of Defendants' positions are perplexing and can only be explained by an intention to hide potentially hot documents.

#### 1. Dow flatly refuses to apply key terms related to co-Defendant Wanhua.

Defendant Dow has eliminated all but a few search strings naming Defendant Wanhua, including Term 128.a1, eliminating "Wanhua AND (pric* w/5 (agree*)"[6]. Every indication from Dow's current productions demonstrate that Dow and Wanhua had many meetings and communications, and the terms sought would yield important evidence of the two producers' conduct and/or communications between or relating to each other. *E.g.,* Ex. R to Decl., DOW-000159129 at 159159 (███████████████████████████████████████████
███████████████████████████████████████████████████████)[7].

---

[6] Terms 42.l, 42.j, 44.f, 51.f, 64.h, 82.e, 82.i17, 82i18, 84.e1, 84.e2, 86.f, 86.o, 86.af, 87.e1, 87.e2, 87.ad, 88.e, 108.i, 110.f, 120.i, 121.i, 128.b11, and 128.a1. The parties have defined sets of "search term groups," such as "Producers 1-8," each of which contains the name and key locations for each Defendant. "Producers 5," for example, is "*Wanhua* OR WCA OR *borsod* OR *whchem* OR Ningbo OR Yantai OR Newtown." Dow has eliminated all but a few references to the Producers 5 string, while agreeing to run many of the same search strings capturing other Defendants' names.
[7] Throughout this brief, Plaintiffs judiciously chose which documents to share with the Court and Defendants. Previewing every conspiracy document Plaintiffs have, prior to depositions, could prejudice Plaintiffs. Plaintiffs are, however, willing to make more documents available *in*

####   2.    Defendants flatly refuse to apply key conspiracy terms.

#####   a.   Domain names across Defendants

Defendants have refused to search for each other's names or the products at issue in this case as standalone terms (*i.e.*, Huntsman will not search "BASF" by itself)—which has resulted in some lengthy search strings to capture possible permutations where competitor names are mentioned. But at a minimum, Defendants should be compelled to look for emails to or from other Defendants (and across Defendants' productions), by including the terms "*dow.com" or *basf.com." Indeed, Defendants Wanhua and Covestro independently proposed to do just that— but Huntsman and BASF will not (and Wanhua will search for *basf.com, but not "*dow.com"). Searching for email domains rather than individual email addresses is more precise as it will show "who is talking price with whom" across Defendants and will take the guesswork out of discerning which executives may have been communicating with other Defendants.  *In re Polyurethane Foam Antitrust Litig.*, 152 F.Supp.3d 968, 983-84 (N.D. Ohio Feb. 9, 2015) ("*Poly Foam*") (communications between upper-level executives with pricing authority in secret may support inference of conspiracy).[8] It is also the simplest way to capture inter-Defendant communications. Documents captured by these terms should be included.

#####   b.   Secrecy, confidentiality, and concealment (Terms 37.a, 50, 23, 49, 54)

The disputed terms seek evidence of Defendants' concealment of their anticompetitive

---

*camera* or to confidentially submit additional documents to Judge Francis justifying any search term.

[8] Certain Defendants added what appear to be a search for the other Defendants' domain names – by providing the term "basf.com" or "dow.com" as search strings with the wildcard "*" or "!" omitted. Plaintiffs understand that these searches will include any results with characters before the term (i.e. tom@basf.com, or www.basf.com). If this is a mistaken understanding, and Defendants are running only the direct term "basf.com" without any preliminary characters, all Defendants should be compelled to run the domain names with the wildcard to capture such communications.

conduct and include known conspiracy buzzwords such as "delete" and "destroy." *See*

*Urethanes,* 913 F. Supp. 2d at 1162 (Affirmative acts of concealment included an executive of

Bayer giving an executive from Huntsman assurances he would "destroy" a written document

which showed that the two exchanged pricing information and discussed "the resolve to have a

price increase stick.").[9] Term 23 ("please delete") is exactly on point to yield evidence of

concealment. *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 983-84 (N.D. Ohio

2015) ("*Poly Foam*") ("[p]lease delete string of emails below"). Term 54 (confidential* w/5

keep*), will also find important evidence. *See id.* at 1004 (instruction by executive to "keep

confidential" an email chain showed competitors engaged in price discussions).[10]  While no

Defendant will run term 37.a, only Huntsman objects to 50, 23, 49, and 54.

### c.  Defendants' market behavior related to price and supply (Terms 57.a-c, 66, 86.f, 86.o, 121.i, 44.f[11])

The disputed terms will specifically uncover evidence of Defendants' conspiratorial

behavior and/or anticompetitive conduct in the MDI and TDI markets (*e.g.,* industry w/10

disciplin*, disrupt*, behave*). For example, Term 57.a contains the word "discipline," which

often appears in price-fixing conspiracy evidence. *See, e.g., EPDM*, 681 F. Supp. 2d at 174

(statements regarding how a supplier was "acting totally undisciplined" and showing

"undisciplined behavior" sufficient to infer conspiracy). Defendants' own productions to date

confirm that such words will yield the evidence sought. *See, e.g.,* Ex. G to Decl., DOW-

000049248 (█████████████████████████████████████

---

[9] *See also In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig*., 681 F. Supp. 2d
141, 158-161 (D. Conn. 2009) ("*EPDM*") (evidence sufficient to infer conspiracy included
emails between defendants regarding capacity and pricing issues in the U.S. market, with the
specific direction to "destroy after receipt" and to "eliminate from email").
[10] Conspiracies occur in secret and behind closed doors and "the proof is largely in the hands of
the alleged conspirators." *See, e.g., TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179,
1184 (N.D. Cal. 2009).
[11] Only Defendant Dow will not run terms 86.f, 86.o, 121.i, 44.f.

████████). While no Defendant will run terms 57.a-c and 66, only Dow will not run terms 86.f, 86.o, 121.i, 44.f.

The disputed terms will uncover any agreements or understanding between Defendants regarding efforts to support each other's price increases or supply actions in the market. For example, Term 66 (*e.g.,* understand\*) may yield evidence that Defendants agreed not to undercut each other's prices. *See, e.g., In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002) ("*HFCS*") (evidence of conspiracy included defendant's plant manager statement that "[w]e have an understanding within the industry not to undercut each other's prices"). The disputed terms will also elicit evidence of how Defendants may have exchanged or collected price and/or supply information and intelligence on each other (*e.g.,* exchang\*, intel\*, info\*). *See Poly Foam,* 152 F. Supp. 3d at 989 (summary judgment denied where defendants "exchanged information re price and timing of price increases.").

Term 44.f, which only Dow disputes, includes words that will bring forth evidence of Defendants attempting to check or confirm Wanhua's prices (*e.g.,* check\*, confirm\*, call\*). Defendants' productions to date confirm that such words will yield key evidence. *E.g.,* Ex. Q to Decl., BC-0033891 (███████████████████████████████████████████ ███████████████████████████████████████).

The disputed terms include words related to industry price increases or hikes (*e.g.,* hik\*, increase\*, **support**\*) and words related to whether a Defendant led or followed the increases of others (e.g., player\*, follow\*, lead\*), all of which are staples of price-fixing evidence. *See e.g., Poly Foam*, 152 F. Supp. 3d at 995 (commenting on evidence re "price 'leaders' and price 'followers'" and noting that "follow the leader" behavior did not defeat direct purchasers' claims). Defendants' documents produced to date confirm that these words are on point and will yield key evidence. *E.g.,* Ex. H to Decl., DOW-0001446993 ██████████████████████.

; Ex. I to Decl., DOW-000005966 (████████████████████████ ██████████████).

### d. Discussion of pricing, costs, and customers (Terms 58.a, 59.c1, 88.e[12])

The disputed terms will find evidence of discussion about prices, costs, and customers (e.g., cost*, customer*) through meetings and calls (e.g., meet*, call). The prior *Urethanes* court found evidence of calls to be evidence of conspiracy. The court pointed out that executives from defendants "conducted numerous meetings outside of their offices around the time of the price increase announcements; and many of the communications were by telephone calls placed after normal business hours and on weekends, including near the times of price increase announcements." *Id.* at 1155-56. Only Defendant Dow refuses to run 88.e.[13]

### e. Price approval, authorization, or changes (Term 62.a)

The disputed terms include words related to Defendants' pricing actions, and whether those actions are consistent with a conspiracy (*e.g.,* pric* w/20 approv* or cut* or bottom). *See e.g., In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2017 WL 5957654, *2 (N.D. Cal. Feb. 27, 2017) (defendants' discussion of "bottom price of $67" consistent with anticompetitive conduct). Defendants' productions confirm that the same types of evidence will be found here. *E.g.,* Ex. J to Decl., WCA_CIV-000050281 ████████████████████ ████████████████████).

### f. Price signaling and Defendants' efforts to stabilize price (Term 62.b)

---

[12] Only Defendant Dow will not run 88.e "[Producers 5] w/20 (pric* OR cost* OR offer* OR bid* OR charg* OR bill* OR "how much" OR rate OR pay*)".

[13] "[Producers 5] w/20 (pric* OR cost* OR offer* OR bid* OR charg* OR bill* OR "how much" OR rate OR pay*)".

Disputed Term 62.b includes words that will uncover efforts by Defendants to maintain or stabilize prices or supply, or to signal each other about the pricing actions each planned to take (*e.g.,* pric\* w/5 maintain\*, signal\*, stabil\*). *See, e.g., In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 225-26 (E.D. Pa. 2016) (testimony regarding defendant's concern about sending the wrong "signal" to competitors by extending a lower price sufficient to be evaluated by a jury). Defendants' DOJ documents confirm the same.

### g. Manipulation of capacity or supply (Terms 65.a; 66, 82.e, 82i17, 82.i18)

The disputed terms will find evidence of Defendants' manipulation of supply (*e.g.,* shut\*, curtail\*, close\*, down\*, turnaround, out\*, announc\*). *See, e.g., In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 53-54 (E.D. Pa. 2007) (plaintiffs' evidence of "market downtime" easily met the summary judgment standard). Defendants' productions to date confirm that Plaintiffs' terms will yield highly relevant evidence. *E.g.,* Ex. K to Decl., COV000009655 (█████████ ████████████████████████████████████████████████████████████ ███████████████). Only Dow refuses to run terms 82.e, 82.il7, and 82.il8.

### h. Terms re MDI or TDI joint ventures (Terms 68, 84.el)

Although they are competitors, Defendants also participate in a number of joint ventures with each other to co-produce MDI and TDI, through which Defendants had many opportunities to collude. For example, BASF and Huntsman ████████████████████████████ ██████████████████████████████████████████. *E.g.,* Ex. L to Decl., HTN-00083065 (███████████████████████████████████████████████████████ ██████). The disputed terms on joint ventures will likely uncover evidence of opportunities to collude in general, and potentially even evidence that Defendants used a joint venture to coordinate on supply or price. *See, e.g, In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 815 (D. Md. 2013) (summary judgment as to certain defendants denied where plaintiffs

presented evidence of Huntsman and Kronos joint venture and facts suggesting that the joint venture was used as a method to jointly reduce output). While Defendants will not search term 68 ("[MDI or TDI 1-3] AND ("joint venture" OR JV)"), only Dow has excluded term 84.el as it relates to Wanhua ("[Producers 5] w/10 (acquir* OR merge* OR (joint w/3 venture) OR JV OR divest* OR transf* OR spinoff*").

### i. Monitoring, policing, retaliation (Terms 108.i, 1.b)

Term 108.i (enforce* AND [Producers 5]) will unearth evidence of Defendants' monitoring and policing the conspiracy and any attempts by Defendants to "enforce" the conspiracy—but Dow will not run this term as it relates to Defendant Wanhua. Term 1.b (consequence*) will bring forward evidence of Defendants' efforts to impose consequences on each other for breaking ranks—but Huntsman will not search for this term. All other Defendants have agreed to run these terms. This type of conduct is common in price-fixing conspiracy cases, and Plaintiffs should have the opportunity to uncover it here. *See, e.g., In re Vitamins Antitrust Litig.*, No. MISC 99–197(TFH), 2000 WL 1475705, *9 (D.D.C. May 9, 2000) (cartel member that stepped out of line ran the risk of having the other conspirators cut off critical supplies).

### j. Whatsapp and wechat (139)

Term 139 (whatsapp or wechat) will find evidence of suspicious communications that Defendants meant to conceal or be private. Only Wanhua and Huntsman oppose running these terms. Having conversations in private or offsite is common evidence in conspiracy cases, including in the prior *Urethanes* action. For example, the court there found the following evidence to be affirmative acts of concealment: On at least two occasions, Mr. Stern and Mr. Bernstein of BASF left trade association meetings and conducted future pricing discussions at an off-site coffee shop so that the men could talk in confidence.[14] *See also In re Generics*

---

[14] *Urethanes*, 913 F.Supp.2d at 1162-1164.

*Pharmaceuticals Pricing Antitrust Litig.*, 394 F.Supp.3d 509, 518 (E.D. Pa. 2019) (direct purchasers alleged that "[p]laying nice in the sandbox was facilitated by [ . . . ] employees frequently communicating [ . . .] via other electronic means (*e.g.,* email, social media platforms, Linkedin, WhatsApp)"). Therefore, including terms related to such media here is reasonably calculated to lead to the discovery of admissible evidence.

### k.  Lies and fals* (122)

Defendants seek to strike key buzzwords relating to secrecy, including "lies" and "fals*"[15]  Such evidence is relevant in a conspiracy. In *Urethanes*, defendants concealed their conspiracy by denying it and calling another a "liar." *Id.* at 1153-54 (witness testified if asked about Dow's communications with BASF about price, he would deny it and call her a liar).

### D.    Defendants have provided no mechanism to adequately identify evidence of meetings with competitors (Group 4 terms).

Opportunity contacts can be circumstantial evidence of conspiracy. Such opportunities to collude often surround legitimate trade association meetings or occur under the cover of meetings relating to swaps. Search terms aimed at uncovering such communications are appropriate, given Plaintiffs' allegations of an antitrust conspiracy, where conspirators (particularly recidivist price fixers like several Defendants here) are likely to use guarded language. *See* R&R at 21 ("broader search terms may be warranted [here rather] than in a case where pertinent communications might be less guarded.").

Plaintiffs' "group 4" terms are aimed at capturing Defendants' opportunities and their conversations and communications, or adjacent meetings that may have surrounded their meetings and events. As an alternative to running the eight disputed searches that aim to uncover clandestine meetings, Plaintiffs offered to accept instead Defendants' full calendars (*i.e.,* all

---

[15] *See, e.g.,* ECF No. 457, Ex. A at Rows 4, 122, 130 (Protected View).

calendar entries for the agreed-upon custodians). As discussed in Plaintiffs' prior motion to compel regarding calendar entries, ECF No. 553, Defendants should produce full calendars because (1) using human reviewers (or worse, TAR) threatens to exclude relevant but ambiguous calendar entries (i.e. "meeting with Joe"), (2) dividing each calendar into individual entries is improper because each calendar is a single document and redactions for relevance are prohibited under the ESI protocol; and (3) producing full calendars is almost burdenless—as demonstrated by the fact that Dow was able to produce its calendars a mere two days after the parties filed a stipulation of agreement on the calendar issue. Decl. ¶ 15.[16] Plaintiffs' compromise proposal is therefore a reasonable alternative to running these terms—which are themselves legitimate.

Defendants have also resisted Plaintiffs' efforts to obtain information about meetings and communications with competitors through an interrogatory too. *Id.* ¶ 21. While the parties are still negotiating, many Defendants are relying on their document productions to respond to this interrogatory. But if Defendants will not use broad search terms to uncover documents like "meeting with Joe," and will not provide a thorough and complete interrogatory response in narrative form, Plaintiffs are prejudiced by this approach to producing discovery that permits Defendants to hide important evidence of such meetings.

Given both the relevance of the terms and the difficulty Plaintiffs have had in obtaining this evidence, inclusion of search terms relating to meetings and communications is reasonable. Plaintiffs' terms include social or afterhours meeting buzzwords (*e.g.,* golf, hotel, drinks and coffee), which may seem innocuous or common in everyday usage, but are the hallmarks of how conspiracies are hatched and carried out. Antitrust conspiracies are not hatched in the open but

---

[16] It is also worth noting that Dow's calendar production consisted of nearly 150,000 documents. It is unclear whether Defendants' hit reports also count each calendar entry (i.e. each individual meeting) as an individual document, and therefore grossly inflating their purported burden.

17

are done in the shadows, often under the guise of social events, meals, and trips to hotels. Collusion does not only occur in meeting rooms, but also commonly in bars over drinks, at meals, at the golf course, at hotels, or even simply over coffee. *See*, *e.g.*, *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 364-65 (3d Cir. 2007) (conspirators coordinated price increases before golf, via phone calls placed in hotel rooms).[17]

    Here we know there were a multitude of trade association meetings. High-level executives from Defendants frequently participated in trade associations and sat on committees with other Defendants' executives, such as the executive committee of the International Isocyanates Institute ("III") and the Steering Committee of the Center for the Polyurethanes Industry ("CPI"), or the various working groups and executive committees of those organizations. *See, e.g.,* Ex. M to Decl., BC-0011463 (███████████████████████ █████████████████████████). Therefore, terms to find those meetings and any communications or social outings, are entirely on point (*e.g.,* WG [working group], comm* w/3 exec*, comm* w/3 steering). We also know that social meetings among defendants surrounding trade association meetings were part of industry culture and that terms such as drink*, hotel, dinner, or lunch will captures such evidence.

    Plaintiffs' terms seek to capture evidence by the method of meeting (*e.g.,* face w/3 face, call, teleco, phone). Defendants' productions so far, confirm that such meetings between Defendants frequently took place. *See, e.g.,* Ex. N to Decl., HTN-00005684 (█████████████ ███████████████████████████████████████); Ex. S to

---

[17] *In re Static Random Access Memory (SRAM) Antitrust Litig.*, Case No. M:07-cv-01819-CW (N.D. Cal. Sep. 17, 2007) ECF No. 290, at ¶155 (antitrust complaint detailing allegations of collusive meetings over, *inter alia*, meals), *dismissal denied in relevant part by* 580 F. Supp. 2d 896 (N.D. Cal. 2008); *see also*, *e.g.*, *In re Capacitors Antitrust Litig.*, Case No. 17-md-02801-JD (N.D. Cal. Jan. 21, 2021), ECF No. 1092 at 3-4 (trial brief describing how antitrust conspirators communicated "in bars, in coffee shops, and on the golf course").

Decl. DOW-000218802 (███████████████████████████████████

███████).

Here, we also know that swaps were a common and frequent reason for meetings among

Defendants, presenting them with many opportunities to collude. *See, e.g., Titanium Dioxide*,

959 F. Supp. 2d at 815 (summary judgment denied where evidence of swaps of raw materials

between defendants, including Huntsman, was presented). Swap meeting information from

Defendants' current productions indicate that Plaintiffs' terms will lead to relevant evidence.

### E.    Proximity limiters will exclude key evidence

For certain Terms (87.r-y and 88.a-h), Defendants seek to shrink the proximity limiter,

for example, shrinking the producer names within 20 ("w/20") of key Terms to within 5 ("w/5"

of those same terms. This restriction, while seemingly a small adjustment, will have the large

effect of excluding key evidence.[18] For example, Defendants' proposal to shrink the limiter to

w/5 on Terms 87.r-y would miss key evidence that would otherwise be captured with a longer

limiter. *E.g.,* Ex. O to Decl., BC-0053726 (w/6 words: ████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████).

Similarly, Defendants' proposal to shrink the limiter to w/5 on Terms 88.a-h would miss

key evidence that would otherwise be captured with a longer limiter.  For example, for Term

128.a1, Defendants seek to limit the search string from pric* **w/10** to pric* **w/5** of key words

such as "agree" or "competit* or follow*.  This limiter will bypass important evidence.  Further,

---

[18] *See, e.g., County of Cook v. Bank of America Corp.*, No. 14 C 2280, 2019 WL 5393997, at *6
(N.D. Ill. Oct. 22, 2019) (allowing broad proximity limiters of w/60 and rejecting shorter limiters
as too narrow to capture relevant evidence); *Axcan Scandipharm Inc. v. Ethex Corp.*, No. 07–
2556 (RHK/JSM), 2008 WL 11349882, at *22 (D. Minn. Dec. 31, 2008) (ruling that proximity
limiter of w/100 would be a good balance for capturing terms that may not necessarily appear in
the same paragraph or with shorter limiters).

Defendants seek to take out certain key terms ("communicat*, customer*, effort*, and distrib*). This too, will cause important conspiracy evidence to be missed. *See, e.g., Urethanes*, 913 F. Supp. 2d at 1153 (evidence of discussion of BASF being unhappy because Dow was not charging the full amount of a recent price increase with a particular customer). In addition, all Defendants seek to qualify Term 128.a1 by only pairing the terms with the producer string [Producers 1-8], which will cause a further loss of content. Defendants should be compelled to run the terms with Plaintiffs' wider proximity strings.

## VII.   CONCLUSION

For the reasons addressed herein, Plaintiffs request the Court grant Plaintiffs' Motion to Compel, and order Defendants to include in their TAR review set those documents identified by the search terms in Exhibit A to the LaFreniere Declaration.

DATED:  December 15, 2021                     Respectfully submitted,

*s/ William Pietragallo, II*
William Pietragallo, II (PA 16413)
PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219
Tel.: (412) 263-2000
Fax: (412) 263-2001
*wp@pietragallo.com*

*Plaintiffs' Interim Liaison Counsel*

Megan E. Jones (CA 296274)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel.: (415) 633-1908
Fax: (415) 358-4980
*mjones@hausfeld.com*

Jason S. Hartley (CA 192514)
HARTLEY LLP
101 W. Broadway, Suite 820
San Diego, CA 92101
Tel.: (619) 400-5822
Fax: (619) 400-5832
*hartley@hartleyllp.com*

*Plaintiffs' Interim Co-Lead Counsel*

## <u>MEET AND CONFER STATEMENT</u>

Pursuant to Local Civil Rule 26.2(D), I hereby certify that counsel for Plaintiffs have attempted in good faith to meet and confer with Defendants, including on December 6, 2021, and attempted to agree on and narrow the issues in dispute.

*/s/ Megan E. Jones*
Megan E. Jones
