IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: DIISOCYANATES ANTITRUST LITIGATION )<br>)<br>)<br>This Document Relates to: )<br>All Cases ) | Master Docket Misc. No. 18-1001<br><br>MDL No. 2862 |

**MEMORANDUM AND ORDER OF COURT**

Presently before the Court is a dispute regarding the appropriate scope of inquiry for Defendants' depositions of Plaintiffs' 30(b)(1) and 30(b)(6) witnesses. Central to this dispute is whether such anticipated lines of questioning would elicit information pertaining to Plaintiffs' "downstream" products, markets, and activities that Plaintiffs contend are irrelevant and not discoverable. The parties raised this issue with the Court at a status conference on October 17, 2023 (ECF No. 956), met and conferred as instructed and subsequently submitted a Joint Status Report detailing the issues that remained in dispute. (ECF No. 959). The parties further outlined their respective positions at a status conference on November 2, 2023 (ECF No. 963), and then submitted briefs, declarations, and other supporting materials for the Court's consideration. (ECF Nos. 971; 972; 973; 974).

Federal Rule of Civil Procedure 26(b)(1) provides, in pertinent part, "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Information is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and, the fact is of consequence in determining the action." Fed. R. Evid. 401; *see also Estate of Eckelberry v. CSX Transp., Inc.*, Civ. No. 18-365, 2019 WL 13199277 (W.D. Pa. Apr. 3, 2019).

Here, Plaintiffs claim that Defendants colluded to manipulate the global production and supply of MDI and TDI to fix prices affecting the U.S. market for these products in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3. Relevant evidence for these types of claims falls into two broad categories: first, direct evidence that the Defendants entered into an unlawful agreement; and second, circumstantial evidence such as consciously parallel behavior along with "plus factors" that permit an inference of unlawful collusion. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004) (finding "no finite set of such criteria" for plus factors and identifying at least three such factors: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1244 (3d Cir. 1993) (internal quotation marks omitted)). Other courts have determined that such "plus factors" include

> [E]vidence that competitors knew about the timing and amount of competitor price increases before the market did and believed the market would not support a price increase but nonetheless raised prices within eight days of each other; evidence that competitors talk every week and had developed a good working relationship; evidence that the defendants' executives engaged in friendly and frequent communications with each other during which they discussed issues such as price and market shares; evidence of discussions of price and the timing of price increases, including (1) who communicated with whom; (2) when those communications occurred and the type of information exchanged; (3) how the exchanges occurred; and (4) the legitimate reasons that may be offered for exchanging the information; and evidence that frequent phone calls after negotiations represented a departure from the ordinary pattern.

(ECF No. 798 (*In re Diisocyanates Antitrust Litigation*, Misc. No. 18-1001, 2022 WL 17668470, at *7 (W.D. Pa. Oct. 19, 2022)) ("Third R&R") (cleaned up) (collecting cases)).

To satisfy this standard for proving consciously parallel behavior and such "plus factors," Plaintiffs have sought to elicit documents and testimony from Defendants' witnesses regarding, among other topics, communications with competitors, participation in trade associations, and their employees' previous employment with competitors, as well as the legitimacy of *force majeure* declarations in the marketplace and whether their customers had knowledge that certain products were sourced from competitors through swap transactions. (ECF No. 972, ¶¶ 11-16). Defendants now wish to pose putatively similar lines of questions to Plaintiffs' Rule 30(b)(1) and Rule 30(b)(6) deposition witnesses, as noted in the parties' Joint Status Report (ECF No. 959) and elsewhere in the record.[1] These topics include:

- Topic No. 27: Force majeure notices or announcements made by Plaintiffs concerning MDI and/or TDI, or any product containing MDI and/or TDI, and the reasons for the force majeure.

- Topic No. 29: All meetings or communications Plaintiffs have had with any competitor.

- Topic No. 30: All trade associations or similar organizations in which Plaintiffs have participated, including without limitation all members of those trade associations or organizations and all meetings or communications Plaintiffs have had with any competitor in connection with such trade association or organization.

- Topic No. 32: Plaintiffs employees who previously worked for a competitor.

---

[1]  (ECF Nos. 963, at 14-16; 972, ¶¶ 4-6, 9-10; 972-1, at 2-3). The parties initially identified Topic No. 34 (regarding Plaintiffs' sales and distribution of substitutes) as being in dispute but subsequently agreed on the scope of that topic. (ECF No. 971, at 3 n. 1). The Court commends counsels' conferral efforts to resolve or narrow this dispute, noting that while five disputed topics remain, there are at least thirty-four topics in total. (ECF No. 963, at 14). The parties also supplied for the Court's consideration their exchange of final proposals for resolving these remaining disputed topics. (ECF No. 972-1, at 2-3).

- Topic No. 33: Plaintiffs' purchases, sales, swaps, exchanges, and/or tolls of Plaintiffs' products with any competitors.

(ECF No. 959).

Plaintiffs object to these proposed lines of inquiry and consequently prevented witnesses from sitting for depositions thus far, contending such questions concern "downstream" products, markets, and activities that are irrelevant and not discoverable[2] pursuant to this Court's prior discovery rulings (ECF Nos. 359, 430), as well as Supreme Court decisions in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and their progeny. Defendants disagree, contending that such lines of inquiry are permissible because they pertain to industry norms and pro-competitive, non-collusive explanations of their own conduct. To resolve this dispute, the Court must determine whether such "downstream" evidence is always irrelevant or whether such evidence is relevant for certain purposes, and, if so, where to draw the line of demarcation.

The Court first looks to the United States Supreme Court's decisions in *Hanover Shoe* and *Illinois Brick* to determine if those controlling decisions preclude discovery on such topics outright as Plaintiffs contend. However, upon a close and careful review of *Hanover Shoe* and *Illinois Brick*, the Court concludes that the holdings in those decisions are not as broad as Plaintiffs suggest. At its core, *Hanover Shoe* rejects an antitrust defendant's passing-on defense, finding that the "illegal overcharge during the damage period [is] reflected in the price charged [for products defendant sold] . . . to its customers" and that whether those customers "recouped the overcharges from their customers [is] *irrelevant in assessing damages*." *Hanover Shoe*, 392 U.S.

---

[2] Plaintiffs also raised concerns regarding confidentiality (ECF No. 963, at 18, 21-22) and jury confusion. (*Id.* at 27).

4

at 487-88, 490 (emphasis added). *Illinois Brick* extends *Hanover Shoe* to preclude downstream customers from recovering antitrust overcharges passed-on to them from the direct purchasers positioned upstream in the chain of distribution. 431 U.S. at 735 (stating that "*Hanover Shoe* . . . rest[s] on the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show as absorbed by it."). The Supreme Court's focus in these decisions is on assessing damages by deeming overcharges passed-on downstream to be irrelevant to determining the quantum of the direct purchaser's damages and to preclude such downstream customers from seeking their allocated portion of such diminishing damages.³ *Hanover Shoe*, 392 U.S. at 489 (stating that "when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of *injury and damage*," that "the buyer is equally *entitled to damages* if he raises the price for his own product," and that "[the buyer] *proved injury and the amount of its damages* for the purposes of its treble-damage suit when it proved [it was overcharged].") (emphasis added); *Illinois Brick Co.*, 431 U.S. at 746-47 (stating, "we are unwilling to carry the compensation principle to its logical extreme by attempting to *allocate damages* among all those within the defendant's chain of distribution, especially because we question the extent to which such an attempt would make individual victims whole for actual injuries suffered rather than simply depleting the overall recovery in litigation

---

³ Some courts have characterized these holdings as limiting standing to direct purchasers for asserting federal antitrust claims regardless of whether such direct purchasers suffered a net economic loss from defendants' wrongful conduct. *See In re Local TV Advert. Antitrust Litig.*, Case No. 18-C-6785, MDL No. 2867, 2023 WL 1863046, at *2-3 (N.D. Ill. Feb. 9, 2023); *In re Turkey Antitrust Litig.*, Case No. 19-C-8318, 2021 WL 6428398, at *2 n.5 (N.D. Ill. Dec. 16, 2021); *see also Valley Drug Co. v. Geneva Pharm.*, 350 F.3d 1181, 1192 (11th Cir. 2003).

over pass-on issues." (quoting *Illinois Brick Co.*, 431 U.S. at 761 (Brennan, J., dissenting) (internal quotation marks omitted) (emphasis added))).

Accordingly, to the extent Defendants seek to elicit deposition testimony from Plaintiffs concerning their downstream sales and pricing considerations for the purpose of diminishing or negating Plaintiffs' provable damages, *Hanover Shoe* and *Illinois Brick* instruct that such evidence is not relevant and thus not discoverable. *See* Fed. R. Civ. P. 26(b)(1). However, nothing in the express holdings of *Hanover Shoe* or *Illinois Brick* address whether evidence of Plaintiffs' parallel and downstream activities might be relevant for some other purposes unrelated to the quantum of Plaintiffs' antitrust damages.  Here, Defendants suggest that the deposition testimony they seek to elicit will not be proffered to negate or diminish Plaintiffs' quantum of damages (by attempting to show that any illegal overcharges were passed-on to their customers) but instead to rebut or discredit Plaintiffs' circumstantial evidence of illegal collusion inferred from Defendants' purported consciously parallel behavior and related "plus factors."  Defendants seek to elicit testimony from Plaintiffs' witnesses about the circumstances resulting in *force majeure* declarations in the MDI and TDI industries (broadly defined by Defendants) and how Plaintiffs spoke to their own customers about the legitimacy of those declarations, including Defendants' *force majeure* declarations that Plaintiffs now challenge as being a pretext for Defendants' collusive, anti-competitive behavior.  Defendants also seek to elicit testimony regarding Plaintiffs' communications with competitors, their participation in trade associations,[4] and their employees' prior employment with competitors, all for the purported purpose of showing that these activities are "competition-enhancing" and consistent with industry norms, and thus relevant to whether

---

[4]   At the status conference on November 2, 2023, Plaintiffs' counsel stated that participation in trade associations would not be considered downstream information and indicated that they "don't think [it is] a topic that we have a problem with our witnesses testifying about." (ECF No. 963, at 23).

certain "plus factors" may or may not establish inferences that consciously parallel behavior is unlawfully collusive. *See, e.g.*, *United States v. Apple, Inc.*, 952 F. Supp. 2d 638, 655 n.14 (S.D. N.Y. 2013) (referencing communications among putative antitrust co-conspirators that was a "departure from the ordinary pattern"). At least one other court has recognized the possibility that a direct purchaser's own parallel and downstream conduct may be relevant for certain purposes. *In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2011 WL 1327988, at *6 (D. Kan. April 5, 2011) ("The Court also agrees with the Magistrate Judge that plaintiffs' own . . . communications with competitors . . . and attendance at trade association meetings would be relevant to rebut plaintiffs' position that such conduct by defendants provides some circumstantial evidence of a conspiracy."); *Cf. Valley Drug Co. v. Geneva Pharm.*, 350 F.3d 1181, 1193 (11th Cir. 2003) ("we read *Hanover Shoe* as directing a court to overlook the potential net gain, or conversely the potential absence of a net loss, that the direct purchaser may in fact have experienced for the purposes of providing the direct purchaser with standing to sue and a means for calculating damages in antitrust violation litigation. *Hanover Shoe* does not hold that this net economic gain must be ignored or overlooked by a court when determining whether Rule 23 has been satisfied.").

Plaintiffs argue that a plethora of case law precludes this type of downstream discovery, and they refer to *In re Urethane Antitrust Litig.* and *Valley Drug Co.* as unhelpful outliers. Plaintiffs' argument in this regard is ultimately unpersuasive. *Valley Drug* is only instructive in this matter to the extent that the Court agrees with those aspects of *Valley Drug* that limit *Hanover Shoe* and *Illinois Brick* to their specific holdings relating to a direct purchaser's damages. In the Court's estimation, *Valley Drug* is otherwise minimally apposite insofar as *Valley Drug* itself is limited to applying those Supreme Court precedents to class certification pursuant to Fed. R. Civ. P. 23(b)(3) and its rationale in that regard was subsequently rejected by the Third Circuit in *In re*

7

*K-Dur Antitrust Litig.*, 686 F.3d 197, 223 (3d Cir. 2012), *vacated on other grounds*, 133 S. Ct. 2849 (2013), *judgment reinstated as to class certification*, 2013 WL 5180857 (3d Cir. Sept. 9, 2013). Accordingly, *Valley Drug* and other class certification decisions are largely inapposite here. And the Court finds Plaintiffs' other cited cases[5] to be similarly unhelpful for determining whether certain communications and activities of direct purchasers, such as Plaintiffs, may be relevant and thus discoverable with respect to those plus-factors for the purpose of generating – or refuting – inferences of unlawful collusion.

Plaintiffs also contend that this Court's July 20, 2020 Order precludes discovery of information regarding Plaintiffs' manufacture, use, sale, distribution, and pricing of polyurethane products to their customers (ECF No. 359 at 2) and, therefore, should be applied again now to preclude Defendants from questioning Plaintiffs' 30(b)(1) and 30(b)(6) deposition witnesses on such "downstream" topics. However, the Court is mindful of the timing and context of this prior ruling, noting that it was entered more than three years ago on the threshold of searching for, gathering, and producing vast amounts of documents in response to written discovery requests for structured and particularized data compilations regarding Plaintiffs' downstream sales, price, volume, transportation, and other such fields. (ECF No. 351). Now, years later, the Court still believes that such structured and particularized data is not relevant, nor do Defendants presently ask for such data. Rather, Defendants now seek a more limited scope of information during the confines of specified depositions of limited duration.[6] While the anticipated scope of inquiry

---

[5] *See In re Local TV Advert. Antitrust Litig.*, 2023 WL 1863046, at *2-3 (standing and class certification); *In re Turkey Antitrust Litig.*, 2021 WL 6428398, at *3-4 (class certification, anti-competitive effects, and market definition); *In re Plastics Additives Antitrust Litig.*, No. 03-2038, 2004 WL 2743591, at *15-17 (E.D. Pa. Nov. 29, 2004) (pricing terms and demand conditions on the end markets for defendants' products).

[6] As Defendants point out, the Court previously imposed numerical and time limitations on depositions (ECF No. 958), so prolonged forays into areas of relatively limited utility are structurally deterred.

seemingly pertains, at least in part, to circumstances arising contemporaneously with or shortly after Plaintiffs' direct MDI or TDI purchases were made and thus is fairly characterized generally as "downstream," such evidence is not of the type contemplated by the Court's July 20, 2020 Order nor is it the type of "massive evidence and complicated theories" that concerned the Supreme Court in *Hanover Shoe*. 392 U.S. at 492-93 (stating, for example, that "[a] wide range of factors influence a company's pricing policies . . . [and] [s]ince establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable."). The point of Defendants' newly sought inquires, as the Court understands it, is focused on Defendants' behavior either directly through Plaintiffs' comments to others concerning Defendants' *force majeure* declarations, or by way of comparison to the behavior of Plaintiffs and others as being consistent with or aberrational to industry norms and standards within the relevant MDI and TDI markets to provide non-collusive explanations for such behavior. On the present record, the Court concludes that such limited inquiries do not transgress *Hanover Shoe* nor violate the Court's July 20, 2020 Order. Furthermore, there is no basis in the record to determine that such limited inquiries would not be proportional to the needs of the case[7] or would pose an undue burden[8] or expense on Plaintiffs. *See* Fed. R. Civ. P. 26 (b)(1) and (c).

---

[7] When evaluating proportionality, courts consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

[8] Plaintiffs raise concerns that such lines of inquiry may infringe upon their confidential and proprietary information in the downstream market. (ECF No. 963, at 21-22) ("it's important for the Court to understand that these business entities are very jealous of their proprietary information in the downstream market. They have highly confidential agreements with the Department of Defense, in some instances. They have special formulations of MDI and TDI in what we call systems to create urethane that have absolutely no bearing on any issues in this case . . . [and at least one deponent was] afraid to lose their job if they disclose any of this highly proprietary information."). However, considering the protections afforded by the Court's Protective Order (ECF No. 239), and given that the

In ruling that these lines of inquiry are relevant and thus discoverable pursuant to Fed. R. Civ. P. 26(b)(1), the Court makes no determination at this juncture as to whether such evidence would be admissible. Fed. R. Civ. P. 26(b)(1) ("[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable."). Indeed, Plaintiffs' interactions with competitors and customers concerning matters unrelated to Defendants and in downstream markets seems far afield of the target. However, refereeing each question during each deposition is neither practical nor in keeping with the conventional manner of taking depositions and interposing objections or otherwise objecting later. *See* Fed. R. Civ. P. 32(b) and (d)(3). Those admissibility determinations are not yet ripe and involve considerations beyond relevance pursuant to Fed. R. Evid. 401, including whether the probative value of such evidence is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, etc., pursuant to Fed. R. Evid. 403. Therefore, these decisions shall be deferred.

Ultimately, Defendants may proceed to question Plaintiffs' 30(b)(1) and 30(b)(6) witnesses on the topics outlined above in a manner consistent with this Memorandum and corresponding Order.

## ORDER OF COURT

Accordingly, this 9th day of February 2024, upon consideration of the parties' respective positions, briefs, and supporting materials, and pursuant to Federal Rule of Civil Procedure 26(b)(2)(C), IT IS HEREBY ORDERED that Defendants may pose questions to Plaintiffs'

---

anticipated inquiries shall avoid eliciting detailed and particularized descriptions of down-market products and pricing, any such lines of questioning, evaluated on the current record at least, would not unduly infringe upon Plaintiffs' confidential commercial interests or otherwise unduly burden them.

30(b)(1) and 30(b)(6) witnesses in a manner consistent with the Court's accompanying Memorandum and as follows:

1. Defendants will refrain from examining Plaintiffs' witnesses concerning the amount of any price increase that Plaintiffs passed on to their customers and/or the identity of any specific customers to whom that price increase was applied.

2. Defendants will refrain from examining witnesses concerning downstream products other than standalone MDI/TDI for resale.

3. Defendants will refrain from examining witnesses concerning specific customers of Plaintiffs' downstream products other than standalone MDI/TDI for resale, subject to a demonstration of good cause to the Court.

4. Notwithstanding the limitations set forth in Paragraphs 1-3 of this Order, Defendants may examine witnesses concerning:

    a. Communications with other direct purchasers of standalone MDI/TDI regarding Defendants' pricing information related to those products;

    b. *force majeure* announcements, notices, and declarations (Topic No. 27) but shall confine the scope of such examinations to any *force majeure* announced, noticed, or declared within six (6) months of any *force majeure* announced, noticed, or declared by any Defendant;

    c. meetings/communications with standalone MDI/TDI competitors (Topic No. 29);

    d. participation in trade associations and similar organizations, including the membership of such organizations and meetings or other communications with competitors in connection with such associations or organizations and

       regardless of whether such associations or organizations pertain to industry sectors limited to standalone MDI/TDI markets. (Topic No. 30);

   e. employees who previously worked for a competitor (Topic No. 32); and

   f. purchases, sales, swaps, exchanges, and/or tolls of standalone MDI/TDI sold with any competitors (Topic No. 33).

5. The testimony elicited in accordance with this Order shall be presumptively designated as "Confidential Discovery Material" pursuant to the Court's Order Governing the Protection and Exchange of Confidential Material (ECF No. 239), subject to the parties' reservation of rights and obligations as set forth therein.

*s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

cc/ecf:  All counsel of record