**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: DIISOCYANATES | ) | Master Docket Misc. No. 18-1001 |
| ANTITRUST LITIGATION | ) | |
| | ) | MDL No. 2862 |
| This Document Relates to: | ) | |
| All Cases | ) | |

## <u>MEMORANDUM OPINION</u>

In this multi-district antitrust litigation, Plaintiffs allege that Defendants engaged in a conspiracy to fix, raise, maintain, and/or stabilize the price of methylene diphenyl diisocyanate ("MDI") and toluene diisocyanate ("TDI") sold in or shipped to the United States through agreements to limit supply of MDI and TDI by planned manufacturing shutdowns at plants worldwide and implementing coordinated pricing increases, in violation of the Sherman Act, 15 U.S.C. §§ 1, 3. (*See* Docket No. 378, ¶¶ 1-3, 7-8).

Presently before the Court are Renewed Motions to Dismiss Under Rule 12(b)(2) For Lack of Personal Jurisdiction filed by Defendants Covestro AG and Wanhua Chemical Group Co., Ltd. ("Wanhua China"), which are opposed by Plaintiffs. (Docket Nos. 681-688, 717, 718, 722, 725, 726, 756, 826, 854, 855-858, 861, 862, 864, 878, 879, 892-895, 1034, 1035). After careful consideration of the parties' arguments in light of the prevailing legal standards, the Court concludes that it lacks personal jurisdiction over Covestro AG and Wanhua China, thus Defendants' Renewed Motions to Dismiss will be granted, Plaintiffs' claims against Covestro AG and Wanhua China will be dismissed with prejudice, and Covestro AG and Wanhua China will be terminated as parties in this litigation.

## I.   **BACKGROUND**

Covestro AG and Wanhua China previously moved to dismiss Plaintiffs' Consolidated Second Amended Class-Action Complaint ("SAC"), challenging whether this Court has personal jurisdiction over them.  (*See* Docket No. 291 at 1).  Plaintiffs argued that sufficient minimum contacts exist in the United States to permit the exercise of personal jurisdiction based on four concepts: (1) Defendants' status as co-conspirators with domestic entities; (2) the effects of Defendants' tortious conduct in the United States; (3) the conduct of Defendants' domestic subsidiaries under an alter ego theory; and (4) the conduct of Defendants' domestic subsidiaries under an agency theory.  (*See id.* at 1-2).  At that time, the Court found that Plaintiffs had not demonstrated the existence of minimum contacts through a conspiracy, alter ego, or agency theory, or via the effects test, but it denied Defendants' motion to dismiss without prejudice and permitted jurisdictional discovery.  (*Id.* at 11-12).  Following the completion of jurisdictional discovery, both Covestro AG and Wanhua China filed a Renewed Motion to Dismiss, once again contending that this Court lacks personal jurisdiction over them.

After the parties briefed the jurisdictional issue, the Court held oral argument on Defendants' Motions.  (Docket Nos. 1185, 1204).  Plaintiffs subsequently filed a Notice of Supplemental Public Information in Support of its Opposition to Wanhua China's Renewed Motion to Dismiss,[1] to which Wanhua China responded.  (Docket Nos. 1212, 1212-1, 1217).

---

[1]     Attached to Plaintiffs' Notice is an investigative report from the United States International Trade Commission  concerning MDI from China, which was published after oral argument on the Renewed Motions to Dismiss.  (*See* Docket No. 1212-1).  According to Plaintiffs, the report questioned whether the United States MDI industry was materially injured by imports of MDI from China.  (Docket No. 1212 at 1).  While Plaintiffs acknowledge that the report primarily addressed an antidumping investigation and concerned import activity "after the class period in this case," they submit that "the conclusion that Chinese imports of MDI had a 'significant impact on the domestic industry' supports [their] claims that Wanhua Chemical Co., Ltd.'s MDI business, and thus the effect of any anticompetitive conduct by it, targets the United States market."  *Id.*  Given Plaintiffs' own acknowledgement that the report primarily concerned an antidumping investigation, as well as import activity after the relevant class period, the report plainly is irrelevant to the analysis of whether personal jurisdiction exists over Wanhua China.

Plaintiffs also subsequently filed a Supplemental Brief in Opposition to the Renewed Motions to Dismiss, seeking to supplement the record with excerpted deposition testimony from five witnesses (former employees of Covestro LLC, Wanhua Chemical (America) Co., Ltd. ("WCA"), and BASF SE), which they claim confirms Covestro AG's and Wanhua China's "pervasive involvement in the U.S. diisocyanate market."[2]    (Docket No. 1221 at 1-2; *see also* Docket Nos. 1222 - 1224).  Defendants then responded to Plaintiffs' Supplemental Brief.  (Docket Nos. 1227 - 1233).  Additionally, Plaintiffs filed a Notice of Supplemental Authority, providing two recent cases which they submit are relevant to the Renewed Motions.  (Docket No. 1234).  Briefing on the Renewed Motions is now complete.

---

2        The Court declines to exercise its discretion to supplement the record with the additional proffered deposition testimony as Plaintiffs request.  *See Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 327, n.16 (3d Cir. 2015) (reviewing district court's decision on motion to supplement the record for abuse of discretion).  The proffered testimony was taken beyond the scope of jurisdictional discovery and it has been submitted well after the filing of Defendants' Motions to Dismiss.  *See, e.g., Garcia v. Newtown Twp.*, 483 F. App'x 697, 705, n.25 (3d Cir. 2012) (finding that district court did not abuse its discretion by refusing the plaintiff's request to supplement record after all discovery had closed and after motions for summary judgment had been filed); *Gentry v. Sikorsky Aircraft Corp.*, 383 F. Supp. 3d 442, 449 (E.D. Pa. 2019) (striking declaration that "was not the result of jurisdictional discovery"); *Karlo v. Pittsburgh Glass Works, LLC*, No. 2:10-cv-1283, 2015 WL 3966434, at *3 (W.D. Pa. June 8, 2015) (denying request to supplement where plaintiffs "had ample opportunity to depose [the witness] or seek relevant information during the extensive discovery phase of [the] litigation" but "elected not to do so").  Furthermore, the deposition testimony proffered by Plaintiffs does not alter the Court's analysis and ultimate finding that it lacks personal jurisdiction over Covestro AG and Wanhua China.  *See Karlo*, 2015 WL 3966434, at *3 (denying request to supplement where proffered information "adds nothing new to the record").  For instance, the Court finds it irrelevant how a former WCA employee (Stephen Cox) characterizes Wenping Zhang's role with Wanhua China, when a robust record otherwise exists concerning Mr. Zhang's dual role as General Manager of Wanhua China's International Business Department and as a Director on WCA's Board, and that certain former employees of Covestro LLC (Gerald MacClearly and Timothy Chappell) and employees of another company (Steven Brughmans and Christian Scheuerer of BASF SE) were unaware of Covestro AG's corporate structure and/or that Covestro AG and Covestro Deutschland AG are separate entities.

## II.     STANDARD OF REVIEW – RULE 12(b)(2)

Pursuant to Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss a complaint for lack of personal jurisdiction.  *See* Fed. R. Civ. P. 12(b)(2).  "[O]nce a defendant has raised a jurisdictional defense," the plaintiff has the burden to "prov[e] by affidavits or other competent evidence that jurisdiction is proper." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (quoting *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996)).  If the district court does not hold an evidentiary hearing, a plaintiff "need[] only … establish a prima facie case of personal jurisdiction."  *D'Jamoos v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009) (citation omitted).  Where, as here, the parties were afforded jurisdictional discovery, "the court must look beyond the allegations in the pleadings in assessing whether plaintiffs presented a prima facie case." *In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litig.*, 735 F. Supp. 2d 277, 307 (W.D. Pa. 2010). "In other words, the nonmoving party must base its prima facie showing of personal jurisdiction over the moving party on evidence of specific facts set out in the record." *Joint Stock Soc. v. Heublein, Inc.*, 936 F. Supp. 177, 192 (D. Del. 1996).  Finally, "in deciding a motion to dismiss for lack of jurisdiction, a court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff." *Metcalfe*, 566 F.3d at 330 (quoting *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003)).

## III.     PERSONAL JURISDICTION AND THE PERTINENT FORUM

Plaintiffs seek to invoke this Court's personal jurisdiction over Covestro AG and Wanhua China pursuant to the Clayton Act, 15 U.S.C. §§ 12-27, for claims asserting purported violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.  *See also* 28 U.S.C. §§ 1331, 1332(d), 1337, and 1367. (Docket No. 378, ¶¶ 17-18).  Moreover, Federal Rules of Civil Procedure 4(k)(1)

and (2) each provide that serving a summons or filing a waiver of service can establish personal

jurisdiction over a defendant when authorized by a federal statute or for a claim that arises under

federal law.  Fed. R. Civ. P. 4(k)(1)(C) and 4(k)(2).

Here, the Clayton Act provides the requisite federal statutory authority for this Court's

personal jurisdiction.  Section 12 of the Clayton Act provides:

> Any suit, action, or proceeding under the antitrust laws against a
> corporation may be brought not only in the judicial district whereof
> it is an inhabitant, but also in any district wherein it may be found
> or transacts business; and *all process in such cases may be served in
> the district of which it is an inhabitant, or wherever it may be found.*[3]

15 U.S.C. § 22 (emphasis added); *see also In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d

288, 296-97 (3d Cir. 2004) (holding that the service of process provision on foreign corporations

is independent of, and does not require satisfaction of, the specific venue provision under Section

12 of the Clayton Act).  This statutory basis for personal jurisdiction must also comport with the

Due Process Clause of the Fifth Amendment.  *In re Auto. Refinishing*, 358 F.3d at 298; *Pinker v.

Roche Holdings Ltd.*, 292 F.3d 361, 368-69 (3d Cir. 2002); *see also* Docket No. 291 at 4-5.

Furthermore, personal jurisdiction under Section 12 of the Clayton Act "is as broad as the limits

of due process under the Fifth Amendment."  *In re Auto. Refinishing*, 358 F.3d at 299.

"The Due Process Clause protects an individual's liberty interest in not being subject to the

binding judgments of a forum with which he has established no meaningful 'contacts, ties, or

relations.' " *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (quoting *International

Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).  "[T]he foreseeability that is critical to due

---

3    Notably, being an "inhabitant" is held to mean incorporated under the laws of that jurisdiction, while being
"found" is generally equated with "doing business" there and requires greater contacts than does "transacting
business."  *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 293 n.6 (3d Cir. 2004).

process analysis . . . is that the defendant's conduct and connection with the forum . . . . are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws." *Burger King*, 471 U.S. at 475 (citation omitted). To that end, "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum." *Id.* at 474 (quoting *International Shoe*, 326 U.S. at 316).

In accordance with these principles, a court's exercise of "[p]ersonal jurisdiction can be either general jurisdiction or specific jurisdiction." *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 129 (3d Cir. 2020) (citations omitted). General jurisdiction exists when a defendant's contacts with the forum are "so continuous and systematic as to render [it] essentially at home [there]." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation marks and citation omitted). On the other hand, specific jurisdiction exists when a plaintiff's claim arises out of a defendant's forum-related activities such that the defendant "should reasonably anticipate being haled into court there." *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.*, 75 F.3d 147, 151 (3d Cir. 1996) (quoting *World–Wide Volkswagen*, 444 U.S. at 297).

In this case, Defendants originally disputed whether their contacts nationwide, or instead in a narrower forum, are relevant to the minimum contacts inquiry. (*See* Docket No. 291 at 4). As the Court previously explained, under the "national contacts doctrine," personal jurisdiction in federal antitrust litigation is assessed based on a defendant's aggregate contacts with the United States as a whole. (*Id.*) (citing *In re Auto. Refinishing*, 358 F.3d at 298) ("We hold that personal

6

jurisdiction in federal antitrust litigation is assessed on the basis of a defendant's aggregate contacts with the United States as a whole.")).  "This means that personal jurisdiction must comply with the due process requirements of the Fifth Amendment, which requires only that the . . . Plaintiffs show that [Defendants] had minimum contacts with the United States as a whole."  *In re Liquid Aluminum Sulfate Antitrust Litig.*, Civ. No. 16-md-2687, 2019 WL 1125589, at *5 (D.N.J. Mar. 11, 2019); *see also Pinker*, 292 F.3d at 369 (holding "that a federal court's personal jurisdiction may be assessed on the basis of the defendant's national contacts when the plaintiff's claim rests on a federal statute authorizing nationwide service of process").  Consistent with this authority, the Court previously ruled that it "will assess personal jurisdiction in light of Defendants' nationwide contacts."  (Docket No. 291 at 6).  Defendants do not contest that the United States is the pertinent forum for the minimum contacts analysis.

Plaintiffs, however, now maintain in their January 6, 2026 Notice of Supplemental Authority that a case from the United States Supreme Court issued more than six months ago on June 20, 2025, and another from the District Court of Delaware issued on December 30, 2025, "effectively overrule[] the due process standard previously applied by this Court and advocated for by Covestro AG and Wanhua China," thus the Court should summarily deny Defendants' Renewed Motions.  (Docket No. 1234 at 2).  This Court disagrees.

In *Fuld v. Palestine Liberation  Org.*, 606 U.S. 1 (2025), a case in which plaintiffs sought to invoke the court's personal jurisdiction over foreign bodies that are not recognized as sovereign by the United States but nevertheless carry out governmental functions pursuant to the Antiterrorism Act of 1990 ("ATA") and the Promoting Security and Justice for Victims of Terrorism Act ("PSJVTA"), the Supreme Court "decline[d] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment [stating that] the Due Process Clause of the

Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.* at 16. After explicating the differences between the Fifth and Fourteenth Amendments when applied to the issue of personal jurisdiction authorized by a federal statute, the Supreme Court held that the Fifth Amendment does not impose the same jurisdictional limitations as the Fourteenth Amendment, stating that "[t]he Constitution confers upon the Federal Government – and it alone – both nationwide and extraterritorial authority." *Id*. at 15. Yet, the Supreme Court majority declined to "delineate the outer bounds of the Federal Government's power, consistent with due process, to hale foreign defendants into U.S. courts." *Id*. at 18. Rather, the Supreme Court reviewed the operative federal statute, the PSJVTA, and discerned that it "ties federal jurisdiction to conduct closely related to the United States that implicates important foreign policy concerns" and observed that PSJVTA is "suitably limited" to a narrow category of claims under the ATA that provide civil remedies only for Americans injured by acts of international terrorism, and that its jurisdiction triggering predicates are likewise narrow. *Id*. at 18-21. In performing this analysis, the Supreme Court majority further stated that "[a]lthough . . . the Due Process Clause of the Fifth Amendment does not incorporate the Fourteenth Amendment minimum contacts standard, the prospect remains that the Fifth Amendment might entail a similar 'inquiry into the reasonableness of the assertion of jurisdiction in the particular case.' " *Id*. at 23 (quoting *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 115 (1987)). Such reasonableness "will depend in each case on an evaluation of several factors, including the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Id*. at 24 (internal quotation marks and citation omitted).

In *King v. Bon Charge*, No. 25-cv-00105-SB, 2025 WL 3764039 (D. Del. Dec. 30, 2025), Circuit Judge Bibas, sitting by designation, applied *Fuld* to a case involving the federal Telephone Consumer Protection Act ("TCPA"). Judge Bibas makes three observations regarding *Fuld*: first, whatever standard applies in the Fifth Amendment context is "more flexible" than the standard applicable to the Fourteenth; second, even though the Fifth Amendment does not import the minimum-contacts standard wholesale, the breadth of asserted jurisdiction and the extent of a defendant's contacts with the United States may still be relevant to the constitutionality of asserting jurisdiction in a particular case; and third, the Fifth Amendment may yet require courts to consider – as they do in Fourteenth Amendment cases – the reasonableness of the assertion of jurisdiction in the particular case. *Id.* at *4 (internal quotations and citations omitted). Judge Bibas then took a "cautious approach" and applied pre-*Fuld* case law to find that the defendant in *King* had sufficient minimum contacts with the United States, that plaintiff's claims relate to those contacts, and that exercising jurisdiction would be fair and reasonable, thereby concluding that asserting personal jurisdiction "would be constitutional under the more stringent standard *Fuld* rejected." *Id.* Judge Bibas then went one step further to evaluate personal jurisdiction as a matter of "first principles" opining that the Fifth Amendment provides little if any substantive limitation on Congress' ability to authorize federal courts to exercise personal jurisdiction over defendants located outside the territorial limits of the United States. *Id.* at *7-10.

While *Fuld* "upset the assumption" that the Fifth Amendment Due Process Clause requires the same minimum contacts with the United States as the Fourteenth Amendment requires with a State, it does not undermine the scope of jurisdiction as established by Congress via federal statutes. If anything, *Fuld* directs courts to evaluate personal jurisdiction in accord with the jurisdiction-granting federal statute at issue (perhaps without any substantive constitutional limits),

such as the TCPA in *King*, the PSJVTA as in *Fuld* itself, or the Clayton Act as is relevant in the instant case. The Third Circuit long ago held that Section 12 of the Clayton Act is essentially a federal long-arm statute and is as broad as the limits of due process under the Fifth Amendment. *In re Auto. Refinishing*, 358 F.3d at 299.  This Court's reading of *Fuld*, and as it was applied by Judge Bibas in *King*, does not alter the view that some showing of minimum contacts and purposeful availment with the United States remains necessary to establish personal jurisdiction in federal antitrust cases, especially since Congress requires being "found" in the United States, meaning that it does business here. 15 U.S.C. § 22; *see also In re Auto. Refinishing*, 358 F.3d at 293 n. 6; *Pinker*, 292 F.3d at 370 (". . . in assessing the sufficiency of a defendant's contacts with the forum, a court should look at the extent to which the defendant availed himself of the privileges of American law and the extent to which he could reasonably anticipate being involved in litigation in the United States.") (internal quotation marks and citation omitted).

## IV.    **THE PARTIES' JURISDICTIONAL ARGUMENTS**

Plaintiffs alleged in the SAC that Defendant Covestro AG is a German corporation[4] headquartered in Leverkusen, Germany, which manufactured, marketed, and/or sold MDI and/or TDI products to purchasers throughout the United States and elsewhere, directly or through its wholly owned subsidiary Covestro LLC.  (Docket No. 378, ¶ 27).  As also alleged in the SAC, Defendant Wanhua China is a Chinese corporation with its principal place of business in Yantai, China, which manufactured and/or sold MDI and TDI products to purchasers throughout the United States and elsewhere, directly or through predecessors, affiliates and/or subsidiaries.  (*Id.*, ¶ 35).  Plaintiffs aver that this Court has personal jurisdiction over these foreign Defendants

---

4    More precisely, as set forth in the Declaration of Dr. Martin Breloer, who is General Counsel for Covestro AG, Covestro AG is a holding company incorporated under German law.  (Docket No. 682-1, ¶ 3).

because, *inter alia*, they: "(a) transacted business in this District;[5] (b) directly or indirectly manufactured and/or sold MDI and/or TDI products in this District; (c) have substantial aggregate contacts with this District; and/or (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District."  (*Id.*, ¶ 20).  Covestro AG and Wanhua China contest that the Court may exercise personal jurisdiction over them.  The parties' jurisdictional arguments are summarized in turn.

### A.  Covestro AG

Covestro AG is a holding company (consisting of approximately four to six business executives, a legal team, and about 150 administrative and corporate personnel) based in Leverkusen, Germany that does not manufacture or sell MDI or TDI, and does not purposefully avail itself of or "aim [its] conduct" at the Western District of Pennsylvania or any other relevant forum in the United States.  (Docket Nos. 682 at 6; 826 at 5, 15).  Rather, Covestro AG guides high-level strategy for the Covestro Group, it acts largely by considering requests to approve transactions that exceed certain monetary thresholds, and it does not manage or even involve itself in the day-to-day aspects of its subsidiaries.  (Docket No. 826 at 6).  Critically, none of the conduct by other companies—whether by an affiliate of Covestro AG (that is, its indirectly wholly-owned U.S. subsidiary Covestro LLC) or another defendant—establish jurisdiction over Covestro AG.  (Docket No. 682 at 6).  According to Covestro AG, Plaintiffs have never argued and cannot demonstrate that this Court has general jurisdiction over Covestro AG; the Court does not have specific jurisdiction over Plaintiffs' claims against Covestro AG under the "effects test"; and Plaintiffs' conspiracy, alter-ego, and agency theories are wholly without support.  (*Id.* at 7-8).  All

---

5       As discussed, the United States is the pertinent forum for the minimum contacts analysis.

told, Covestro AG maintains that Plaintiffs' theories of jurisdiction are based on a "fundamental misunderstanding of the record" as shown by Plaintiffs' citation to various documents where they attribute to Covestro AG actions by other legal entities within the Covestro Group. (Docket No. 826 at 6).

Plaintiffs counter that the evidence produced in jurisdictional discovery and as a whole contradicts Covestro AG's contention that it is a mere holding company with no involvement in the United States diisocyanates business. (Docket No. 725 at 5). Plaintiffs maintain that Covestro AG had a systematic level of involvement and control over Covestro LLC's business and decision-making, including related to pricing and supply of diisocyanates to United States customers, as shown by the following: Covestro AG had direct oversight of the construction and management of the Covestro-branded MDI and TDI plant in Baytown, Texas; in one instance, Covestro LLC specifically required permission from Covestro AG's Board of Management to declare force majeure at Baytown, constraining United States supply of diisocyanates; in other instances, Covestro AG's CEO demanded an increase in sales of diisocyanates, including in the United States; and Covestro AG executives were also directly responsible for approving contracts, including pricing terms, between Covestro LLC and key U.S. customers for the sale of MDI and TDI. (*Id.*).

### B.  <u>Wanhua China</u>

Wanhua China maintains that it has no presence in the United States. (Docket No. 855 at 6). It does not manufacture or sell MDI or TDI, or any other products, in the United States. (*Id.*). Therefore, Plaintiffs have attempted to impute to Wanhua China the activities of its U.S. subsidiary, WCA. (*Id.*). To that end, Plaintiffs ask the Court to ignore corporate formalities to find jurisdiction over Wanhua China based on "attenuated" theories likes alter ego, agency, and

co-conspirator jurisdiction, yet they fail to point to evidence that Wanhua China aimed any conspiracy or tortious conduct at the United States, or that its activities were so intertwined with WCA's that WCA should be deemed its agent or alter ego. (*Id.*; Docket No. 894 at 7). Quite simply, there is nothing unusual or extraordinary about WCA or its relationship with Wanhua China that would warrant the Court's exercise of jurisdiction over it through actions of WCA. (Docket No. 855 at 7). Overall, as an entity that neither has a presence in, or does business in, the United States, Wanhua China submits that it is not subject to jurisdiction based on its own alleged activities or the alleged activities of its subsidiary, WCA. (*Id.* at 12).

Conversely, Plaintiffs argue that the Court has reason to exercise personal jurisdiction over Wanhua China under any jurisdictional theory it may consider. (Docket No. 1034 at 5). As support, Plaintiffs posit that the evidence shows Wanhua China engaged in the construction of an MDI plant in the United States; shipped MDI directly to customers in the United States; engaged directly with United States customers; "swapped" diisocyanates with United States manufacturers; set prices for MDI sold in the United States through WCA, including setting a "limit" or floor price; and controlled nearly all aspects of WCA's business. (*Id.*).

In summary, Plaintiffs maintain that the totality of the evidence is sufficient for the Court to exercise general personal jurisdiction over both Covestro AG and Wanhua China. (Docket Nos. 725 at 28; 1034 at 28). Plaintiffs also claim that that the Court possesses specific jurisdiction over both Defendants because they have sufficient minimum contacts with the United States under the "effects test." (Docket Nos. 725 at 7-15; 1034 at 6-14). Additionally, Plaintiffs assert that the Court has specific jurisdiction over Covestro AG and Wanhua China under imputed contacts theories, including agency, alter ego, and conspiracy because: Covestro AG transacted business within the United States through its agent, Covestro LLC, while Wanhua China did so through its

agent, WCA; Covestro LLC is the alter ego of Covestro AG, and WCA is the alter ego of Wanhua China; and, Covestro AG and Wanhua China are co-conspirators of domestic entities. (Docket Nos. 725 at 15-28; 1034 at 14-28). Both Covestro AG and Wanhua China maintain that personal jurisdiction does not lie under any of these theories. (*See generally* Docket Nos. 682; 826; 855; 894). Furthermore, both Defendants contend that this Court's exercise of personal jurisdiction over them would not comport with fair play and substantial justice, particularly given that they are foreign Defendants. (Docket Nos. 682 at 30; 725 at 29; 855 at 29-30; 1034 at 28-29).

## V.   THE COURT LACKS PERSONAL JURISDICTION OVER COVESTRO AG AND WANHUA CHINA

After careful consideration of the parties' arguments and the evidence adduced during jurisdictional discovery as presented in the briefing papers and at oral argument, the Court finds that Plaintiffs have not sustained their burden to establish a prima facie case of either general or specific personal jurisdiction over Covestro AG and Wanhua China.

### A.   General Jurisdiction

General jurisdiction refers to a court's power to "hear any and all claims" against a defendant. *Goodyear*, 564 U.S. at 919. "A court may exercise general jurisdiction over a defendant where it has 'continuous and systematic' contacts with the forum, whether or not those contacts are related to the plaintiff's cause of action." *Metcalfe*, 566 F.3d at 334 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, (1984)). "Sporadic, ephemeral, or deciduous contacts do not suffice." *In re Chocolate Confectionary Antitrust Litig.*, 641 F. Supp. 2d 367, 383 (M.D. Pa. 2009) ("*Chocolate II*"). Instead, "general jurisdiction requires a strong nexus between the defendant's essential business activities and its contacts with the forum." *Id.* at 384. Therefore, general jurisdiction requires the defendant "to possesses qualitative contacts with the forum that constitute the bread and butter of [the defendant's] daily business,

14

such that its activities approximate[ ] business presence in the forum." *Id.* (internal quotation marks and citations omitted). Conversely, "[f]leeting activities such as periodic business trips, occasional purchases, and mere communication with in-forum entities hold relatively little sway in the general jurisdiction analysis." *Id.* (citations omitted).

To summarize, "general jurisdiction over a foreign corporation typically arises only when that corporation's 'affiliations with the [forum] are so continuous and systematic as to render [it] essentially at home in the forum [].' " *Chavez v. Dole Food Co., Inc.*, 836 F.3d 205, 223 (3d Cir. 2016) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)). As the Supreme Court has explained, a corporation is generally "at home" in its "place of incorporation and principal place of business." *Daimler*, 571 U.S. at 137. Therefore, the place of incorporation and principal place of business are "paradig[m] ... bases for general jurisdiction." *Id.* (citation omitted); *see also* 15 U.S.C. § 22 ("may be served in the district of which it is an *inhabitant . . .*") (emphasis added). As such, it is "incredibly difficult to establish general jurisdiction [over a corporation] in a forum *other* than the place of incorporation or principal place of business." *Chavez*, 836 F.3d at 223 (emphasis in original) (citation omitted). Plaintiffs have not done so here.

As noted, Covestro AG is a German holding company headquartered in Leverkusen, Germany, and Wanhua China is a Chinese corporation with its principal place of business in Yantai, China. (Docket Nos. 378, ¶¶ 27, 35; 682-1, ¶ 3). These foreign corporations with a headquarters and a principal place of business in other countries are not "at home" in the United States, *see Daimler*, 571 U.S. at 137, and Plaintiffs have not persuaded the Court otherwise. Neither Covestro AG's nor Wanhua China's alleged contacts with the United States are so continuous and systematic to render these foreign corporations at home in this country. At most, Plaintiffs cite "sporadic . . . contacts" or "[f]leeting activities [by Covestro AG and Wanhua China]

. . . [which] hold relatively little sway in the general jurisdiction analysis."[6] *Chocolate II*, 641 F. Supp. 2d at 383, 384. Consequently, the Court is unable to exercise general personal jurisdiction over Covestro AG and Wanhua China.

### B.    Specific Jurisdiction

In contrast to general jurisdiction, specific jurisdiction "is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear*, 564 U.S. at 919 (internal quotation marks and citation omitted). The Supreme Court has articulated two tests for specific jurisdiction: (1) the "traditional" test, which is known as the "minimum contacts" or purposeful availment test, *Burger King*, 471 U.S. at 474 (quoting *Int'l Shoe*, 326 U.S. at 316); and (2) the "*Calder* effects test," *see Calder v. Jones*, 465 U.S. 783 (1984). As the Third Circuit Court of Appeals has explained, the traditional test and the *Calder* effects test have distinct requirements, and both tests should be considered. *See Hasson v. FullStory, Inc.*, 114 F.4th 181, 197 (3d Cir. 2024) ("Though we agree with its application of *Calder*, the District Court also should have considered whether specific personal jurisdiction was proper under the traditional test as applied in *Ford Motor*."). Notably, while *Calder's* effects test is often applied "in assessing personal jurisdiction over intentional tortfeasors, . . . *Calder* [did not] carve out a special intentional torts exception to the traditional specific jurisdiction analysis." *Id.* at 189 (citation omitted) (alteration in original).

Here, Plaintiffs maintain that specific personal jurisdiction exists over both Covestro AG

---

6    Plaintiffs maintain that Covestro AG sent its CTO to the United States for purposes of maintaining oversight and management of a manufacturing plant in Baytown, Texas; participated in trade association meetings and other communications with executives of U.S. Defendants; directed the sales or swaps of diisocyanates; and approved sponsorship and advertising within Pennsylvania for the purpose of advancing its U.S. sales, including with the Pittsburgh Penguins, (Docket No. 725 at 28), and that Wanhua China engaged in swap agreements with United States components; exercised control over WCA's pricing; placed its executives on WCA's Board; planned the construction of an MDI plant; and shipped diisocyanates directly into the United States. (Docket No. 1034 at 28). These periodic activities do not equate to the continuous business presence necessary for general jurisdiction.

and Wanhua China under the *Calder* effects test, but they do not contend that personal jurisdiction lies under the traditional test. (*See* Docket Nos. 725 at 7-15; 1034 at 6-14) (arguing that Covestro AG and Wanhua China each have sufficient minimum contacts with the United States under the effects test). Nonetheless, the Court will assess whether it has specific personal jurisdiction over Defendants under both the traditional test and the *Calder* effects test. *See Hasson*, 114 F.4th at 189, 197 (expressing skepticism about assertion that Third Circuit precedents require courts to apply *Calder* effects test exclusively to intentional tort claims and explaining that the district court should have considered whether specific personal jurisdiction was proper under the traditional test, as well as under *Calder* effects test).

### 1. The Court Does Not Have Specific Personal Jurisdiction Over Covestro AG and Wanhua China Under the Traditional Test

The traditional test for specific jurisdiction "focuses on the relationship among the defendant, the forum, and the litigation," *Walden v. Fiore*, 571 U.S. 277, 284 (2014), and entails a three step analysis. First, the defendant must have taken "some act by which [it] purposefully avail[ed] itself of the privilege of conducting activities within the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (citation omitted). In other words, the defendant must have had "minimum contacts with the forum … that show [it] took a deliberate act reaching out to do business in that [forum]." *Hepp v. Facebook*, 14 F.4th 204, 207 (3d Cir. 2021). Second, "the litigation must 'arise out of or relate to' at least one of those activities." *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007) (quoting *Helicopteros*, 466 U.S. at 414). Third, "if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise 'comport[s] with fair play and substantial justice.' " *Id.* (quoting *Burger King*, 471 U.S. at 476).

As to both Covestro AG and Wanhua China, the record makes clear that personal

jurisdiction does not lie under the traditional test because neither foreign Defendant "purposefully avail[ed] itself of the privilege of conducting activities" in the United States. *Ford Motor*, 592 U.S. at 359. Covestro AG is a holding company incorporated under German law, which does not manufacture or sell MDI, TDI, or any other products. (Docket No. 682-1, ¶ 3). Given Covestro AG's status as a holding company that does not manufacture or sell any products, it follows that Covestro AG did not purposefully avail itself of the United States market. Likewise, Wanhua China, located in Yantai, China, has never manufactured or sold MDI or TDI in the United States, (Docket No. 857, ¶¶ 7, 17, 19), thus it did not purposefully avail itself of the United States market. Plaintiffs do not argue, let alone point to any record evidence, that Covestro AG or Wanhua China had "minimum contacts with the [United States] that show [it] took a deliberate act reaching out to do business [here]", *Hepp*, 14 F.4th at 207, to satisfy the purposeful availment prong of the traditional test.

**2.    The Court Does Not Have Specific Personal Jurisdiction Over Covestro AG and Wanhua China Under the *Calder* Effects Test**

The *Calder* effects test is an alternative means of establishing specific jurisdiction when an intentional tort is alleged. *See Lutz v. Rakuten, Inc.*, 376 F. Supp. 3d 455, 466 (E.D. Pa. 2019) ("When an intentional tort is alleged and personal jurisdiction cannot be established through the traditional specific jurisdiction test, courts apply the *Calder* effects test."). In that scenario, specific jurisdiction may be predicated upon a defendant's activities outside of the relevant forum if the plaintiff suffered the effects of the conduct within the forum. *See Calder,* 465 U.S. at 789-90 (personal jurisdiction was proper over non-resident defendants who committed an intentional tort outside of the forum where the effects caused damage to the plaintiff within the forum). The *Calder* effects test permits a court to exercise jurisdiction over "an intentional tortfeasor whose contacts with the forum . . . otherwise [do] not satisfy the requirements of due process under the

traditional test" if "the forum is the focus of the defendant's tortious conduct." *Hasson*, 114 F.4th at 187 (internal quotation marks and citations omitted).   The Third Circuit Court of Appeals explained the difference between the "effects test" and the traditional test as follows:

> [T]he effects test ... require[s] that the tortious actions of the defendant have a forum-directed purpose[—a requirement that] is not applicable in the more traditional specific jurisdiction analysis .... Unlike th[e] express requirement in the effects test, the traditional specific jurisdiction analysis simply requires that the plaintiff's claims arise out of or relate to the defendant's forum contacts. We do not agree with the argument that this traditional requirement is the equivalent of *the more demanding relatedness requirement of the effects test*.

*Id.* at 189 (quoting *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 99 (3d Cir. 2004) (emphasis added).

For the *Calder* effects test to apply, the plaintiff must show that: (1) the defendant committed an intentional tort;[7] (2) the plaintiff felt the brunt of the harm caused by that tort in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of the tort; and (3) the defendant expressly aimed its tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity. *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265-66 (3d Cir. 1998); *see also Hasson*, 114 F.4th at 187. The "expressly aimed" element is the threshold requirement that must first be met before a court considers the other two elements. *Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007) ("Only if the 'expressly aimed' element of the effects test is met need we consider the other two elements."). To meet this exacting standard, "the plaintiff must show that the defendant ***knew*** that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and ***point to*** specific activity

---

7    Courts have held that "[a] plaintiff may rely upon the *Calder* effects test to acquire jurisdiction over a defendant in cases involving business torts, including price fixing." *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 564 (M.D. Pa. 2009) ("*Chocolate I*") (citations omitted).

indicating that the defendant expressly aimed its tortious conduct at the forum." *IMO Indus.*, 155 F.3d at 266 (emphasis added).

The Court is mindful of a sister court's previous observation that "[t]he special character of an antitrust claim leads the Court to interpret more liberally the phrase 'expressly aim [...] tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.' " *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*, Civ. No. 02–6030, 2007 WL 2212713, at *9 (D.N.J. July 30, 2007). However, the Court is equally mindful of the Court of Appeals' consistent emphasis that *Calder* should be applied narrowly.[8] *See Marks v. Alfa Group*, 369 F. App'x 368, 370 (3d Cir. 2010) (citing *IMO*, 155 F.3d at 261-65). It also bears repeating that "[t]he liberal approach taken in *Bulk [Extruded] Graphite Prods.* stemmed, in part, from the existence of evidence that a witness suggested to the foreign Defendant that he 'establish contacts … to facilitate extracting a higher level of profitability from the … market in the United States,' and a cooperation policy relating to pricing in the United States." (*See* Docket No. 291 at 8) (citation omitted). As this Court previously found, "[n]o evidence of this type exists here." (*Id.*). The same holds true following jurisdictional discovery, despite Plaintiffs' claims to the contrary.

Turning to application of the *Calder* factors to Covestro AG and Wanhua China, Plaintiffs claim that the first and second factors are met because they have alleged an intentional tort, that is, violations of Sections 1 and 3 of the Sherman Act, and they have alleged that they suffered harm within the United States, which is the target forum. (Docket Nos. 725 at 8, n.2; 1034 at 7, n.2) (citing SAC at ¶¶ 44, 218-222). Notably, however, Plaintiffs do not contend that they have alleged

---

[8]    Although the *Calder* effects test and traditional specific jurisdiction analysis are different, "they are cut from the same cloth." *Marten*, 499 F.3d at 297. "Just as the standard test prevents a defendant from be[ing] haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, the effects test prevents a defendant from being haled into a jurisdiction solely because the defendant intentionally caused harm that was felt in the forum state if the defendant did not expressly aim his conduct at that state." *Id.* (internal quotation marks and citations omitted).

the third *Calder* factor – that Defendants expressly aimed tortious conduct at the United States such that it can be said to be the focal point of the tortious activity.[9] Even assuming that Plaintiffs' SAC properly alleges the third *Calder* factor, the evidence adduced during jurisdictional discovery does not establish that the express aiming requirement is satisfied as to either Covestro AG or Wanhua China.

### a. Covestro AG

According to Plaintiffs, Covestro AG aimed tortious conduct at the United States because it: (1) considers the United States part of its global diisocyanate business; (2) constructed an MDI plant in the United States; (3) approved diisocyanate plant shutdowns; and (4) approved swap agreements with competitors. (Docket No. 725 at 8-15). Plaintiffs' contend that this evidence shows Covestro AG's "direction of the effects of its diisocyanate business, and thus the alleged conspiracy, into the United States." (*Id.* at 15).

The Court is not convinced that any of the activities identified by Plaintiffs demonstrate that Covestro AG expressly aimed the alleged tortious conduct - a conspiracy to fix the price of MDI and TDI by agreements to restrict their supply - at the United States. *IMO Indus.*, 155 F.3d at 266. First, Plaintiffs incorrectly attribute to Covestro AG certain activities which are carried out by another entity. As Dr. Breloer explained, Covestro AG does not decide to declare force majeure or direct swap agreements. (*See* Docket No. 826-1, ¶¶ 7, 9) (stating that Covestro AG Board of Management approval "has never been required to declare force majeure, which is an operational issue outside Covestro AG's remit" and that co-producer supply agreements or swaps "are

---

9    In discussing the third *Calder* factor, Plaintiffs conspicuously omit "expressly" from its formulation. (*See* Docket Nos. 725 at 7; 1034 at 6) (listing third *Calder* factor as "the defendant aimed his tortious conduct at the forum"). To be clear, "the *Calder* 'effects test' can only be satisfied if the plaintiff can point to contacts which demonstrate that the defendant *expressly aimed its tortious conduct* at the forum, and thereby made the forum the focal point of *the tortious activity.*" *Hasson*, 114 F.4th at 192 (quoting *IMO Indus.*, 155 F.3d at 265) (emphasis added)).

operational activities under the purview of Covestro Deutschland AG").  Moreover, given that Covestro AG is a German holding company which does not manufacture or sell MDI or TDI, or otherwise perform any operational functions, (*see* Docket Nos. 682-1, ¶ 3; 826-1, ¶ 3), it strains credulity that it expressly aimed the tortious conduct at issue here at the United States.  Overall, the evidence cited by Plaintiffs, even if attributable to Covestro AG, is far less than the "thin" evidence found to be sufficient in *Bulk [Extruded] Graphite Prods.* for personal jurisdiction to lie under the *Calder* effect test.[10]  Consequently, Plaintiffs have not established a basis for personal jurisdiction over Covestro AG under the *Calder* effects test.

### b.  **Wanhua China**

Plaintiffs contend that Wanhua China aimed tortious conduct at the United States because it: (1) began the construction of an MDI plant in the United States; (2) shipped MDI into the United States; (3) engaged directly with United States customers; (4) was involved in swaps of diisocyanates with other defendants which had a United States component; (5) set a floor price for sales of MDI through WCA; and (6) controlled WCA by having Wanhua China members on WCA's Board of Directors.  (Docket No. 1034 at 7-14).

The Court is not persuaded that any of the activities identified by Plaintiffs establish that

---

10      As the *Chocolate I* court explained, *Bulk [Extruded] Graphite Prods.* "illustrates the evidentiary showing that a plaintiff must proffer to acquire jurisdiction under the *Calder* effects test."  *Chocolate I*, 602 F. Supp. 2d at 565, n.24.  In that case, the plaintiffs introduced deposition testimony reflecting that the moving defendant had attended meetings concerning price fixing in foreign graphite markets.  *Bulk [Extruded] Graphite Prods*, 2007 WL 2212713 at *6. During those meetings, a co-conspirator recommended that the defendant "establish contacts" with the co-conspirator's American company to facilitate extracting a higher level of profitability from the extruded graphite market in the United States.  *Id.* at *7-8. In furtherance of this recommendation, the defendant informed the co-conspirator that he desired to implement a global price-fixing scheme to prevent arbitrage across markets.  *Id.* at *8-9.  The court concluded that although the co-conspirator "did not expressly state [that the defendant] acted to fix prices in the United States, [the co-conspirator] clearly did state that a conspiracy to fix prices in Europe must necessarily involve the fixing of prices in other markets, including the United States."  *Id.* at *9.  The court found that this evidence, though "thin," was sufficient to show that the defendant "expressly direct[ed] acts in furtherance of price fixing in the United States."  *Id.*

Wanhua China expressly aimed the alleged tortious conduct - a conspiracy to fix the price of MDI and TDI by agreements to restrict their supply - at the United States. *IMO Indus.*, 155 F.3d at 266. Overall, Plaintiffs have not proffered evidence of the type found to be thin, yet sufficient, in *Bulk [Extruded] Graphite Prods.* as discussed above.

First, Plaintiffs inaccurately contend that Wanhua China is involved in setting a floor price for sales of MDI through WCA and that Wanhua China controlled WCA by having Wanhua China members on WCA's Board of Directions. To support these contentions, Plaintiffs place considerable emphasis on the role of Wenping Zhang[11] and Wanhua China's Integrated Management Regulations of International Business Development.[12] (Docket No. 1034 at 10-14). However, WCA's CEO, Jacob Sturgeon, explained in his sworn declaration that he is responsible for formulating and implementing WCA's overall sales strategy and approving the price and volume terms that are offered to WCA customers. (Docket No. 857, ¶¶ 11, 23-25). Mr. Sturgeon explained that he sometimes determines it is necessary to offer prices to customers that are below the pricing range set by WCA's Board, which it is independently authorized to determine after consideration of the guidance set by Wanhua China.[13] (*Id.*, ¶ 25). In such instances, Mr. Sturgeon discussed the circumstances with WCA's Board of Directors, most often with Mr. Zhang (who

---

[11] Mr. Zhang was on WCA's Board of Directors, and he also was the General Manager of Wanhua China's International Business Department. (Docket No. 857, ¶ 13).

[12] Mr. Sturgeon explained that the Integrated Management Regulations were "generic guidelines" and were "intended to be a global guide for all international operations," but they gave "significant autonomy to the local businesses while providing consistency among the Wanhua China entities and oversight for substantial transactions." (Docket No. 857, ¶ 16). Although the issuance of such global guidance is relevant to whether an alter ego relationship exists, it is notable in this context that a parent company may permissibly issue "group-wide accounting, finance, and sales protocols" because "[u]niformity in finance procedure is a practical necessity for global conglomerates to monitor corporate growth and maximize efficiency." *In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d 580, 600 (M.D. Pa. 2009) ("*Chocolate III*").

[13] Mr. Sturgeon explained that Wanhua China "formulates limited pricing guidance that it communicates to its subsidiaries across the globe." (Docket No. 857, ¶ 24).

was his primary contact on the Board) and sought their approval.  (*Id.*, ¶¶ 12, 13, 25).  According to Mr. Sturgeon, that approval was usually given freely, sometimes even after the pricing already had been offered to the customer.  (*Id.*, ¶ 25).

Plaintiffs attempt to impute Mr. Zhang's involvement with WCA as a member of its Board of Directors to Wanhua China for jurisdictional purposes.  As noted, while serving on WCA's Board of Directors, Mr. Zhang also held the position of General Manager of Wanhua China's International Business Department.  (Docket No. 857, ¶ 13).  There is nothing remarkable about Mr. Zhang's dual roles given that it is a "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership."  *In re Latex Gloves Prods. Liab. Litig.*, No. MDL 1148, 2001 WL 964105, at *4 (E.D. Pa. Aug. 22, 2001) (quoting *United States v. Bestfoods*, 524 U.S. 51, 69 (1998)).  In any event, Mr. Sturgeon's sworn declaration establishes that he is responsible for pricing for WCA's customers subject to applicable guidance and consultation with WCA's Board in certain circumstances.  This scenario does not establish that Wanhua China expressly aimed the alleged tortious conduct at issue in this case at the United States.

Next, while Plaintiffs acknowledge that Wanhua China did not "ultimately" construct an MDI plant in the United States,[14] they nevertheless maintain that "the announcement and subsequent cancellation of the plant **would have constrained** the market by boosting supply expectations and then not delivering." (Docket No. 1034 at 8) (emphasis added).  Plaintiffs' purely speculative argument on this point is wholly insufficient to establish *Calder's* express aiming

---

[14]    Mr. Sturgeon confirmed that Wanhua China announced a plan to build an MDI manufacturing plant in the United States in November 2018, but the project was ultimately abandoned due to a number of factors.  (Docket No. 857, ¶ 27).

prong.  Likewise, Plaintiffs' contention that Wanhua China engaged directly with United States customers by attending meetings, hosting visits at its plant in China, or engaging with them on technical issues and providing updates on research and development does not suffice to establish that it expressly aimed the tortious conduct at issue at the United States.  Further, although Plaintiffs state that Wanhua China was involved in swaps of diisocyanates with United States manufacturers, they do not elaborate how any such swaps show that Wanhua China expressly aimed the tortious conduct alleged here at the United States.

Finally, Plaintiffs' claim that Wanhua China shipped diisocyanates into the United States does not establish the express aiming prong.  *See, e.g., Chocolate I*, 602 F. Supp. 2d at 565 (finding that inter-company shipment of products which crossed the border, standing alone, did not establish a basis for personal jurisdiction under the *Calder* effects test).  Moreover, Plaintiffs' shipping argument obscures the fact that although the vast majority of the MDI that WCA sells in the United States comes from Wanhua China,[15] WCA, not Wanhua China, sells MDI and TDI to customers in the United States, as Mr. Sturgeon explained.  (*See* Docket No. 857, ¶¶ 17, 23) ("WCA is the only Wanhua-China affiliated entity that sells MDI or TDI to customers in the United States.").  Even in instances where WCA offered "China Direct" shipping[16] for customers to save on overall supply chain logistics and costs, customers contracted and interacted with WCA, not

---

[15]    Mr. Sturgeon clarified that, during the relevant period, WCA did not purchase MDI directly from Wanhua China, but rather through an intermediate company, Wanhua Chemical Singapore.  (Docket No. 857, ¶ 17).  Occasionally, WCA purchased some of the MDI that it sold in the United States through swap agreements with other MDI suppliers in the United States.  (*Id.*).  Additionally, during the relevant period, WCA purchased the vast majority of TDI that it sold in the United States from BorsodChem Zrt.  (*Id.*, ¶ 19).

[16]    WCA offers "China Direct" shipping when a customer needs to receive MDI in certain size drums or intermediate bulk containers.  (Docket No. 857, ¶ 22).  In these cases, WCA makes the sale, then instructs Wanhua China to package the MDI in drums or intermediate bulk containers as required by the customer before shipping it directly to the customer's warehouse in North America.  (*Id.*).  In these instances, WCA takes title of the product and acts as the importer of record, but it does not take possession of it.  (*Id.*).  To be clear, when "China Direct" shipping is utilized, customers contract and interact with WCA, not Wanhua China.  (*Id.*).

Wanhua China.  (*Id.*, ¶ 22).

In summary, Wanhua China does not manufacture or sell MDI or TDI in the United States, (Docket No. 857, ¶¶ 17, 19), and Wanhua China's alleged activities cited by Plaintiffs, individually or in combination, do not show that it expressly aimed the claimed tortious conduct at the United States.  Accordingly, this Court does not have personal jurisdiction over Wanhua China under the *Calder* effects test.

### C.    **Imputed Personal Jurisdictional Theories**

Plaintiffs also advance the imputed jurisdictional theories of alter ego, agency, and conspiracy in an attempt to establish that this Court has personal jurisdiction over Covestro AG and Wanhua China.  Personal jurisdiction does not lie as to either Defendant under any of these imputed theories.

#### 1.    **Alter Ego**

Plaintiffs urge the Court to impute Covestro LLC's and WCA's contacts with the United States to Covestro AG and Wanhua China, respectively, contending Covestro LLC is the alter ego of Covestro AG, and WCA is the alter ego of Wahnua China.  The Court previously ruled that Plaintiffs failed to adequately establish facts showing that Defendants exercised "a greater than normal degree of control, [failed] to adhere to corporate boundaries, or disregard[ed] . . . separate corporate existence," thus they did not demonstrate that the exercise of alter ego jurisdiction is appropriate.  (Docket No. 291 at 10).  Following jurisdictional discovery, Plaintiffs still have not adduced evidence to show that Covestro AG and Wanhua China exercise the type of day-to-day operational control of Covestro LLC and WCA, respectively, required for the Court to exercise

26

personal jurisdiction over either Defendant under an alter ego theory.[17]

Under the alter ego theory of personal jurisdiction, "the presence of a subsidiary company within a jurisdiction does not subject the parent company to jurisdiction in the [forum] because there is a presumption of corporate separateness." *In re SoClean, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 22-MC-00152-JFC, 2025 WL 1330539, at *9 (W.D. Pa. Feb. 18, 2025) (citing *Enterprise Rent-A-Car*, 735 F. Supp. 2d at 317-19); *see also Hooper v. Safety-Kleen Sys., Inc.*, No. 2:16-CV-123, 2016 WL 7212586, at *5 (W.D. Pa. Dec. 13, 2016) ("The mere fact of a parent-subsidiary relationship is not enough to establish jurisdiction over the parent corporation."). However, an alter ego relationship exists where an "out-of-forum corporation either controls or is controlled by an in-forum affiliate to such a degree that the two corporations operate as a single, amalgamated entity." *Chocolate II*, 641 F. Supp. 2d at 383. "This fusion of corporate identity … allows the court to impute the domestic entity's activities to the foreign organization when analyzing jurisdictional contacts." *Id.*

When one corporation is a subsidiary of another, the level of control necessary to find an alter ego relationship must exceed the usual supervision that a parent exercises over a subsidiary. *See In re Latex Gloves*, 2001 WL 964105, at *3 (observing that appropriate parental involvement includes "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures"). Therefore, to

---

17    In ruling whether jurisdiction lies via alter ego and agency theories, the Court evaluated the evidence adduced during jurisdictional discovery and the parties' respective arguments concerning same in light of applicable Third Circuit precedent addressing whether parent-subsidiary relationships permitted courts to exercise personal jurisdiction pursuant to those imputed theories.  The Court found it unnecessary at this juncture to rely upon the Declarations of Jonathan R. Macey in support of Covestro AG's Renewed Motion to Dismiss, wherein he offers opinions on the evidence cited by Plaintiffs for the proposition that Covestro LLC is the alter ego or agent of Covestro AG, (Docket Nos. 682-2, 756-2), as well as Professor Macey's Report, which Wanhua China proffered in support of its Renewed Motion to Dismiss, regarding whether the relationship between Wanhua China and WCA is sufficient for purposes of specific jurisdiction over Wanhua China through alter ego and agency theories.  (Docket No. 856).  Accordingly, Plaintiffs' Motions to Exclude the Testimony of Jonathan R. Macey, (Docket Nos. 719, 875), will be denied as moot without prejudice.

establish personal jurisdiction under the alter ego theory, a plaintiff must demonstrate that "[t]he degree of control exercised by the parent [is] greater than normally associated with common ownership and directorship." *Id.* (citation omitted). To do so, the plaintiff "must prove that [the parent] controls the day-to-day operations of [subsidiary] such that [the subsidiary] can be said to be a mere department of the parent." *Id.*, n.10 (citation omitted).

Courts in this Circuit have considered the following ten factors to determine whether an alter ego relationship exists: (1) the parent owns all or a significant majority of the subsidiary's stock; (2) commonality of officers or directors exists between the two corporations; (3) the corporate family possesses a unified marketing image, including common branding of products; (4) corporate insignias, trademarks, and logos are uniform across corporate boundaries; (5) corporate family members share employees; (6) the parent has integrated its sales and distribution systems with those of its subsidiaries; (7) the corporations exchange or share managerial or supervisory personnel; (8) the subsidiary performs business functions that would ordinarily be handled by a parent corporation; (9) the parent uses the subsidiary as a marketing division or as an exclusive distributor; and (10) the parent exercises control or provides instruction to the subsidiary's officers and directors. *Enterprise Rent-A-Car*, 735 F. Supp. 2d at 318-19 (citing *Chocolate I*, 602 F. Supp. 2d at 569-70). Importantly, "[n]o single factor is dispositive, and the court may consider all relevant evidence to determine whether the parent exercises actual control over a subsidiary beyond that which is characteristic of a usual parent-subsidiary relationship." *Chocolate I*, 602 F. Supp. 2d at 570. The evidence of record here, considered as a whole, does not demonstrate a level of control by Covestro AG over Covestro LLC or by Wanhua China over WCA, other than the kind of control associated with a usual parent – subsidiary relationship.

### a. **Covestro AG**

Although Covestro AG does not appear to dispute Plaintiffs' evidence and argument concerning factors 1, 3, 4, and 6, those factors are outweighed by other more consequential factors that inform the extent of a parent's control over a subsidiary's daily operations. *Enterprise Rent-A-Car*, 735 F. Supp. 2d at 323 (finding that a common marketing image and use of integrated sales system[18] did not establish high level of operational control for purpose of alter ego analysis); *Savin Corp. v. Heritage Copy Prods., Inc.*, 661 F. Supp. 463, 470 (M.D. Pa. 1987) (explaining that overlapping directors and officers between parent and subsidiary did not establish alter ego relationship where overlapping is "no more significant than is to be expected in a situation where a holding company owns a majority interest in a subsidiary"). Considering the overall relationship between Covestro AG and Covestro LLC, the factors discussed below weigh in favor of Covestro AG, outweigh the factors favoring Plaintiffs, and indicate the existence of a normal parent-subsidiary relationship for jurisdictional purposes.

---

18      On this point, Plaintiffs highlight that Covestro AG reports its sales on a global basis without breaking out Covestro LLC as a separate entity. (Docket No. 725 at 21). Dr. Breloer explained that Covestro AG's annual and quarterly reports and consolidated financial statements are prepared by the accounting department and reflect a combined management report for both Covestro AG and the entire Covestro Group, which consists of all of Covestro AG's wholly owned subsidiaries. (Docket No. 682-1, ¶ 12). Courts have held that providing centralized services, such as accounting or legal, is normal corporate behavior which is insufficient to establish an alter ego relationship. *See Skolnick v. Evolution AB (PUBL)*, No. 2:24-cv-0326, 2025 WL 2585667, at *4 (E.D. Pa. Sept. 5, 2025) (citing *Central States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 945 (7th Cir. 2000)). Likewise, an alter ego relationship is not shown by Plaintiffs' assertion that Covestro AG directs swap agreements between Covestro LLC and its competitors. (Docket No. 725 at 21). As Dr. Breloer explained, Stefan Wunderlich, who was employed by Covestro AG as senior legal counsel, at times provided legal services to Covestro Deutschland AG pursuant to a written services agreement between the two entities (including in connection with the development of co-producer supply agreements or swaps, which are operational activities under Covestro Deutschland AG's purview), and Covestro Deutschland AG paid Covestro AG for Wunderlich's work on behalf of Covestro Deutschland AG. (Docket No. 826-1, ¶ 9; *see also* Docket No. 682-1, ¶¶ 34-36). The existence of a services agreement and reimbursement for services performed pursuant to it demonstrates the existence of separate corporate entities and weighs against the existence of an alter ego relationship. *See Action Mfg. Co., Inc. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411, 425 (E.D. Pa. 2005) (observing that reimbursement for shared administrative services indicates that parent and subsidiary maintain their corporate separateness and observe corporate formalities).

As to factors 2 and 7, Plaintiffs point out that Covestro AG and Covestro LLC had an overlapping board member at one time, (*see* Docket No. 682-1, ¶¶ 5, 7), and supposedly considered managerial and supervisory personnel interchangeable, pointing to the fact that certain personnel occasionally visited the United States. (Docket No. 725 at 19-20). While these factors may suggest that Covestro AG monitors its subsidiary, they do not establish day-to-day operational control of Covestro LLC. There is nothing to suggest that any overlap was so extensive that Covestro AG and Covestro LLC were not two separate entities. Moreover, "[w]here a parent company constitutes one hundred percent of the stockholders of the subsidiary, it is to be expected that there will be directors which are common to the boards of both." *In re Latex Gloves*, 2001 WL 964105, at *4 (quoting *Arch v. American Tobacco Co., Inc.*, 984 F. Supp. 830, 838 (E.D. Pa. 1997)). It bears repeating that it is a "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *Id.* (quoting *Bestfoods*, 524 U.S. at 69). Although such "changing hats" is not unusual, David Rzepecki, who is Vice President, General Counsel, and Secretary for Covestro LLC explained that Covestro LLC's Board of Directors and senior executives manage its operations, including with respect to the U.S. MDI and TDI business, (Docket No. 756-3, ¶ 5), which demonstrates that it is a distinct entity from Covestro AG.

Concerning factor 5, Dr. Breloer confirms that Covestro LLC and Covestro AG do not have overlapping employees. (Docket No. 682-1, ¶ 8). Plaintiffs do not contest this point. (*See* Docket No. 725 at 21) (acknowledging that Covestro AG and Covestro LLC do not share employees).

Next, factor 8 is not met because Covestro AG is a holding company, therefore Covestro

LLC, which is its indirect wholly-owned subsidiary, (Docket Nos. 682-1, ¶ 7; 756-3, ¶ 3), is not performing functions that Covestro AG would otherwise undertake itself as the parent. *See Action Mfg.*, 375 F. Supp. 2d at 422 ("[I]n the case of holding companies, the subsidiary is not performing a function that the parent would otherwise have had to perform itself (the holding company could simply hold another type of subsidiary). In such a case, imputing jurisdictional contacts would be improper.") (internal quotation marks and citation omitted).  Rather, Covestro LLC manufactures and sells polymers and high-performance plastics products in North America, including MDI and TDI, (Docket No. 756-3, ¶ 4), whereas Covestro AG solely performs administrative and corporate functions, not operational functions.  (Docket No. 826-1, ¶ 3).

Plaintiffs do not squarely address factor 9, and nothing suggests that Covestro LLC acts as Covestro AG's marketing arm or as its exclusive distributor.  That scenario would be impossible, given that Covestro AG is a holding company which does not manufacture or sell any products. (Docket Nos. 682-1, ¶ 3; 826-1, ¶ 3).

Finally, as other courts in this Circuit have observed concerning factor 10, "[a]lthough one aspect of the relationship between two corporations will not unilaterally dispose of the analysis, a review of existing case law demonstrates that the most significant pieces of evidence are those that concern the existence (or non-existence) of a parent company's control over its subsidiaries' day-to-day functions." *Skolnick*, 2025 WL 2585667, at *4 (quoting *Neopart Transit, LLC v. CBM N.A. Inc.*, 314 F. Supp. 3d 628, 645 (E.D. Pa. 2018)); *see also In re Latex Gloves*, 2001 WL 964105, at *3, n.10 (alter ego relationship is shown where "[the parent] controls the day-to-day operations of [the subsidiary] such that [the subsidiary] can be said to be a mere department of the parent.").

Covestro AG does not control Covestro LLC's day-to-day business operations and decisions.  Although Covestro AG manages its investments in its direct and indirect subsidiaries

by setting long-term goals and strategy,[19] each subsidiary's board of directors and senior management manage day-to-day operations. (Docket No. 682-1, ¶ 15). As relevant here, Covestro LLC's Board of Directors and senior executives have managed and supervised Covestro LLC's operations concerning the U.S. MDI and TDI business, including MDI and TDI production facilities in Baytown, Texas, (*see* Docket No. 756-3, ¶¶ 5-7), undermining any claim that Covestro AG controls its subsidiary's daily affairs. To that end, Corporate Regulation No. 1 vests the day-to-day operational authority in Covestro LLC, not Covestro AG, but requires Covestro AG approval for certain transactions and activities that meet particular financial or other materiality thresholds.[20] (*Id.*, ¶ 9; *see also* Docket No. 682-1, ¶¶ 16-17). That Covestro AG's approval is required for such transactions does not establish an alter ego relationship. *See Bestfoods*, 524 U.S. at 72 (supervision of a subsidiary's capital and finance decisions does not establish an alter ego relationship with its parent). Further, the fact that Covestro LLC's Board of Directors must approve any dividend paid to its sole member, Covestro (Netherlands) B.V., which ultimately goes to the benefit of Covestro AG, changes to its employee benefits plans, and significant merger and acquisition transactions involving Covestro LLC assets, (Docket No. 756-3, ¶ 11), further demonstrates the absence of an alter ego relationship.

In summary, in "an ordinary holding company/subsidiary relationship, not one of undue domination and control," there is no alter ego relationship. *Transp. Ins. Co. v. Am. Harvest Baking*

---

19    Covestro AG, as the parent corporation "is entitled to ordain [its subsidiaries'] officers and directors, influence executive compensation, approve budgets, gather information about corporate performance, and receive distributions of subsidiary profits." *Chocolate III*, 674 F. Supp. 2d at 599-600. As other courts have recognized, "[t]hese activities typify standard parent-subsidiary interactions and do not reflect daily, operational control that is the *sine qua non* of an alter ego relationship. *Id.* at 600 (citing *Poe v. Babcock Int'l PLC*, 662 F. Supp. 4, 6 (M.D. Pa. 1985)) (holding that a parent's "exercise [of] some degree of control over the subsidiary" does not constitute an alter ego relationship unless the latter has become indistinguishable from the former)).

20    During the relevant period, capital expenditures with a total projected cost of up to €2 million, and the initial stage of all projects with a total projected cost of up to €20 million, were under the approval authority of business unit heads of Covestro AG subsidiaries. (Docket No. 682-1, ¶ 17).

*Co., Inc.*, Civ. No. 15-663, 2015 WL 9049273, at *5 (D.N.J. Dec. 16, 2015) (quoting *Arch*, 984 F. Supp. at 837-38). Such is the case here. Covestro LLC is not the alter ego of Covestro AG, thus Covestro LLC's contacts with the United States cannot be imputed to Covestro AG for jurisdictional purposes.

### b. **Wanhua China**

Although Wanhua China does not dispute Plaintiffs' evidence and argument concerning factors 1 and 4, those factors are outweighed by other more significant factors that inform the extent of a parent's control over a subsidiary's daily operations. The other factors discussed below weigh in favor of Wanhua China, outweigh the factors favoring Plaintiffs, and indicate the existence of a normal parent-subsidiary relationship for jurisdictional purposes.

As to factors 2 and 7, Plaintiffs point out that Wanhua China and WCA shared common officers and directors, emphasizing that WCA's Board of Directors was made up predominately of Wanhua China employees (including Mr. Zhang), and Wanhua China supposedly considered managerial and supervisory personnel interchangeable.[21] (Docket No. 1034 at 22). While the presence of shared directors may indicate Wanhua China's monitoring of its subsidiary, it does not establish day-to-day operational control of WCA. As Mr. Sturgeon explained, WCA's directors are elected by its sole shareholder, Wanhua China. (Docket No. 857, ¶ 10). Therefore, during the majority of the relevant period, WCA's Board consisted of Directors who were Wanhua China employees. (*Id.*). Such overlap, however, is not particularly significant. As previously stated, "[w]here a parent company constitutes one hundred percent of the stockholders of the subsidiary, it is to be expected that there will be directors which are common to the boards of both." *In re*

---

[21]    Regarding factor 7, Plaintiffs broadly state that Wanhua China and WCA "considered managerial and supervisory personnel interchangeable," (Docket No. 1034 at 22), but provide no factual support for this assertion.

*Latex Gloves*, 2001 WL 964105, at *4 (quoting *Arch*, 984 F. Supp. at 838). Nonetheless, to Mr. Sturgeon's knowledge, no director on WCA's Board simultaneously served on Wahnua China's Board, (*see* Docket No. 857, ¶ 10), thus demonstrating that any overlap was not so extensive that there was no distinction between the two boards or entities.

Relative to factor 3, although WCA uses the "Wanhua" brand and logo, it makes an effort to distinguish itself as a separate entity by its email domain addresses and use of its own letterhead with WCA's legal name and U.S. contact information. (Docket No. 857, ¶ 33). While WCA does not have its own website, Wanhua China's website provides basic information about its global operations and directs visitors to its affiliates across the globe. (*Id.*, ¶ 34). For instance, Wanhua China's website provides WCA's telephone number, email, and physical address, but it does not have the functionality for customers to engage in transactions with WCA. (*Id.*). Overall, factor 3 does not tip the alter ego analysis in Plaintiffs' favor. *See Enterprise-Rent-A-Car*, 735 F. Supp. 2d at 323 (finding common marketing image insufficient to establish alter ego relationship).

Regarding factor 5, Plaintiffs do not dispute that WCA and Wanhua China do not have overlapping employees. (*See* Docket No. 1034 at 22) (acknowledging that Wanhua China and WCA do not share employees).

With respect to factor 6, WCA maintained its own partitioned space of the Wanhua China Systems Applications and Products ("SAP") sales planning system. (Docket No. 857, ¶ 32). Although the system was shared, WCA had its own designated space within it, and WCA employees could not access any other Wanhua China affiliated entity's SAP system. (*Id.*). Even if this were not the case, courts have found that use of an integrated sales system is insufficient to establish alter ego jurisdiction because that factor "merely show[s] the resources defendant parent provided to its operating subsidiaries, but [it does] not show a high-level of operational control

34

over the operating subsidiaries." *Enterprise Rent-A-Car Wage*, 735 F. Supp. 2d at 323.

Next, factor 8 is not met because WCA and Wanhua China perform separate functions. WCA purchases, imports, markets, prices, contracts, and sells MDI and TDI to customers in North America, whereas Wanhua China is involved in the development, manufacture and sale of chemical products, including MDI and TDI. (Docket No. 857, ¶¶ 6, 7, 17, 19). In a similar situation, a sister court refused to impute the contacts of a U.S. subsidiary to its foreign parent. *See Kearney v. Bayerische Motoren Werke Aktiengesellschaft*, Civ. No. 17-13544, 2021 WL 1207476, at *4 (D.N.J. Mar. 31, 2021) (declining to impute contacts under alter ego or agency theory because BMW NA and BMW AG performed separate core functions).

As for factor 9, nothing suggests that WCA acts as Wanhua China's marketing arm or as its exclusive distributor.

Finally, as to factor 10, Wanhua China does not control WCA's day-to-day business operations and decisions. WCA has its own articles of incorporation, bylaws, and Board of Directors. (Docket No. 857, ¶ 9). Throughout the relevant period, Mr. Sturgeon was subject to oversight by WCA's Board, but he was solely responsible for WCA's day-to-day operations, including pricing, sales strategy, supervising inventory, conducting or overseeing contract negotiations and agreements with customers and other service providers, managing WCA employees, overseeing WCA's finances, and all other aspects of its business, (*see id.*, ¶¶ 11, 24, 25), undermining any claim that Wanhua China controls its subsidiary's daily affairs.

That conclusion is not altered by the fact that Wanhua China's Integrated Management Regulations set forth generic guidelines which were intended to be a global guide for all international operations or by the fact that Wanhua China formulated limited pricing guidance[22]

---

[22]    The fact that Mr. Sturgeon occasionally needed approval from WCA's Board to offer prices to customers

that it communicated to its subsidiaries around the world, (*see* Docket No. 857, ¶¶ 16, 24), because "issuance of group-wide accounting, finance, and sales protocols . . . [do] not establish an alter ego relationship." *Chocolate III*, 674 F. Supp. 2d at 600; *see also In re Latex Gloves*, 2001 WL 964105, at *3 (appropriate parental involvement includes "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and ***articulation of general policies and procedures***") (emphasis added); *Skolnick*, 2025 WL 2585667, at *5 ("Third Circuit alter-ego jurisdiction requires far more than uniform policies or shared compliance infrastructure. … Providing handbooks, training modules, and approval requirements for certain activities is oversight—not the kind of *hands-on management* courts equate with alter-ego status.") (emphasis in original).  It is also notable that the Integrated Management Regulations gave "significant autonomy" to the local businesses.  (Docket No. 857, ¶ 16).  To that end, WCA developed its own employee handbook, which included essential policies regarding its operations.    (*Id.*).  Additionally highlighting a lack of day-to-day parental control, WCA reported its financial results to Wanhua China, but it prepared its financial reports independently from Wanhua China and used its own accounting firm to prepare its financial statements, and WCA also engaged its own U.S. legal counsel, which handled legal matters without the approval of Wanhua China, (*Id.*, ¶¶ 15, 29).  Overall, factor 10 strongly supports a finding that Wanhua China does not exercise the type of day-to-day control of WCA necessary to establish an alter ego relationship for purposes of the Court exercising personal jurisdiction over Wanhua China.

### 2.  <u>Agency</u>

Similar to alter ego, Plaintiffs advocate that the Court should impute Covestro LLC's and

---

that were below the pricing range set by the Board, and that he discussed the circumstances of those situations with Mr. Zhang, who was a member of WCA's Board, does not establish an alter ego relationship under the circumstances present here.

WCA's contacts with the United States to Covestro AG and Wanhua China, respectively, contending Covestro LLC is the agent of Covestro AG, and WCA is the agent of Wahnua China. The Court previously ruled that Plaintiffs had not established a degree of control by the foreign Defendant parents over their domestic subsidiaries to warrant the exercise of personal jurisdiction based on an agency relationship. (Docket No. 291 at 10). Following jurisdictional discovery, the result remains the same.

"The concept underlying the agency theory of personal jurisdiction is the familiar principle that a principal is responsible for the actions of its agent." *D'Jamoos*, 566 F.3d at 108. The Supreme Court has recognized that an agency relationship "may be relevant to the existence of *specific* jurisdiction" because a corporation can purposefully avail itself of a forum by directing its agents to take action there.[23] *Daimler*, 571 U.S. at 135 n.13 (emphasis in original) (citations omitted).

In analyzing whether personal jurisdiction exists under an agency theory, courts "examine[] the degree of control which the parent exercises over the subsidiary." *Nespresso USA, Inc. v. Ethical Coffee Co. SA*, 263 F. Supp. 3d 498, 505 (D. Del. 2017) (citation omitted). In conducting the analysis, sister courts in this Circuit have considered the following: 1) whether the subsidiary is doing business in the forum that would otherwise be performed by the parent; (2) whether there is common ownership of the parent and subsidiary; (3) whether there is financial dependency; and (4) whether the parent interferes with the subsidiary's personnel, disregards the corporate formalities, and/or controls the subsidiary's marketing and operational policies. *In re Fragrance Direct Purchaser Antitrust Litig.*, 2025 WL 572827, at *8 (D.N.J. Feb. 21, 2025) (citing

---

[23]     The Supreme Court cautioned, however, that focusing on whether an agent performs services that a corporation would otherwise perform absent the agent "stacks the deck, for it will always yield a pro-jurisdiction answer. *Daimler*, 571 U.S. at 136.

*High 5 Games, LLC v. Marks*, Civ. No. 13-7161, 2019 WL 3761114, at *7 (D.N.J. Aug. 9, 2019)).

### a. **Covestro AG**

Factor 1 weighs against finding an agency relationship between Covestro AG and Covestro LLC because "the agency rule ordinarily does not apply to a holding company inasmuch as the parent could simply use another subsidiary to accomplish the same result." *In re Latex Gloves*, 2001 WL 964105, at *2, n.8 (citing *Arch*, 984 F. Supp. at 840) (subsidiary involved in manufacturing, marketing, selling and distributing cigarettes was not parent's agent because the parent could have employed another subsidiary); *see also C.R. Bard Inc. v. Guidant Corp.*, 997 F. Supp. 556, 561 (D. Del. 1998) (agency principle did not apply to a holding company parent whose subsidiary manufactured allegedly infringing product).

Next, as to factor 2, the fact that Covestro LLC is an indirect wholly-owned subsidiary of Covestro AG, (Docket Nos. 682-1, ¶ 7; 756-3, ¶ 3), does not alone suffice to establish an agency relationship. *See Cardenas v. Spinnaker Resorts, Inc.*, Civ. No. 16-2466, 2017 WL 3315285, at *5 (D.N.J. Aug. 3, 2017) ("[F]orum contacts of a subsidiary corporation will not be imputed to a parent corporation without a showing of something more than mere ownership.") (citation omitted).

Regarding factor 3, "[a] subsidiary is dependent if it needs financial support from its parent on a regular basis or for expenses other than the strategic acquisitions of other corporations." *Cardenas*, 2017 WL 3315285, at *5 (internal quotation marks and citation omitted). Here, Plaintiffs do not argue that Covestro LLC needs financial support from Covestro AG. Furthermore, this factor is not established by the fact that Covestro AG's annual and quarterly reports and consolidated financial statements reflect a combined management report for both Covestro AG and all of its wholly owned subsidiaries. (Docket No. 682-1, ¶ 12). This is so

because a parent corporation's filings of the "assets, liabilities, and financial earnings of its subsidiaries as one indistinguishable whole do not prove agency." *Nespresso*, 263 F. Supp. 3d at 505 (internal quotation marks and citation omitted).

Finally, for reasons discussed relative to the alter ego analysis, factor 4 is not established because Covestro AG does not exercise day-to-day operational control of Covestro LLC. Overall, this factor and those just addressed convince the Court that Covestro LLC is not the agent of Covestro AG, thus Covestro LLC's contacts with the United States cannot be imputed to Covestro AG for purposes of establishing personal jurisdiction under an agency theory.

### b. Wanhua China

Factor 1, which considers whether the subsidiary is doing business in the forum that would otherwise be performed by the parent, weighs against finding an agency relationship between Wanhua China and WCA because the two entities perform separate functions. Wanhua China manufactures diisocyanates, whereas WCA purchases, imports, markets, and sells MDI and TDI in the United States. (Docket No. 857, ¶¶ 6, 17, 19). Under similar circumstances, a sister court declined to find that a U.S. based subsidiary was the agent of its foreign parent. *See Kearney*, 2021 WL 1207476, at *4 ("BMW NA and BMW AG perform separate core functions: BMW AG manufacturers vehicles while BMW NA markets, sells, and distributes vehicles throughout the United States.").

Next, regarding factor 2, WCA's status as a wholly-owned subsidiary of Wanhua China, (Docket No. 857, ¶ 7), does not alone establish an agency relationship. *See Cardenas*, 2017 WL 3315285, at *5 ("[F]orum contacts of a subsidiary corporation will not be imputed to a parent corporation without a showing of something more than mere ownership.") (citation omitted).

As for factor 3, WCA is not financially dependent on Wanhua China. *See Cardenas*, 2017

WL 3315285, at *5.  WCA's financial independence is shown by the fact that it prepared its financial reports separately from Wanhua China and used its own accounting firm to prepare its financial statements; entered into contracts for logistics services, including large service agreements with terminal operators, on its own without Wanhua China acting as a co-signer or guarantor; and set salary levels of individual employees. (Docket No. 857, ¶¶ 15, 28, 30).

Finally, factor 4 is not established because WCA "operated as a normal subsidiary of Wanhua China," meaning that it was "subject to a normal degree of oversight from its parent," but it "observed corporate formalities and operated with a significant degree of independence." (Docket No. 857, ¶ 8).  To that end, Wanhua China does not exercise day-to-day operational control of WCA for reasons previously discussed in connection with the alter ego analysis.[24]  This final factor, along with those above, demonstrate that WCA is not the agent of Wanhua China, thus WCA's contacts with the United States cannot be imputed to Wanhua China to establish personal jurisdiction under an agency theory.

### 3. **Conspiracy**

Plaintiffs contend that Covestro AG and Wanhua China are subject to personal jurisdiction as co-conspirators of domestic entities.  The Court previously expressed concern about exercising jurisdiction over the foreign Defendants under a co-conspirator theory.  (Docket No. 291 at 7).  Following jurisdictional discovery, nothing has changed.  The Court finds that it is not appropriate to impute the contacts of domestic entities to Covestro AG and Wanhua China for jurisdictional

---

[24]      In advancing its agency argument, Plaintiffs place much emphasis on Wanhua China's Integrated Management Regulations, contending that they provided for Wanhua China's extensive control over WCA.  (*See* Docket No. 1034 at 16-21).  This argument ignores the fact that appropriate parental involvement includes "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures."  *In re Latex Gloves*, 2001 WL 964105, at *3.  The argument also ignores the fact, explained by Mr. Sturgeon, that the Integrated Management Regulations were generic guidelines intended to be a global guide for all international operations and that they gave significant autonomy to the local businesses.  (Docket No. 857, ¶ 16).  In WCA's case, it developed its own employee handbook addressing policies covering all aspects of its operations.  (*Id.*).

purposes.

Under co-conspirator jurisdiction, "the court imputes the contacts of the 'resident' co-conspirator over whom it has jurisdiction to the 'foreign' co-conspirator to see if there are sufficient contacts to exercise jurisdiction over the latter." *Doe v. Hesketh*, 15 F. Supp. 3d 586, 595 (E.D. Pa. 2014) (citation omitted). To establish jurisdiction under the co-conspirator theory, a plaintiff "must plead with particularity that 1) the defendant was a participant in an actionable conspiracy, 2) substantial acts in furtherance of the conspiracy occurred in [the forum], and 3) the non-forum co-conspirator was aware or should have been aware of those acts." *Aetna Inc. v. Insys Therapeutics, Inc.*, 324 F. Supp. 3d 541, 551 (E.D. Pa. 2018); *see also Sugartown Worldwide LLC v. Shanks,* Civ. No. 14-5063, 2015 WL 1312572, at *4 (E.D. Pa. Mar. 24, 2015) ("It is not enough that the non-forum co-conspirator is part of the conspiracy as plaintiff must plead the defendant's involvement with specificity.").

As the Court previously observed, (*see* Docket No. 291 at 7), Plaintiffs' allegations in the SAC "do not rise to the level of particularity required" for purposes of exercising co-conspirator jurisdiction over foreign entities. *See Aetna,* 324 F. Supp. 3d at 551 (requiring that allegations establishing co-conspirator jurisdiction be pled "with particularity"); *Doe*, 15 F. Supp. 3d at 595 (a defendant's involvement in the conspiracy must be pled with particularity); *Sugartown*, 2015 WL 1312572, at *4 (non-forum defendant's involvement in the conspiracy must be pled with specificity). Plaintiffs never sought to amend the SAC to address the referenced lack of particularity, yet they continue to press the co-conspirator theory as a basis of personal jurisdiction over the foreign Defendants following jurisdictional discovery. Another court has declined to exercise personal jurisdiction in a similar context. *See, e.g., Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*, Civ. No. 21-3500, 2021 WL 6200907, at *20 (E.D. Pa. Dec. 29, 2021) ("[Plaintiff]

does not plead we have personal jurisdiction over [defendant] under an alter ego theory. It cannot now attempt to rely on an unpled theory through briefing.").[25] In light of the Court's previously cited concern about the lack of particularity, the Court declines to exercise co-conspirator jurisdiction over the foreign Defendants.[26] This outcome is buttressed by the fact that the Third Circuit Court of Appeals has not expressly adopted the co-conspirator theory of jurisdiction.[27] *See Mr. Sandless Franchise, LLC v. Karen Cesaroni LLC*, 498 F. Supp. 3d 725, 733 (E.D. Pa. 2020)[28] (citation omitted). Accordingly, the Court reiterates that it is unable to "conclusively and comfortably" exercise personal jurisdiction over Covestro AG and Wanhua China under a co-conspirator theory.

## VI.  **CONCLUSION**

This Court is unable to exercise general or specific personal jurisdiction over Defendants Covestro AG and Wanhua China. In the Court's estimation, Plaintiffs fail to establish that Covestro AG and Wanhua China had sufficient minimum contacts evidencing they do business in

---

25      In response to the plaintiff's argument that the district court should not ignore its evidence regarding alter ego jurisdiction, the court acknowledged that the plaintiff was correct that the inquiry on a Rule 12(b)(2) motion is not limited to pleadings, but explained the plaintiff was "incorrect [that] it can rest on an unpled theory for personal jurisdiction merely by providing evidence of its unpled theory once jurisdiction is challenged." *Value Drug*, 2021 WL 6200907, at *20, n. 168 (citing *Chocolate II*, 641 F. Supp. 2d at 381-82) ("Although plaintiffs bear the ultimate burden of proving personal jurisdiction by a preponderance of the evidence, such a showing is unnecessary at the preliminary stages of litigation ... **Rather, plaintiffs must merely allege sufficient facts to establish a prima facie case of jurisdiction over the person. Once these allegations are contradicted by an opposing affidavit, however, plaintiffs must present similar evidence in support of personal jurisdiction** ...) (emphasis in original)).

26      Even assuming Plaintiffs cleared the particularity pleading hurdle, the Court is not convinced that Plaintiffs' interpretation of the evidence it has cited, (Docket Nos. 725 at 26-27; 1034 at 28), shows that "substantial acts in furtherance of the conspiracy occurred within the forum ... and that the foreign defendant[s] [were], or should have been, aware of them." *Doe*, 15 F. Supp. 3d at 595.

27      Notably, a sister court has observed, "federal due process does not square with the conspiracy-jurisdiction theory. Purposeful availment must be analyzed individually to assure that *each* defendant deliberately targeted [the forum]." *Rickman v. BMW of N. Am. LLC*, 538 F. Supp. 3d 429, 440 (D.N.J. 2021) (emphasis in original).

28      As the *Mr. Sandless* decision recognized, district courts within the Third Circuit have applied the co-conspirator theory of jurisdiction under "certain circumstances." *Mr. Sandless*, 498 F. Supp. 3d at 733 (quoting *Doe*, 15 F. Supp. 3d at 595). The Court declines to apply it under the circumstances of this case for reasons explained.

the United States to be "found" here, nor do they establish that these Defendants availed themselves of the privileges of American law or otherwise reasonably could anticipate being involved in litigation in the United States, even if the measure for doing so is a more flexible inquiry than how the Due Process Clause of the Fifth Amendment had been understood pre-*Fuld*.

Accordingly, the Renewed Motions to Dismiss Under Rule 12(b)(2) for Lack of Personal Jurisdiction filed by Defendants Covestro AG and Wanhua China, (Docket Nos. 681, 854), are granted, Plaintiffs' claims against Covestro AG and Wanhua China are dismissed with prejudice,[29] and Covestro AG and Wanhua China are terminated as parties in this litigation.

An appropriate Order follows.

*s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Date: <u>January 8, 2026</u>

cc/ecf:  All counsel of record

---

[29]    For reasons discussed herein, dismissal with prejudice is warranted because amendment would be futile in this case.  *See Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014) (internal quotations omitted) (although leave to amend should be freely granted "when justice so requires . . . a court may deny leave to amend when such amendment would be futile").