**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: DIISOCYANATES | ) | Master Docket Misc. No. 18-1001 |
| ANTITRUST LITIGATION | ) | |
| | ) | MDL No. 2862 |
| This Document Relates to: | ) | |
| All Cases | ) | |

## <u>MEMORANDUM OPINION</u>

Presently before the Court is Plaintiffs' Motion for Reconsideration, (Docket No. 1240), of the Court's Memorandum Opinion and Order dismissing Defendants Covestro AG and Wanhua Chemical Group Co., Ltd. ("Wanhua China") for lack of personal jurisdiction. *See In re Diisocyanates Antitrust Litig.*, No. MC 18-1001, 2026 WL 233978 (W.D. Pa. Jan. 29, 2026) (the "January 2026 Opinion").[1] The matter is fully briefed and ready for disposition. (Docket Nos. 1241, 1244). For the reasons set forth below, Plaintiffs' Motion will be granted to the extent the Court will reconsider the January 2026 Opinion, but the Motion will be denied to the extent the Court reaffirms its ruling dismissing Plaintiffs' claims against Covestro AG and Wanhua China with prejudice and terminating Covestro AG and Wanhua China as parties in this litigation.

## I.    <u>INTRODUCTION</u>

In this multi-district antitrust litigation, Plaintiffs allege that Defendants engaged in a conspiracy to fix, raise, maintain, and/or stabilize the price (*i.e.*, fix prices) of methylene diphenyl diisocyanate ("MDI") and toluene diisocyanate ("TDI") sold in or shipped to the United States

---

[1]    The Court initially filed the Memorandum Opinion under seal on January 8, 2026, (Docket No. 1235), and then solicited the parties' positions on whether to unseal or otherwise redact portions of it. The parties filed a Joint Notice agreeing that the Memorandum Opinion could be unsealed in full, (Docket No. 1245), so the Court reissued it in unsealed form on January 29, 2026. (Docket No. 1247).

through agreements to limit supply of these products by planned manufacturing shutdowns at plants worldwide and implementing coordinated pricing increases, in violation of the Sherman Act, 15 U.S.C. §§ 1, 3. (*See* Docket No. 378, ¶¶ 1-3, 7-8).

Two specific foreign Defendants, Covestro AG and Wanhua China, initially moved to dismiss Plaintiffs' Consolidated Second Amended Class-Action Complaint ("SAC"), challenging whether this Court has personal jurisdiction over them. (Docket No. 291 at 1). At that time, the Court found that Plaintiffs had not demonstrated the existence of minimum contacts through a conspiracy, alter ego, or agency theory, or via the effects test, but it denied the motion without prejudice and permitted jurisdictional discovery. (*Id.* at 11-12). The parties thereafter undertook extensive jurisdictional discovery while also conducting merits discovery pertaining to other domestic and foreign Defendants who were not challenging this Court's exercise of personal jurisdiction over them.

Upon completion of jurisdictional discovery, both Covestro AG and Wanhua China filed a Renewed Motion to Dismiss, once again contending that this Court lacks personal jurisdiction over them, which was opposed by Plaintiffs. The parties submitted extensive briefing, including supplemental briefing and supplemental evidentiary material, and participated in oral argument. Ultimately, the Court issued the January 2026 Opinion dismissing both Covestro AG and Wanhua China for lack of personal jurisdiction. On January 15, 2026, Plaintiffs filed the pending Motion for Reconsideration alleging the Court committed a clear error of law principally based upon the United States Supreme Court's June 20, 2025, decision in *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 16 (2025). For the reasons set forth herein, the Court denies the ultimate relief sought by Plaintiffs' Motion for Reconsideration and writes to clarify and elaborate on certain aspects of the

January 2026 Opinion and ultimately affirm its decision to dismiss Covestro AG and Wanhua China from this action with prejudice.

## II.    PROPRIETY OF RECONSIDERATION

### A.  Standard for Reconsideration

A motion for reconsideration is not to be used to relitigate or rehash issues the Court already decided, or to ask the Court to rethink a decision it, rightly or wrongly, already made. *Nyamekye v. Mitsubishi Elec. Power Prods., Inc.*, Civ. No. 17-852, 2018 WL 3933504 at *3 (W.D. Pa. Aug. 16, 2018).  Rather, the purpose of a motion for reconsideration "is to correct manifest errors of law or fact or to present newly discovered evidence."  *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)).

Typically, a judgment may be altered or amended pursuant to Federal Rules of Civil Procedure 59(e) or 60(b) if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court made its decision; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice.  *See North River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995); *Tennant v. Range Resources – Appalachia, LLC*, Civ. No. 18-1533, 2021 WL 5040421, at *3 (W.D. Pa. Oct. 29, 2021) (Hardy, J.).  To succeed on such a motion, "the movant must demonstrate a definite and firm conviction that a mistake has been committed, or that the court overlooked arguments that were previously made." *Nyamekye*, 2018 WL 3933504 at *3 (internal quotation marks and citation omitted).

Here, however, Plaintiffs are seeking reconsideration of an interlocutory order that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties so the

pending motion must be considered pursuant to Federal Rule of Civil Procedure 54(b).[2]  "While the standards articulated in Rule[] . . . 60(b) are not binding in the analysis of Rule 54(b) motions, courts frequently look to these standards for guidance in considering such motions." *Nyamekye*, 2018 WL 3933504 at *3 (internal quotation marks and citation omitted).  Importantly, although a district court has more discretion in reconsidering interlocutory orders than in revising final judgments, the Third Circuit Court of Appeals instructs that it "must, of course, exercise this authority in a responsible way, both procedurally and substantively, and that effective trial court management requires a presumption against reconsideration of interlocutory decisions."  *Id*. (internal quotation marks and citation omitted).  While " '[a] court has the power to revisit prior decisions of its own . . . in any circumstance . . . as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would make a manifest injustice.' "  *Id*. (quoting *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009)).  Accordingly, "courts should exercise this inherent power with a light hand."  *Id*. (internal quotations marks and citation omitted).  In doing so, this Court evaluates whether good cause exists for revising its prior decision. *Cypher v. J.V. Mfg. Co., Inc.*, Civ. No. 23-1428, 2025 WL 776156 at *2 (W.D. Pa. Mar. 11, 2025); *see also Qazizadeh v. Pinnacle Health Sys.*, 214 F. Supp. 3d 292, 295 (M.D. Pa. 2016).

---

[2]      Pursuant to Rule 54(b), "[w]hen an action presents more than one claim for relief . . . or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b).

B. **The Court Will Reconsider the January 2026 Opinion's Decision on Personal Jurisdiction Even Though Plaintiffs Lack Good Cause and Invited Potential Error.**

As noted above, a motion for reconsideration is "not to be used as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant." *Qazizadeh*, 214 F. Supp. 3d at 295 (citation omitted). Relevant here, a motion for reconsideration also should not be used to raise arguments that a party should have raised earlier; rather, such a motion is appropriate only where the court misunderstood a party or where there has been a significant change in the law or facts after the Court originally ruled on that issue. *Id.* at 295-96; *United States v. Kubini*, 304 F.R.D. 208, 211 (W.D. Pa. 2015) ("Motions for reconsideration are not to be used as vehicles 'for addressing arguments that a party should have raised earlier' and likewise do not 'empower litigants . . . to raise their arguments, piece by piece.' ") (quoting *United States v. Dupree*, 617 F.3d 724, 732-33 (3d Cir. 2010)).

Plaintiffs' principal basis for reconsideration is that the Court committed a "clear error of law" in ruling that they still were required to make at least some showing of minimum contacts and purposeful availment with the United States despite *Fuld's* holding that the minimum contacts test for personal jurisdiction flowing from the Fourteenth Amendment no longer applies to that subset of federal cases in which personal jurisdiction derives from a federal statute; rather, the Fifth Amendment governs and calls for a "more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Fuld*, 606 U.S. at 16. Although the Court will reconsider the January 2026 Opinion, the following timeline leading up to Plaintiffs' filing of their Motion for Reconsideration demonstrates that they lack good cause and invited potential error here:

- The Court heard oral argument on the foreign Defendants' then-pending Motions to Dismiss on April 22, 2025. (Docket No. 1185).

- Two months later, on June 20, 2025, the Supreme Court decided *Fuld*.

- On October 21, 2025, without leave of Court, Plaintiffs filed a two-page Notice of Supplemental Public Information in Support of their Opposition to Wanhua China's Renewed Motion to Dismiss, along with an attached 208-page exhibit containing an investigative report from the United States International Trade Commission concerning MDI from China.  (Docket Nos. 1212, 1212-1).  Plaintiffs' filing did not mention *Fuld*.

- At a telephone status conference held on November 6, 2025, the Court informed the parties that its decision on the foreign Defendants' Motions to Dismiss is "on the near horizon and should be forthcoming very shortly," but Plaintiffs' counsel requested that the Court permit supplemental briefing relating to "brand new" deposition testimony of five witnesses obtained in October 2025 during general discovery but long after the jurisdictional discovery period ended. (Docket Nos. 1218, 1220).  Plaintiffs' request only pertained to the "brand new" deposition testimony, and they did not mention *Fuld* during the November 6th telephone status conference.

  - The Court granted Plaintiffs' request and permitted the submission of the deposition testimony along with five pages of briefing, allowing the foreign Defendants to file responsive five-page briefs, and instructing counsel to "[u]se [their] five pages however [they] wish."  (Docket Nos. 1219; 1220 at 22-23).

  - Plaintiffs filed their supplemental brief and related materials on November 12, 2025, (Docket Nos. 1221-1224), followed by foreign Defendants' briefs and related materials on November 19, 2025. (Docket Nos. 1227-1232).  Plaintiffs' supplemental brief did not mention *Fuld*.

- On January 6, 2026, ***more than six months after*** the Supreme Court issued *Fuld*, Plaintiffs filed a 2-page Notice of Supplemental Authority alerting the Court, for the first time, that they contend *Fuld* is applicable here and baldly asserting that the Court "should summarily deny the pending 12(b)(2) motions." (Docket No. 1234 at 2).

Plaintiffs had ample opportunity to assert their *Fuld* argument following issuance of the decision in June 2025, yet opted to wait six months to do so, instead pursuing other avenues of supplemental briefing.  The Court ultimately issued its 43-page January 2026 Opinion in which it considered Plaintiffs' numerous legal arguments and analyzed the parties' extensive evidentiary

record in view of the legal standards Plaintiffs had long-advanced. The Court also considered *Fuld* and its effect on that analysis – though, without the benefit of any briefing on this important issue from Plaintiffs. Plaintiffs now contend the legal standards it steadfastly advanced all along are incorrect and that the Court committed a clear error of law by applying them.

In this Court's estimation, Plaintiffs lack good cause to seek reconsideration in light of the sequence of events detailed above. Plaintiffs waited for more than six months to advocate that *Fuld* changed the law and necessitated the application of a different legal standard for reviewing the evidentiary record here. All along, Plaintiffs continued advancing a legal standard that they now claim has been erroneous since June 20, 2025, yet they never sought leave to submit supplemental briefs arguing that a new legal standard controls the analysis. Simply put, Plaintiffs' *Fuld* argument could have, and most certainly should have, been raised earlier. Even so, there was no change in the law between the time this Court issued the January 2026 Opinion under seal on January 8, 2026, and when Plaintiffs filed their Motion for Reconsideration on January 15, 2026. Under these circumstances, not only do Plaintiffs lack good cause to seek reconsideration, but they also very well may have invited the purported error they now contend was made and thus risk implicating the invited error doctrine. *See, e.g.*, *Lesende v. Borrero*, 752 F.3d 324, 337 (3d Cir. 2014) ("The doctrine of 'invited error' refers to '[a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the erroneous ruling.'") (quoting *Lima v. Newark Police Dep't*, 658 F.3d 324, 333 n.2 (3d Cir. 2011) (further quoting Black's Law Dictionary 622 (9th ed. 2009)).

Notwithstanding the timeline of events leading to this point, the Court is mindful of Plaintiffs' significant efforts to have this Court exercise personal jurisdiction over Covestro AG and Wanhua China in pursuit of their antitrust claims alleged in this multidistrict litigation. The

parties have engaged in extensive jurisdictional discovery pertaining to Covestro AG and Wanhua China, while also undertaking substantial merits discovery, some of which traversed into international territory.  Clarity and finality on this issue also will help resolve ongoing disagreements pertaining to the Court's forthcoming case management order and Plaintiffs' stated reservation to seek an extension of discovery or reopen it should foreign Defendants be restored to the case.  Consequently, under these unique circumstances, the Court will exercise its discretion to reconsider the January 2026 Opinion to ensure no manifest injustice has occurred.  *Qazizadeh*, 214 F. Supp. 3d at 295. In doing so, the Court also clarifies and elaborates upon certain aspects of its decision as expressed in the January 2026 Opinion.

### III.    DISCUSSION

#### A.    Plaintiffs Fail to Establish a Clear Error of Law.

Plaintiffs contend that the Court committed a clear error of law by dismissing Covestro AG and Wanhua China for lack of personal jurisdiction.  A clear error is "plain and indisputable" and "amounts to a complete disregard of the controlling law[.]"  *In re Titus*, 479 B.R. 362, 368 (Bankr. W.D. Pa. 2012) (quoting *In re Oak Park Calabasas Condo. Ass'n*, 302 B.R. 682, 683 (Bankr. C.D. Cal. 2003)).  A clear error must be "direct, obvious, [or] observable" and "one that is of at least some importance to the larger proceedings." *In re Energy Future Holdings Corp.*, 904 F.3d 298, 312 (3d Cir. 2018).  Here, the crux of Plaintiffs' argument for reconsideration is that the Court misapplied controlling legal precedent, post-*Fuld*, by requiring some showing of minimum contacts and purposeful availment with the United States to exercise personal jurisdiction over the foreign Defendants within constitutional limits.  More specifically, Plaintiffs contend that the

Court erroneously applied the Fourteenth Amendment "minimum contacts" test rather than some yet-to-be-defined more flexible jurisdictional inquiry pursuant to the Fifth Amendment.[3]

Contrary to Plaintiffs' contention, the Court did not commit a clear error of law. It was impossible for the Court to "completely disregard" controlling law because there is no Supreme Court or Third Circuit authority applying *Fuld* to foreign parties sued pursuant to federal antitrust statutes. As the Court previously explained, *Fuld* directs courts to evaluate personal jurisdiction in accord with the jurisdiction-granting federal statute at issue, and the Third Circuit long ago held that Section 12 of the Clayton Act is essentially a federal long-arm statute[4] and is as broad as the limits of due process under the Fifth Amendment. *In re Auto. Refinishing*, 358 F.3d at 299

---

[3]    Plaintiffs also contend that the Court misread Section 12 of the Clayton Act, 15 U.S.C. § 22, in a manner contrary to Third Circuit precedent. As noted in the Court's January 2026 Opinion, the provision on service of process of foreign corporations found in the second clause of Section 12 ("all process in such cases may be served . . . wherever it may be found") is independent of, and does not require satisfaction of, the specific venue provision found in the first clause of Section 12 ("Any . . . action . . . under the antitrust laws . . . may be brought . . . in any district wherein it may be found or transacts business"). *Diisocyanates*, 2026 WL 233978, at *2. The Court now clarifies that Section 12 of the Clayton Act itself does not require that a foreign defendant be found *in the United States* to be served in an antitrust case because this statutory provision authorizes service of process "wherever . . found" which has been interpreted to mean "nationwide, indeed worldwide." *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 293 (3d Cir. 2004). Notably, the Supreme Court adopted Fed. R. Civ. P. 4(k)(2) in 1993 pursuant to the Rules Enabling Act, 28 U.S.C. §§ 2071-2077, to operate as a federal long-arm statute and "provides that if (1) the plaintiff's claim arises under federal law, (2) the defendant is 'not subject to jurisdiction in any state's courts of general jurisdiction,' and (3) 'exercising jurisdiction is consistent with the United States Constitution and laws,' then serving a summons establishes personal jurisdiction over that defendant in any federal court." *King v. Bon Charge*, No. 25-cv-00105-SB, 2025 WL 3764039, at *2 (D. Del. Dec. 30, 2025) (quoting Fed. R. Civ. P. 4(k)(2)). Here, Plaintiffs antitrust claim arises under federal law, thereby establishing the first prong. The parties did not expressly address whether Covestro AG and Wanhua China are subject to jurisdiction in any state court of general jurisdiction, but these foreign Defendants impliedly assert that they could not, so the Court assumes this second prong has also been satisfied. *See id.* at *3. With the first two prongs uncontested, the sole remaining prong of Rule 4(k)(2) is whether exercising jurisdiction over these foreign Defendants would be "consistent with the United States Constitution and laws." Section 12 of the Clayton Act permits service upon an antitrust defendant "wherever . . . found," thereby leaving the question of whether exercising personal jurisdiction over such a foreign defendant is "consistent with the United States Constitution" which for present purposes means the Due Process Clause of the Fifth Amendment. To the extent this Court's January 2026 Opinion gave an impression that Section 12 of the Clayton Act itself requires being "found" in the United States for the purpose of service of process and its attendant jurisdictional consequence, that was not the Court's intent and the Court should have more clearly stated that evaluating the foreign Defendants' contacts with the United States remains necessary, not to satisfy Section 12 of the Clayton Act, but to ensure that exercising personal jurisdiction over them passes constitutional muster. To be clear, the Due Process Clause of the Fifth Amendment was the sole basis and measure for the Court's determination.

[4]    *See* note 3, *supra*. *See also* Fed. R. Civ. P. 4(k)(2).

(applying constitutional limits pre-*Fuld* commensurate with the Fourteenth Amendment). *Fuld* expressly recognizes that the Fifth Amendment "implicitly limit[s] the jurisdictional authority of courts" but "decline[s] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment. Rather, the Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Fuld*, 606 U.S. at 16.

While the Supreme Court in *Fuld* "upset [the] assumption" that the Fifth Amendment requires the same minimum contacts with the United States as the Fourteenth Amendment has required with a state, *King*, 2025 WL 3764039, at *3-4 (citing *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 239 (5th Cir. 2022)), the Supreme Court nonetheless declined to "delineate the outer bounds of the Federal Government's power, consistent with due process, to hale foreign defendants into U.S. courts." *Fuld*, 606 U.S. at 18. Such "commendable restraint" left a critical issue for lower courts (like this one) to decide, *King*, 2025 WL 3764039, at *4 (quoting *Axalta Coating Sys. LLC v. FAA*, 144 F.4th 467, 482 (3d Cir. 2025) (Bibas, J. concurring)), that is, defining a more flexible jurisdictional inquiry that must be undertaken before a court exercises personal jurisdiction over a foreign defendant. Plaintiffs' assertion that this Court failed to apply a standard that has yet to be established by the Third Circuit Court of Appeals or the Supreme Court can hardly qualify as a clear error of law. Indeed, the Court's January 2026 Opinion addressed *Fuld* and expressly determined that Plaintiffs failed to establish that the foreign Defendants had sufficient minimum contacts with the United States or that they availed themselves of American law or otherwise reasonably could anticipate being involved in litigation in the United States, "even if the measure for doing so is a more flexible inquiry than how the Due Process Clause of the Fifth Amendment had been understood pre-*Fuld*." *Diisocyanates*, 2026 WL 233978, at *20.

As discussed below, the Court's analysis of the evidentiary record contained in the January 2026 Opinion comports with the more "flexible inquiry" *Fuld* calls for.

**B.      Reconsideration is not Warranted Simply Because Plaintiffs Disagree With the Result of the More Flexible Jurisdictional Inquiry Applied by this Court.**

Absent an established controlling standard, this Court found persuasive and applied a sister district court's "cautious approach" which relied on pre-*Fuld* case law as part of the overall constitutional analysis.  *See King*, 2025 WL 3764039, at *4.  In doing so, this Court addressed Plaintiffs' multitude of arguments premised on such pre-*Fuld* case law and determined that specific personal jurisdiction does not lie under the traditional test, the *Calder* "effects test," or otherwise by imputation pursuant to alter ego, agency, and co-conspirator theories.  The Court's detailed analysis as to each of Plaintiffs' jurisdictional theories as applied to the evidentiary record is incorporated herein.  *See Diisocyanates*, 2026 WL 233978, at *7-19.  Crucially, this Court also expressly applied a more flexible inquiry as *Fuld* demands and determined that the foreign Defendants' relationships with the United States were insufficient even if measured by that "more flexible inquiry."  *See id.* at *4, *20.

The Court's application of the pre-*Fuld* case law that Plaintiffs consistently advanced establishes that it would not have had a basis to exercise specific personal jurisdiction over Covestro AG and Wanhua China pursuant to constitutional limits imposed by the Fourteenth Amendment.  But *Fuld* instructs that the Fifth Amendment "necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Fuld*, 606 U.S. at 16.  Had the Court concluded that exercising such personal jurisdiction would be constitutional under the less "flexible" Fourteenth Amendment standard that *Fuld* rejects, it would remain constitutional post-*Fuld* under the Fifth Amendment's "more flexible jurisdictional inquiry" by force of logic.  *See King*, 2025 WL 3764039, at *4.  But, alas, this Court concluded

otherwise and now finds itself discerning whether exercising personal jurisdiction over Covestro

AG and Wanhua China is inside or outside the "outer bounds of the Federal Government's power,

consistent with due process, to hale foreign defendants into U.S. courts." *Fuld*, 606 U.S. at 18.

While the Supreme Court exercised judicial restraint by declining to delineate where those

outer bounds may be found, *Fuld*, 606 U.S. at 18, and left scant clues on how to find the

jurisdictional perimeter, *Fuld* itself does suggest a few navigational guideposts.  First, *Fuld*

reaffirms the important maxim that:

> [The] Constitution confers upon the Federal Government [and the corollary
> authority of the federal courts]– and it alone – both nationwide and extraterritorial
> authority. While "the limitations of the Constitution are barriers bordering the
> States and preventing them from transcending the limits of their authority," there is
> no equivalent "ground for constructing an imaginary constitutional barrier around
> the exterior confines of the United States for the purpose of shutting that
> government off from the exertion of powers which inherently belong to it by virtue
> of its sovereignty."

*Fuld*, 606 U.S. at 15 (quoting *United States v. Bennett*, 232 U.S. 299, 306 (1914)).  Second, *Fuld*

still suggests the necessity of a judicial evaluation of a foreign party's contacts with the United

States. In an early effort to apply *Fuld*, Judge Bibas notes that "even though the Fifth Amendment

does not import the minimum-contacts standard wholesale, the breadth of asserted jurisdiction and

the extent of the defendant's contacts with the United States may still be relevant to the

constitutionality of asserting jurisdiction in a particular case." *King*, 2025 WL 3764039, at *4. In

this Court's estimation, the foregoing considerations from *Fuld* "[do] not alter the view that some

showing of minimum contacts and purposeful availment with the United States remains necessary

to establish personal jurisdiction in federal antitrust cases." *Diisocyanates*, 2026 WL 233978, at

*4.

1.    **The Breadth of Asserted Jurisdiction Frames the Inquiry into the Foreign Defendants' Relationships with the United States.**

While not delineating the constitutional outer bounds for the purpose of discerning personal jurisdiction pursuant to the Due Process Clause of the Fifth Amendment, *Fuld* acknowledges that such a boundary does exist by refusing to adopt a "maximalist theory of federal jurisdiction," which would "impose[] *no* territorial limits on personal jurisdiction." *Fuld*, 606 U.S. at 18 (emphasis in original). Indeed, "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 115 (1987) (quoting *United States v. First Nat'l City Bank*, 379 U.S. 378, 404 (1965) (Harlan, J., dissenting)). And, while *Fuld* makes clear "that the Due Process Clause of the Fifth Amendment does not incorporate the Fourteenth Amendment minimum contacts standard, the prospect remains that the Fifth Amendment might entail a similar 'inquiry into the reasonableness of the assertion of jurisdiction in a particular case.' " *Fuld*, 606 U.S. at 23 (quoting *Asahi*, 480 U.S. at 115).

The *Fuld* Court observed that personal jurisdiction was tied to "conduct closely related to the United States that implicates important foreign policy concerns" and which "predicates jurisdiction on . . . conduct within the United States," thus "[tying] jurisdiction to specific and narrow conduct that directly implicates issues of sensitive and ongoing concern in [defendants'] relationships with the United States." *Fuld*, 606 U.S. at 18, 21. The Supreme Court further noted that it is "wary to reach further and bless more attenuated assertions of jurisdiction when the cases before [it] do not require doing so." *Id*. at 18.

In regard to Congress' power to extend the reach of federal antitrust statues extraterritorially, "[t]here is no doubt . . . that Congress possesses . . . broad power under Article I, § 8, cl. 3, '[t]o regulate Commerce with foreign Nations,' and [the Supreme] Court has repeatedly

upheld its power to make laws applicable to persons or activities beyond our territorial boundaries where United States interests are affected." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 813-14 (1993) (Scalia, J., dissenting). This power, sometimes referred to as "legislative jurisdiction" or "jurisdiction to prescribe," is relevant to determining the extraterritorial reach of a statute as a matter of substantive law. *Id*. at 813; *see also F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 165 (2004) ("[A]pplication of our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress *domestic* antitrust injury that foreign anticompetitive conduct has caused.") (emphasis in original). However, this legislative power to enact laws prescribing extraterritorial conduct "has nothing to do with the jurisdiction of the courts" which is sometimes referred to as "jurisdiction to adjudicate." *Hartford Fire*, 509 U.S. at 813. Yet, the present jurisdictional conundrum is concerned with a different form of adjudicative jurisdiction, one not derived from Article III of the Constitution and enabling statutes providing for the courts' subject matter jurisdiction, but instead the courts' ability to exercise personal jurisdiction over a party pursuant to the Due Process Clause, not as a matter of sovereignty, but as a matter of individual liberty which necessitates that the maintenance of the suit not offend traditional notions of fair play and substantial justice. *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702-03 (1982). Notwithstanding precedents that instruct lower courts not to consider the so-called legislative jurisdiction of a federal law as a limitation on a court's jurisdiction, those authorities are concerned with improper consideration of legislative jurisdiction on the application of the courts' subject matter jurisdiction pursuant to Article III of the Constitution absent Congress clearly stating that it is doing so. *See Animal Sci.*

*Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 468-69 and n. 7 (3d Cir. 2011) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515-16 (2006)).

Notably, the Supreme Court in *Fuld* considered the legislative jurisdiction of the Antiterrorism Act of 1990 ("ATA") and the Promoting Security and Justice for Victims of Terrorism Act ("PSJVTA") when deciding whether the exercise of *personal* jurisdiction over the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA") was constitutional under the Fifth Amendment, specifically in regard to the cases before it, noting that the PSJVTA "ties federal jurisdiction to conduct closely related to the United States that implicates important foreign policy concerns." *Fuld*, 606 U.S. at 18. The Supreme Court discussed at length the rationale underlying the PSJVTA, stating that it "reflects the political branches' balanced judgment of competing concerns over sensitive and weighty interests of national security and foreign affairs and fairness to these particular defendants – entities with which the Federal Government has complex, long-standing relationships in which concerns over terrorism have long been at the fore[,]" and further noting that "Congress and the President made a considered judgment to subject the PLO and PA to liability in U.S. courts as part of a comprehensive legal response to halt, deter, and disrupt acts of international terrorism that threaten the life and limb of American citizens." *Id*. at 19-20 (internal quotation marks and citations omitted). The Supreme Court determined that the PSJVTA is "suitably limited" to its ends, applies only to ATA cases, a narrow category of claims that provide civil remedies only for Americans injured by acts of international terrorism, and ultimately concluded that "[i]t is permissible for the Federal Government to craft a narrow jurisdictional provision that ensures, as part of a broader foreign policy agenda, that Americans injured or killed by acts of terror have an adequate forum in which to vindicate their right to ATA compensation." *Id*. at 20-21. The Supreme Court also determined

that both the PSJVTA's jurisdiction triggering predicates (referred to by the Supreme Court as the "payments prong" and the "activities prong") are similarly "narrow," observing that the activities prong predicates jurisdiction on conduct within the United States. *Id.* at 21.

As noted above, *Fuld* considered, in the cases before it, that jurisdiction under the PSJVTA was tied to "conduct closely related to the United States that implicates important foreign policy concerns" and which "predicates jurisdiction on . . . conduct within the United States," thus "[tying] jurisdiction to specific and narrow conduct that directly implicates issues of sensitive and ongoing concern in [defendants'] relationship with the United States." *Fuld*, 606 U.S. at 18, 21. Then, when undertaking an "inquiry into the reasonableness of the assertion of jurisdiction" under the Fifth Amendment, the Supreme Court evaluated these considerations to conclude that there is a "close connection between the PSJVTA's predicate conduct and the United States" and that "the forum sovereign has a substantial interest in adjudicating the dispute." *Id*. at 23, 24 (noting further that the "Federal Government has an exceedingly compelling interest, as part of its comprehensive efforts to deter international terrorism, in providing a forum for American victims to hold the perpetrators of such acts accountable."). The Supreme Court ultimately concluded that the PSJVTA "ties the assertion of jurisdiction to predicate conduct that in and of itself bears a meaningful relationship to the United States," finding the exercise of personal jurisdiction over the PLO and PA to be constitutionally permissible. *Fuld*, 606 U.S. at 23.

Just as the PSJVTA "ties the assertion of jurisdiction to predicate conduct that in and of itself bears a meaningful relationship to the United States," *Fuld*, 606 U.S. at 23, so too, Congress has done with its extraterritorial reach of the federal antitrust laws.  Here, Plaintiffs allege that the Defendants (and certain named and un-named co-conspirators) conspired to fix prices of MDI and TDI by collectively reducing the supply of these products through anticompetitive conduct in

violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.  (Docket No. 378).  The Sherman Act, as supplemented by the Clayton Act, is derived from Congress' legislative authority pursuant to the Commerce Clause of the U.S. Constitution, Art. III, §8, cl. 3, and it prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  Courts have long-held that "the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States."  *Hartford Fire*, 509 U.S. at 796 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 582, n.6 (1986); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 444 (2d Cir. 1945)).

In 1982, Congress enacted the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a, which expressly addresses the issue of extraterritorial application of the Sherman Act. The FTAIA excludes from the Sherman Act's reach "conduct involving trade or commerce (other than import trade or import commerce) with foreign nations" unless the conduct "has a direct, substantial, and reasonably foreseeable effect" on domestic commerce.  15 U.S.C. § 6a(1). Therefore, commercial activities taking place abroad are outside the scope of the Sherman Act and thus not of consequence in determining violations of the Sherman Act if the conduct "adversely affect[s] only foreign markets."  *Hoffman-La Roche*, 542 U.S. at 161.  Accordingly, such foreign conduct only falls within the purview of the Sherman Act if it has "*a direct, substantial, and reasonably foreseeable effect*" on domestic commerce. 15 U.S.C. § 6a(1) (emphasis added). The FTAIA reflects a legislative limitation on Congress' own power to regulate commerce pursuant to the Commerce Clause, *i.e.*, self-limiting its so-called legislative jurisdiction, rather than imposing a limit on the Judiciary's Article III subject matter jurisdiction, stating: "the additional limitations imposed by the FTAIA may function to define the outer reach of congressional power over foreign

behavior by requiring a nexus between the alleged anticompetitive behavior and the United States." *Animal Sci. Prods.*, 654 F.3d at 468, n. 7.

Based upon the foregoing, it is clear that the Sherman Act, as it's been long-interpreted, and as clarified by the FTAIA, "ties the assertion of [legislative] jurisdiction to predicate conduct that in and of itself bears a meaningful relationship to the United States," *Fuld*, 606 U.S. at 23. In *Fuld*, the Supreme Court considered that the applicable legislative jurisdiction being asserted by Congress through the ATA and PSJVTA was tied to "specific and narrow conduct that directly implicates issues of sensitive and ongoing concern in [the PLO's and PA's] relationships with the United States." *Fuld*, 606 U.S. at 21. In doing so, however, the Supreme Court explained that "[f]ar from haling just any run-of-the-mill private defendant into American courts, the PSJVTA represents but one targeted aspect of a multifaceted foreign policy toward these two *sui generis* foreign entities,[5] both of which exercise governmental functions in a geopolitically sensitive region and have decades of 'meaningful 'contacts, ties, [and] relations' with the United States." *Id.* at 22

---

[5]      Unlike Covestro AG and Wanhua China, the PLO and the PA are expressly identified, by name, in the federal statute at issue in *Fuld*, who, as the Supreme Court explains, are:

> [E]ntities responsible for carrying out, respectively, foreign and domestic governmental functions for parts of the West Bank and Gaza Strip. . . . Although the United States does not recognize [them] as sovereign, other nations do, and [they] maintain consular facilities and diplomatic missions around the world. The PLO also maintains an office in New York City as part of its mission to the United Nations, in which the PLO participates as a "Permanent Observer."

> Motivated by concerns over [their] support for overseas terrorism, Congress has for decades restricted their activities on U.S. soil. For example, in the Anti-Terrorism Act of 1987, 101 Stat. 1406, 22 U.S.C. § 5201 et seq., Congress found that the PLO and its constituent groups "ha[d] taken credit for, and been implicated in, the murders of dozens of American citizens abroad." § 5201(a)(4). Congress accordingly limited the PLO's operations in the United States. §§ 5201(b), 5202. Congress has similarly restricted the PA's ability to conduct activities on U.S. soil. *See* Palestinian Anti-Terrorism Act of 2006, § 7, 120 Stat. 3324, 22 U.S.C. § 2378b. It has also placed limits on the distribution of foreign aid and other assistance to [them]. *See* Taylor Force Act, § 1004(a), 132 Stat. 1144, 22 U.S.C. § 2378c–1(a).

*Fuld*, 606 U.S. at 6.

(citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (further quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).  Importantly, the Supreme Court emphasized that it is "wary to reach further and bless more attenuated assertions of jurisdiction when the cases before us do not require doing so."  *Id*. at 18.

> **2.** **It Would Be Unreasonable to Exercise Personal Jurisdiction Over These Foreign Defendants Who Lack Meaningful Relationships with the United States.**

In the January 2026 Opinion, as incorporated here, the Court extensively examined the evidentiary record to conclude, consistent with the "more flexible inquiry" that *Fuld* requires, that Covestro AG and Wanhua China lack meaningful relationships or other contacts with the United States which involve anticompetitive predicate conduct tied to the legislative jurisdiction asserted by Congress through the Sherman Act as constrained by the FTAIA.  In the Court's estimation, this case presents a more attenuated assertion of jurisdiction that the Supreme Court would be wary to bless.

It is important to note, too, that the *Calder* effects test was the principal theory Plaintiffs pressed in advocating for the exercise of personal jurisdiction over the foreign Defendants. The Court applied that test to conclude that personal jurisdiction could not be exercised over either Covestro AG or Wanhua China.  *Diisocyanates*, 2026 WL 233978, at \*8-11.  Under the effects test, a court may exercise personal jurisdiction over "an intentional tortfeasor whose 'contacts with the forum . . . otherwise [do] not satisfy the requirements of due process' under the traditional test."  *Hasson v. Fullstory, Inc.*, 114 F.4th 181, 187 (3d Cir. 2024) (quoting *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265 (3d Cir. 1998) (explaining that, under the effects test, "the unique relations among the defendant, the forum, the intentional tort, and the plaintiff may under certain circumstances render the defendant's contacts with the forum – which otherwise would not satisfy

the requirements of due process – sufficient")). While the Third Circuit has indicated that the effects test and the traditional test "are cut from the same cloth," it has also observed that the effects test "may be more lenient in some respects and stricter in others, depending on the facts and claims at issue." *Id.* at 189. This description of the *Calder* effects test sounds strikingly similar to the "more flexible jurisdictional inquiry" *Fuld* contemplates.

The Court likewise considered Plaintiffs' arguments that it ought to exercise personal jurisdiction over Covestro AG and Wanhua China by imputing upon them the forum contacts of certain U.S.-based affiliates, also Defendants in this case, through alter ego, agency, and co-conspirator theories. After undertaking extensive analyses of the evidentiary record, this Court declined to exercise personal jurisdiction over Covestro AG and Wanhua China upon application of these theories, too. *See Diisocyanates*, 2026 WL 233978, at *11-19. Like the *Calder* effects test, these attenuated theories of personal jurisdiction seemingly also are more flexible. *See, e.g.*, *Rickman v. BMW of N. Am. LLC*, 538 F. Supp. 3d 429, 440 (D.N.J. 2021) ("[F]ederal due process does not square with the conspiracy-jurisdiction theory. Purposeful availment must be analyzed individually. . . ."); *Orient Plus Int'l Ltd. v. Baosheng Media Group Holdings Ltd.*, No. 1:24-cv-00744 (JLR), 2025 WL 3022826, at *5 and n. 4 (S.D.N.Y. Oct. 29, 2025) (stating that while the Second Circuit has questioned whether the co-conspirator theory of personal jurisdiction is consistent with the minimum-contacts test, it appears to be consistent with the "more expansive" sufficient-nexus test).

Plaintiffs suggest, now for the first time, that personal jurisdiction may be exercised pursuant to *Fuld* so long as there is a "close connection" between the predicate conduct at issue and the United States. Plaintiffs advance this new standard in its briefing in support of its Motion for Reconsideration, presented only after the Court determined it could not exercise personal

jurisdiction over Covestro AG and Wanhua China upon extensively evaluating and ultimately rejecting each of the theories Plaintiffs previously promoted for doing so.  Yet Plaintiffs serve up this newfound standard without adequately explaining what it actually means or how to apply it to the evidentiary record here. Even so, the Court will address Plaintiffs' newly proposed standard despite that they had more than ample opportunity to present it after the Supreme Court issued *Fuld* and long before this Court issued its decision.  *Kubini*, 304 F.R.D. at 211 ("[M]otions for reconsideration are not to be used as vehicles 'for addressing arguments that a party should have raised earlier' and likewise do not 'empower litigants . . . to raise their arguments, piece by piece.'").

Initially, the Court notes that Covestro AG's and Wanhua China's purported relationships with the United States are far more attenuated and thus meaningfully differentiated from the parties in *Fuld*.  Plaintiffs here contend that their proposed "close connection" standard has been met based upon a sweepingly generalized characterization of their antitrust claim that these foreign Defendants "engaged in a wide-ranging price-fixing conspiracy that had a direct, substantial, and reasonably foreseeable effect on U.S. commerce in the form of artificially increased MDI and TDI prices in the United States." (Docket No. 1241 at 9-10)  However, Plaintiffs fail to explain how the evidentiary record establishes that Covestro AG and Wanhua China have such a "close connection" to the United States, or that they otherwise satisfy any of those above-referenced formulations actually expressed in *Fuld*, such as predicate anticompetitive conduct bearing a "meaningful relationship to the United States," 606 U.S. at 23, or "specific and narrow conduct that directly implicates issues of sensitive concern in [defendants'] relationship with the United States," *Id.* at 21, or  "meaningful 'contacts, ties, [and] relations' with the United States."  *Id.* at 22. Nor do Plaintiffs explain how the foreign Defendants conduct is tied to FTAIA's standard that

it has "a direct, substantial, and reasonably foreseeable effect" on domestic commerce. 15 U.S.C.

§ 6a(1).  Notably, Plaintiffs limit their Motion for Reconsideration to an alleged clear error of law.

They do not contend that the Court made any errors of fact, so the Court's factual findings remain

undisturbed. As such, on reconsideration, Plaintiffs fail to show "evidence of specific facts set out

in the record" to satisfy their burden of establishing personal jurisdiction, even under their newly

advanced "close connection" standard.  *Joint Stock Soc. v. Heublein, Inc.*, 936 F. Supp. 177, 192

(D. Del. 1996).

As an alternative to their newfound "close connection" standard, Plaintiffs also seemingly

advocate for application of the "substantial nexus" test derived from federal criminal cases in the

Second and Third Circuits. (Docket No. 1241 at 10, n. 6).  Plaintiffs cite *Orient Plus*, 2025 WL

3022826, a civil securities fraud case, wherein the court similarly endeavored to evaluate the

constitutionality of exercising personal jurisdiction over foreign defendants pursuant to a more

flexible inquiry post-*Fuld* and thus borrowed from the Second Circuit's more expansive "sufficient

nexus" test, "which is employed in the criminal context to determine[] whether the extraterritorial

application of federal criminal law comport[s] with constitutional due process under the Fifth

Amendment." *Id.* at *5 (internal quotation marks and citation omitted).  As the *Orient Plus* court

explained, "[c]ourts have found a sufficient nexus to exist based upon factors such as the

defendant's citizenship or residency, the location of the acts allegedly giving rise to the suit and

whether those acts could be expected to or did produce an effect in the United States." *Id.* at *6

(internal quotation marks and citation omitted).  Under this test, the "ultimate question is whether

defendant's conduct is not so unrelated to American interests as to render their [being sued] in the

United States arbitrary or fundamentally unfair." *Id*. (internal quotation marks and citation

omitted).  Plaintiffs also cite *United States v. Usher*, No. 17 Cr. 19 (RMB), 2018 WL 2424555

(S.D.N.Y. May 4, 2018), in which the court applied this "sufficient nexus" test in a criminal matter alleging price fixing, requiring there to be a sufficient nexus between the defendant's conduct and the United States because of the effects such conduct had in this country. *Id.* at *8. Additionally, Plaintiffs cite *United States v. Martinez-Hidalgo*, 993 F.2d 1052 (3d Cir. 1993), a case finding no due process problem with a criminal prosecution for possession of cocaine on the high seas with intent to distribute, and conspiracy, in violation of the Maritime Drug Law Enforcement Act. Although the *Martinez-Hidalgo* court addressed the concept of a "domestic nexus," it declined to apply that standard because the case involved Congress' power to "define and punish Piracies and Felonies committed on the high seas, and Offenses against the Law of Nations" pursuant to U.S. Const. art. 1, §8, cl. 10. *Id.* at 1057. Regardless, the "sufficient nexus" test as described and applied in *Orient Plus* and *Usher* bears a resemblance to both the traditional "minimum contacts" test (*e.g.*, residency, location of acts) and the *Calder* effects test (*e.g.*, whether acts could be expected to or did produce an effect in the United States). These analyses were performed by the Court in the January 2026 Opinion, and they are incorporated here upon reconsideration. To repeat once again, the Court finds no such "sufficient nexus" or "meaningful relationship" exists between the foreign Defendants and the United States to support the exercise of personal jurisdiction over them in accordance with the Fifth Amendment.

The Court reiterates that the foreign Defendants lack a close connection, nexus, or meaningful relationship with the United States in ways reasonably tied to the legislative jurisdiction asserted by the Sherman Act and the FTAIA. Covestro AG is a German holding company which does not manufacture or sell MDI or TDI, or otherwise perform operational functions. Wanhua China does not manufacture or sell MDI or TDI in the United States. Any contacts the foreign Defendants have had with the United States are attenuated and fall well below

the threshold to satisfy the minimum contacts test that has long been applicable pursuant to the Due Process Clause of the Fourteenth Amendment (and until *Fuld*, pursuant to the Fifth Amendment). Their relationships with affiliates in the United States are similarly attenuated from the United States in that they do not exercise a greater than normal degree of control over their American subsidiaries, particularly over matters of pricing of MDI and TDI specific to the U.S. market, nor do they fail to adhere to corporate boundaries or disregard a separate corporate existence. Again, the evidentiary record does not establish that either Covestro AG or Wanhua China, either directly or by imputation, have a close connection or meaningful relationship with the United States in the context of the instant antitrust claims. Finally, and as noted above, the evidentiary record does not support a finding that either of these foreign Defendants expressly aimed predicate anticompetitive conduct at the United States such that the United States can be said to be the focal point of their purported anticompetitive activity to satisfy the more flexible *Calder* effects test. *See Hasson*, 114 F.4th at 187.

Finally, the Court addresses the reasonableness of asserting personal jurisdiction over Covestro AG and Wanhua China. *See Fuld*, 606 U.S. at 23-24 (citing *Asahi*, 480 U.S. at 115); *King*, 2025 WL 3764039, at *4. Indeed, the personal jurisdiction requirement recognizes and protects an individual liberty interest for it represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty. *Fuld* itself notes that "the principle that 'due process protects the individual's right to be subject only to lawful power' . . . [a]nd 'whether a judicial judgment is lawful depends on whether the sovereign has authority to render it.' " *Fuld*, 606 U.S. at 17 (quoting *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011)). Therefore, "the test for personal jurisdiction requires that 'the maintenance of the suit . . . not offend traditional notions of fair play and substantial justice.' " *Insurance Corp. of Ireland*, 456 U.S. at 702-03

(quoting *International Shoe.*, 326 U.S. at 316).    Exercising personal jurisdiction must be reasonable in a particular case, *Burger King*, 471 U.S. at 476, which turns on several factors, including the interests of the forum, the burden on the defendant, and the plaintiff's interest in obtaining relief.  *King*, 2025 WL 3764039, at * 4 (citing *Fuld*, 606 U.S. at 23).

First, as discussed above, the United States has a constitutional and statutorily authorized interest in regulating commerce and prohibiting price fixing pursuant to the Commerce Clause and the Sherman Act.  However, the scope of that interest is not unbounded.  Congress also limited its own legislative jurisdiction in this regard when it enacted the FTAIA, thereby restricting its sovereign reach extraterritorially only to when the predicate anticompetitive conduct "has a direct, substantial, and reasonably foreseeable effect" on the relevant market in the United States.  For largely the same reasons expressed above, this Court concludes there is not a close connection nor meaningful relationships between the foreign Defendants and the United States tied to predicate anticompetitive conduct prohibited by the Sherman Act and the FTAIA.  Consequently, the forum sovereign – the United States – does not have a substantial intertest in adjudicating this dispute, at least in relation to Covestro AG and Wanhua China, given their attenuated contacts and relationships with the United States.  *See Fuld*, 606 U.S. at 24.

Next, the Court finds that the burden of exercising personal jurisdiction over the foreign Defendants is palpable.  First, being hailed into a foreign court to answer for purported conduct beyond the sovereign's defined statutory reach burdens traditional notions of fair play and substantial justice. Second, while both foreign Defendants are sophisticated corporate organizations, the evidence adduced after extensive jurisdictional discovery does not establish "substantial operations in the United States [who] for years . . . marketed, sold, and profited from the sale of diisocyanate products, and engaged in transactions with other Defendants, in the United

States," despite Plaintiffs' contention to the contrary. (*See* Docket No. 1241 at 11). Moreover, these assertions also contradict this Court's factual findings, *see Diisocyanates*, 2026 WL 233978, at *7-19, which, again, Plaintiffs have not challenged as clearly erroneous in their Motion for Reconsideration. Third, relative to Wanhua China, the record reflects that it had difficulties producing documents responsive to Plaintiffs' jurisdictional discovery requests because certain laws of the People's Republic of China require that an authorized Chinese government official review and approve all documents before being produced outside China's sovereign boundaries, with severe penalties for violations. (*See* Docket Nos. 697-700, 786, 858 at 3-6). Not only would such foreign legal obligations burden Wanhua China in any ongoing efforts to participate fully in good faith in any remaining merits discovery and other aspects of this litigation, but such burdens would befall all the parties and the Court's case schedule.[6]

Finally, Plaintiffs' interests in obtaining relief are not impacted nearly as much as they contend. Plaintiffs assert antitrust claims against a plethora of manufacturers and sellers of MDI and TDI in this multidistrict litigation, alleging that these Defendants and certain named and unnamed co-conspirators conspired to fix prices for MDI and TDI products by collectively limiting supply of those products. Importantly, among the named Defendants in this case are Wanhua China's U.S. subsidiary, Wanhua Chemical (America) Co., Ltd. ("WCA"), and Covestro AG's U.S. subsidiary, Covestro LLC. While Plaintiffs certainly have a keen interest in obtaining relief from those manufacturers and sellers whose purported anticompetitive conduct affected the U.S.

---

[6]    In reaching this conclusion concerning ostensible legal and practical burdens placed on a foreign party litigant by that party's home nation's laws, the Court need not address at this juncture the underlying legal issues regarding Wanhua China's duties to comply with China's laws, such that the Chinese government may impede or prevent it from abiding by the laws of the United States and the rules of its courts, notably those procedural rules pertaining to all party-litigants' duties to fulfill its discovery obligations. However, those issues likely would need to be adjudicated if this Court were to exercise personal jurisdiction over Wanhua China, thereby increasing litigation costs and delaying the ultimate disposition for all parties.

market thereby causing them injury by having to pay unlawfully inflated prices for MDI and TDI, that interest only extends to domestic entities and those foreign entities who manufactured, sold, or otherwise engaged in anticompetitive conduct having a direct, substantial, and reasonably foreseeable effect on the U.S. market for MDI and TDI.  Plaintiffs remain able to pursue such claims against the foreign Defendants' domestic affiliates, as well as other foreign Defendants who have not contested the Court's exercise of personal jurisdiction over them, all of whom remain parties in this case. Plaintiffs have been able to obtain merits discovery from all remaining parties, including the domestic subsidiaries of Covestro AG and Wanhua China, pertaining to information about overseas activities reasonably bearing upon imports or exports of MDI and TDI to or from the United States. *See In re Diisocyanates Antitrust Litig.*, No. MC 18-1001, 2023 WL 424186 (W.D. Pa. Jan. 26, 2023).  Moreover, Plaintiffs own pleadings reflect the fact that they have not sued all co-conspirators who they contend participated in this global-scale price fixing conspiracy. (Docket No. 378, ¶ 3) (alleging a conspiracy "among the Defendants and certain named and unnamed co-conspirators").  Therefore, Plaintiffs' interest in obtaining relief is not meaningfully hindered by the Court's decision that it is unable to exercise personal jurisdiction over two foreign parent corporations which have attenuated relationships with the United States, particularly given that their American subsidiaries remain in the case.

### IV.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion for Reconsideration, (Docket No. 1240), is granted to the extent that the Court has reconsidered the January 2026 Opinion.  Plaintiffs' Motion is denied to the extent that the Court reaffirms its ruling dismissing Plaintiffs' claims against

Covestro AG and Wanhua China with prejudice and terminating Covestro AG and Wanhua China

as parties in this litigation as set forth in the January 2026 Opinion.[7]

      An appropriate Order follows.

_s/ W. Scott Hardy_
W. Scott Hardy

Date:  <u>February 25, 2026</u>             United States District Judge

cc/ecf:  All counsel of record

---

[7]     In reaching this conclusion, the rationale set forth herein governs to the extent any conflict exists between this Memorandum Opinion and the January 2026 Opinion.